**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**

| | |
|---|---|
| ERIC OLLILA, Individually and on Behalf of All Others Similarly Situated, | CIVIL ACTION NO.: 3:17-CV-00109 |
| Plaintiff, | |
| | JURY TRIAL DEMANDED |
| vs. | |
| BABCOCK & WILCOX ENTERPRISES, INC., E. JAMES FERLAND and JENNY L. APKER, | |
| Defendants | |

**SECOND AMENDED CONSOLIDATED COMPLAINT**
**FOR VIOLATIONS OF FEDERAL SECURITIES LAWS**

# TABLE OF CONTENTS

I. PRELIMINARY STATEMENT ................................................................. 1

II. JURISDICTION AND VENUE ............................................................. 12

III. PARTIES ................................................................................................ 13

    A. Lead Plaintiff ............................................................................... 13

    B. Named Plaintiff ............................................................................ 13

    C. Defendants ................................................................................... 13

IV. B&W WAS EXPERIENCING SIGNIFICANT, UNDISCLOSED PROBLEMS IN ITS RENEWABLE BUSINESS DURING THE CLASS PERIOD.......................... 15

    A. B&W Began Rapidly Growing Its Renewable Business Through Its European Subsidiary, B&W Volund, in 2014 and 2015, and Touted this Growth As Key to the Company's Future Value. .................................. 15

    B. At the Same Time B&W Was Initiating A Number Of New Projects in Its Power Business, It Also Embarked On A Cost-Cutting Initiative. ....................... 22

    C. Defendants Were Fully Informed About Business Developments and Project Scheduling at B&W Volund Throughout the Class Period. ..................... 24

    D. Defendants Were Aware of Significant Engineering and Other Problems With Multiple Major Renewable Projects at the Start of the Class Period.......... 27

    E. Defendants Knew that Their Efforts to Fix the Engineering Design Flaws at Copenhill Would Negatively Impact the Progress and Profitability of Several Other Renewable Projects. ....................................................... 32

    F. Defendants Were Aware of Significant Problems at Other Renewable Projects Throughout the Class Period. ................................................. 34

        1. Norfors Plant in Denmark ....................................................... 34

        2. Waste to Energy and Biomass Plants in the U.K. ....................... 35

            (a) Dunbar ................................................................... 39

            (b) Margam .................................................................. 40

            (c) Templeborough ....................................................... 42

            (d) Teesside ................................................................. 43

V.    DEFENDANTS MADE MATERIALLY FALSE AND MISLEADING
      STATEMENTS AND OMISSIONS CONCERNING THE PROBLEMS IN
      B&W'S RENEWABLE DIVISION AND MISREPRESENTED THE
      COMPANY'S FINANCIAL PROSPECTS AND INTERNAL CONTROLS................ 44

      A.    June 17, 2015 Analyst/Investor Day Statements ................................................. 44

      B.    June 30, 2015 Final Prospectus.......................................................................... 46

      C.    August 4, 2015 Press Release and 10-Q .............................................................. 47

      D.    August 5, 2015 Earnings Call Statements........................................................... 49

      E.    September 21, 2015 Statements........................................................................... 50

      F.    November 3, 2015 Form 10-Q ............................................................................. 52

      G.    November 4, 2015 Earnings Conference Call ...................................................... 52

      H.    February 25, 2016 Press Release ......................................................................... 55

      I.    February 25, 2016 Form 10-K ............................................................................. 56

      J.    February 25, 2016 Earnings Conference Call...................................................... 57

      K.    May 10, 2016 Press Release and 10-Q ................................................................ 59

      L.    May 11, 2016 Earnings Conference Call ............................................................. 61

VI.   THE TRUTH IS GRADUALLY REVEALED, BUT DEFENDANTS
      CONTINUED TO CONCEAL THE TRUE EXTENT OF THE FRAUD UNTIL
      AUGUST 2017 ................................................................................................................ 63

      A.    June 28, 2016 Press Release and Investor Call.................................................... 63

      B.    August 9-10, 2016 Financial Results and Earnings Call ...................................... 68

      C.    November 2-3, 2016 Financial Results and Earnings Call ................................... 70

      D.    February 28 - March 1, 2017 Financial Results and Earnings Call ...................... 74

      E.    May 9-10, 2017 Financial Results and Earnings Call........................................... 81

      F.    August 9, 2017 Financial Results and Earnings Call............................................ 84

VII.  ADDITIONAL EVIDENCE OF SCIENTER .................................................................. 90

      A.    Growth in the Renewable Segment (B&W Volund) Was Critical to the
            Company's Success After the Spin-Off.................................................................. 91

B.  Defendants and Former Employees Confirm that Senior B&W Management Received Frequent and Contemporaneous Reports of the Activities and Problems at all Ongoing Projects in the Renewable Segment.................................................................................. 95

C.  B&W's Deal with Lightship to Obtain $125 Million in Financing at an Effective Interest Rate of Over 30% Evidences Defendants' Knowledge of the Magnitude of Financial Problems and Intent to Deceive.............................. 98

VIII.  LOSS CAUSATION/ECONOMIC LOSS ....................................................... 99

IX.  CLASS ACTION ALLEGATIONS ............................................................... 102

X.  PRESUMPTION OF RELIANCE .................................................................. 104

XI.  INAPPLICABILITY OF STATUTORY SAFE HARBOR ............................... 105

XII.  CLAIMS FOR RELIEF ................................................................................ 106

COUNT I For Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants................................................................................. 106

COUNT II For Violation of Section 20(a) of the Exchange Act  Against the Individual Defendants................................................................................. 107

XIII.  PRAYER FOR RELIEF ............................................................................... 109

XIV.  JURY DEMAND ......................................................................................... 109

1.     Lead Plaintiff Arkansas Teacher Retirement System ("Lead Plaintiff" or "ATRS"), and additional named plaintiff St. Paul Electrical Construction Pension Plan, St. Paul Electrical Construction Workers Supplemental Pension Plan, and St. Paul Electrical Workers Retirement Medical Funding Plan ("St. Paul Electrical," together with ATRS, "Plaintiffs"), by and through their undersigned counsel, on behalf of themselves and all others similarly situated, allege the following based upon the investigation by Plaintiffs' counsel, except as to allegations specifically pertaining to Plaintiffs, which are based on personal knowledge.  The investigation by counsel included, among other things:  (i) review and analysis of the public filings with the U.S. Securities and Exchange Commission ("SEC") by Babcock & Wilcox Enterprises, Inc. ("B&W" or the "Company"); (ii) review and analysis of corporate press releases, disclosures and media reports issued and disseminated by the Company; (iii) review of other publicly available information concerning B&W, including transcripts of public investor presentations and conference calls; (iv) consultation with experts; (v) review and analysis of the trading data relating to the price and volume of B&W common stock; and (vi) interviews of former employees of B&W and other persons with knowledge of the matters alleged herein.[1]  Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.  On behalf of themselves and the class they seek to represent, Plaintiffs allege as follows:

## I.     PRELIMINARY STATEMENT

2.     This is a securities class action brought under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a); and SEC

---

[1] Confidential witnesses ("CWs") will be identified herein by number (CW1, CW2, etc.).  All CWs will be described in the masculine to protect their identities.

Rule 10b-5, 17 C.F.R. § 240.10b-5 against B&W and certain of its most senior executives (the "Action"). The Action is brought on behalf of a class consisting of all persons and entities who purchased B&W publicly-traded common stock on the New York Stock Exchange ("NYSE") or other U.S. exchanges or in a U.S. transaction between June 17, 2015 and August 9, 2017, inclusive (the "Class Period").

3. B&W is a technology-based provider of advanced fossil and renewable power generation equipment that includes a suite of boiler products, environmental systems, and services for power and industrial uses. The Company specializes in technology and engineering for power generation and various other applications, the related procurement, erection, and specialty manufacturing of equipment, and the provision of related services.

4. At the start of the Class Period, B&W operated in three segments: Global Power (which provided boilers for fossil fuel and renewable energy generation, and environmental equipment for power plants), Global Services (which provided parts and technical services for B&W boilers and other equipment), and Industrial Environmental (which included all non-boiler environmental projects and engineered equipment).

5. On June 28, 2016, the Company announced a reorganization, changing the reportable segments to Power, Renewable, and Industrial. Financial reporting under the new divisions began in the third quarter of 2016. Through the Power segment, the Company provides the supply and aftermarket services for steam-generating and auxiliary equipment for power generation and other industrial applications. Through its Renewable segment, B&W supplies steam-generating systems, environmental, and auxiliary equipment for the waste-to-energy and

biomass power generation industries.[2] The Company's Industrial segment provides custom-engineered environmental solutions, industrial equipment, and aftermarket parts and services, as well as custom-engineered comprehensive dry and wet cooling solutions and aftermarket services to the power generation industry and other industrial end-markets.

6. B&W was a subsidiary of The Babcock & Wilcox Company ("BWC") (now known as BWX Technologies, Inc.) until June 2015, when B&W was spun-off from BWC. B&W's common stock became registered on June 16, 2015 and was distributed on June 30, 2015 by way of a distribution of shares of B&W common stock to BWC's shareholders. The distribution of B&W common stock consisted of one share of B&W common stock for every two shares of BWC's common stock as of the record date, June 18, 2015. Cash was paid in lieu of any fractional shares of B&W common stock. B&W's stock began trading on the NYSE on June 16, 2015, on a "when issued" basis and began "regular way" trading on July 1, 2015, under the ticker symbol "BW."

7. Throughout the Class Period, Defendants promoted B&W's Renewable segment as key to its future revenues and strategic shift away from its legacy fossil-fuel energy centered business. On June 17, 2015—the first day of the Class Period—B&W hosted its first Analyst/Investor Day as a new publicly traded entity. The event included presentations by B&W Chief Executive Officer, President and Director, E. James Ferland ("Ferland"), and Senior Vice President, Chief Financial Officer, Jenny L. Apker ("Apker"), who explained to analysts and investors the rationale for the spin-off from BWC and B&W's strategy going forward.

---

[2] A waste-to-energy plant converts municipal and industrial solid waste into electricity and/or heat for industrial processing and for district heating systems by burning waste at high temperatures and using the heat to make steam which drives a turbine. A biomass plant converts organic matter from industrial and agricultural scrap (such as wood chips, pellets, sawdust, and straw) into energy through combustion or gasification. A multi-fuel plant generates energy using a combination of these and/or other fuels.

3

8.  While the legacy company, BWC, relied heavily on its coal energy based business, throughout the presentation, Ferland stressed that B&W spun off, in part, to diversify away from coal, stating for example:

> [A] couple of comments, big picture, BW going forward. So we're about 55% coal today from a revenue standpoint. That number 4 to 5 years ago, its 67%, right? So you can already see coal beginning to drop off out of our portfolio. . . . [Our] other strategy is about international growth and diversification . . . . we already see that coal percentage dropping. ***We know that percentage of our revenue and profit that comes from coal is likely to be under pressure over time***.

Ferland further elaborated that he expected the percentage of electricity in the U.S. derived from coal to drop by about 13% over the next fifteen years, from around 38% to 25%.

9.  In light of industry developments, B&W's strategy going forward was comprised of three elements:  (1) cutting costs to improve margins (primarily, but not exclusively, in Global Services, which included the Renewable aftermarket service contracts); (2) pursuing revenue growth opportunities in international markets (primarily a Global Power initiative); and (3) pursuing strategic acquisitions.

10.  In explaining the Company's strategy to grow revenues and diversify, Ferland touted B&W's Global Power segment—which then encompassed the Renewable segment—stating that "Global Power . . . is all about growth, it's about revenue growth, it's about expanding internationally, it's about expanding our product offering."

11.  Ferland stated that B&W had "a ton of momentum" in Europe due to new waste-to-energy renewable projects there, adding "we're leveraging our technology, we're delivering a finished product quite often to the customer, and we're partnering where we need to."  Ferland further stated, "our job in the renewable waste-to-energy business is to ***leverage the success we've had in the U.K., which is great, and that's good for at least 2 or 3 years for us***, is to find the next market[.]"

12. Additionally, Ferland boasted about seven recently signed contracts, including four contracts for renewable energy projects, which he said "provide[] a ton of momentum for B&W coming out of the spin." He also highlighted a project in Copenhagen, Denmark, known as the Copenhill project, discussed further below.

13. At the same time the Company was touting its growing international renewable business, however, it was embarking on significant cost-saving measures, including outsourcing significant portions of its engineering and other duties for its international contracts to a joint venture in India. As Apker explained at the June 17, 2015 Analyst/Investor Day event:

> An example of one of the engineering initiatives is that we have – with a couple of those international boiler projects that we recently won, we were able to bid the use of TBWES[3] engineers. In other words, our India joint venture engineers [sic] into the design engineering, thereby lowering the cost of the engineering for the bid and it made our bids more competitive.

14. Ferland noted that one new waste-to-energy plant would "go through" its Indian joint venture with Thermax Limited, called Thermax Babcock & Wilcox Energy Solutions ("TBWES"), and stated, "[t]he India facility, I view it is an option, it's a great facility for us from a manufacturing cost standpoint and we can start to blend more and more of the Indian engineering into our work product, it's a nice combination."

15. Ferland noted the cost-cutting and international growth initiatives of B&W's strategy, and said, "I really believe we can drive value via margin improvement, we've got our hands on the projects, we know what we need to do. You can already see the traction we have on revenue growth internationally. I feel really good about that piece of the strategy."

---

[3] TBWES refers to Thermax Babcock & Wilcox Energy Solutions, which is a joint venture in India between Thermax Limited, India, and Babcock & Wilcox Power Generation Group, Inc., with the web address of www.tbwes.com. It is described on its website as "a global company with capacity to satisfy the need for very large boilers."

16.     While Defendants touted B&W's rapidly growing renewable energy business and B&W's ability to cut costs through the use of the Indian joint venture and other initiatives, they failed to disclose that B&W's capabilities and resources had become "stretched" during the Class Period and, as a result, the Company was experiencing significant problems with the majority of its Renewable energy projects it had touted to investors.  For example, according to CW 2, a Process Engineer from November 2004 to 2010 and Estimating Specialist from 2010 to June 2016 at B&W's Barberton, Ohio office, the use of cheaper Indian contractors as part of the Company's cost-cutting measures resulted in inferior work, which routinely had to be corrected by B&W employees.

17.     Emblematic of the impact that B&W's overstretched resources and capabilities were having on its ability to adequately perform its contractual obligations was the Company's internal recognition *prior to the beginning of the Class Period* of critical design errors in a $170 million renewable project in Copenhagen, Denmark called Copenhill.  The project was initiated in 2012, and the piping design for the project was outsourced to non-B&W engineers.  In 2014, errors were discovered in the piping design that required a major redesign of a substantial portion of the plant—but only after it was more than 50% completed.  Resolving the massive piping design problems became the source of intensive corrective efforts starting in 2015.  In fact, notwithstanding B&W's already over-extended resources, to address the problems at Copenhill, the Company diverted much-needed staff from several other major European and United Kingdom ("U.K.") projects, which exacerbated engineering, project management, and other latent problems in those projects that were the result of the Company's overstretched resources.  For example, beginning in 2015, an $80 million project in Denmark called Skaerbaek was experiencing significant delays and cost overruns due to a defective boiler supplied by TBWES (B&W's Indian

joint venture that ostensibly was supposed to improve efficiency and reduce margins). The combination of existing problems and diverted resources resulted in four projects being constructed *at a loss* to B&W (including Copenhill and Skaerbaek), and four other U.K. projects having substantially reduced profitability. The continued problems subsequently resulted in two additional projects being constructed *at a loss* (for a total of six loss projects), and the Company determining that it would no longer bid on Renewable construction projects of the scope of its existing projects, which would reduce future revenue from Renewable projects by approximately 50%.

18.     Multiple CWs confirm that throughout the Class Period, senior management at B&W U.S.[4] were informed of the pervasive problems, delays, and cost-overruns on the Renewable projects in Denmark and the U.K. through, *inter alia*, Monthly Management Reports and quarterly conference calls with senior management from B&W Volund, the Renewable subsidiary located in Denmark.

19.     While B&W and its senior management were fully aware of the problems B&W Volund was experiencing in its Renewable energy projects—as well as the impact of those problems on the Company's financial performance—Defendants knowingly or recklessly made materially false and misleading statements about the financial prospects and condition of its Renewable business. Specifically, Defendants misrepresented or failed to disclose that: (1) due to rapid growth in the Renewable segment and cost cutting strategies, the Company lacked sufficient professional resources to perform on time and within budget on a large portion of the Renewable contracts in its backlog; (2) there were significant, undisclosed, and ongoing design

---

[4] "B&W U.S." refers to B&W's personnel and/or offices located in the United States, principally in Barberton, Ohio, and its headquarters in Charlotte, North Carolina.

problems at the Copenhill project; (3) there were significant, undisclosed, and ongoing problems at other Renewable projects; (4) in order to remediate the serious design problem at Copenhill, the Company diverted resources from other major ongoing projects in the Renewable segment, which exacerbated the latent problems on those other projects; (5) the Company would have to cease bidding on Renewable projects of comparable revenue and scope to those alleged due to the Company's inability to timely perform its existing Renewable construction contracts; and (6) at least as early as January 2017, there was an undisclosed material weakness in internal control over financial reporting in the Renewable segment. Defendants knew or were reckless in not knowing that these major problems and insufficient professional resources would lead to significant losses, and that the collective impact of all of these problems was that B&W's highly touted backlog of projects and Renewable growth strategy was, in reality, an improbable and unrealistic source of profitability in 2016 and 2017.

20. By concealing these material facts from investors throughout the Class Period, B&W's stock price was artificially inflated, and when the truth ultimately reached the market, investors saw their shares' values plummet. On June 28, 2016, after months of non-disclosure, the Company first revealed that there were engineering design problems at Copenhill. Specifically, the Company disclosed that the Copenhill plant had a significant piping design defect that was causing delays and material cost-overruns. That news caused B&W's share price to fall from its closing price on June 27, 2016 of $18.94 per share to $14.92 per share on June 28, 2016—a 21% drop.

21. The June 28, 2016 disclosure was itself, however, materially misleading in that B&W described its Copenhill problem as an "*isolated incident*" (which it clearly was not) and wholly failed to inform investors that: (1) other Renewable projects were suffering from myriad

issues, including design and construction problems; (2) Defendants were diverting resources from other projects to fix the Copenhill problems; and (3) the diversion of already limited personnel and resources from other B&W Renewable projects—which had their own problems—to Copenhill was materially adversely affecting the cost and timely completion of those other projects which would inevitably lead to losses and/or substantially reduced profitability of these projects.

22.     On November 2, 2016, B&W revealed it had recorded a $14 million charge for the Copenhill project due to "complexities" and lower than expected labor productivity, which extended the remediation schedule.  In response to the news, B&W's share price fell by $1.61—almost 11%—on unusually high trading volume to close at $14.00 on November 3, 2016.  The Company's share price, however, still remained artificially inflated after this partial disclosure as Defendants continued to misrepresent and failed to disclose that:  (1) other Renewable projects were suffering from myriad issues, including design and construction problems; (2) B&W diverted personnel and resources from other B&W Renewable projects to work on Copenhill; and (3) that diversion of personnel and resources was materially adversely affecting the cost and timely delivery of those projects, which would inevitably lead to losses and/or substantially reduced profitability of these projects.

23.     Nevertheless, Defendants continued to tout the Company's capabilities and minimize its Renewable segment problems, stating in a November 3, 2016 earnings call, for example, "*[e]xcluding the challenged project, our other renewable projects are progressing as expected*."

24.     On February 28, 2017, after the market closed, the Company revealed additional information about delays, cost-overruns, and charges in the Company's European/U.K. Renewable segment, which caused four projects, including Copenhill and Skaerbaek, to become losses and

reduced the profitability of four other Renewable projects. For 2016, the Company recorded a total of $141.1 million in losses from changes in the estimated revenues and costs to complete these renewable energy contracts. In the earnings conference call that followed on March 1, 2017, Ferland admitted that, as a result of the rapid growth of the Renewable segment in 2014 and 2015, "*our resources and capabilities across the business became stretched*" and the Company needed to "*beef[] up our engineering processes in depth and improv[e] our overall project management*." The Company further acknowledged the resource constraints its rapid growth and cost-cutting had engendered when it announced that it was imposing a six-month moratorium on entering into any new renewable energy projects. In response to the news, B&W shares again plunged—this time by more than 37% or $6.17 per share—to close at $10.33 per share. In that one day, approximately $300 million of the Company's market capitalization was erased.

25. The February 28, 2017 and March 1, 2017 disclosures, however, *still* did not reveal the full extent of the fraud and were materially misleading in that they failed to disclose that: (1) due to rapid growth in the Renewable segment and cost cutting strategies, the Company lacked sufficient expertise or engineering and other resources to perform on time and within budget the Renewable contracts in its backlog, thereby rendering the backlog an improbable and unrealistic source of profitability; and (2) there were ongoing, undisclosed material problems within the Renewable segment that were exacerbated by the undisclosed diversion of limited resources.

26. Finally, on August 9, 2017, after the market closed, the Company revealed the full truth about the extent of the troubled status of B&W's Renewable projects. That day, the Company announced disappointing second quarter 2017 earnings due to an additional $115 million in charges (tied to reduced productivity, increased costs, and delayed schedule) on six total Renewable projects, which the Company disclosed were all operating at a loss. In addition, the

Company announced that it had dramatically changed its business model in the Renewable segment in order to purportedly lower execution risk, which would have the effect of slashing revenue on Renewable projects by approximately 50% per project. The Company also disclosed that, with the exception of one or two Renewable contracts it might bid on in 2017, bidding on Renewable projects in Europe would not resume in earnest until 2018 or early 2019. Finally, the Company disclosed that, as a result of the additional charges taken for the troubled Renewable projects, it required additional financing and had entered into a loan agreement for $176 million with Lightship Capital LLC ("Lightship"). The deal required B&W to pay 10% interest on the loan principal and spend $50.9 million of the proceeds to repurchase Lightship's 9.9% equity stake in B&W at roughly the same price that Lightship originally paid in May 2017.[5]

27.    Given the 10% interest rate on the $176 million loan, plus the $34 million paper loss on the 9.9% equity stake bought back by the Company, the effective cost to B&W of obtaining $125 million in financing is equivalent to an interest rate well in excess of 30%. The fact that this financing arrangement was, according to Ferland, "the best by far" of the options the Company had reviewed over the prior few weeks further demonstrates both the scale of the problems in its Renewable business and that B&W was aware of the full severity of the problems it disclosed on August 9, 2017 well before that disclosure.

28.    On that same day, B&W filed its report on Form 10-Q for the fiscal quarter ended June 30, 2017. Therein, the Company disclosed, "the operation of [B&W's] disclosure controls and procedures were not effective as of June 30, 2017 due to a material weakness in our internal control over financial reporting at Volund" due to a failure to "maintain effective internal control

---

[5] By August 10, 2017, Lightship's stake in B&W would have only been worth $13 million. The sweetheart deal with B&W saved Lightship approximately $34 million in paper losses.

over the completeness and accuracy of the information used in the percentage of completion ("POC") accounting for three European renewable energy projects at Volund . . . which resulted in an understatement of our consolidated net loss in the first quarter of 2017."

29.    As a result of these stunning revelations, B&W's stock price plummeted more than 72% on August 10, 2017, falling from $9.75 per share on August 9, 2017 to close at $ 2.70 per share on August 10, 2017.

30.    Due to Defendants' misstatements and omissions, and the precipitous decline in the market value of the Company's common stock, Plaintiffs and other Class members have suffered significant losses and damages.

## II.    JURISDICTION AND VENUE

31.    The claims asserted herein arise pursuant §§ 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78t(a) and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.  Jurisdiction exists pursuant to § 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. §§ 1331, 1337, and 1367.

32.    Venue is proper in this District pursuant to § 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. §§ 1391(b) and (c).  B&W is headquartered in this District.

33.    Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this District.  Many of the acts charged herein, including the preparation and dissemination of materially false and/or misleading information, occurred in substantial part in this District.  In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## III. PARTIES

### A. Lead Plaintiff

34.     ATRS, as set forth in the attached certification which is incorporated herein by reference, purchased B&W stock on the NYSE during the Class Period and has been damaged thereby.  ATRS was established in 1937 to provide retirement benefits for the employees of Arkansas' education community and manages approximately $15 billion in assets.  ATRS lost more than $5.4 million from its purchases of B&W stock during the Class Period.

### B. Named Plaintiff

35.     St. Paul Electrical, as set forth in the attached certification which is incorporated herein by reference, purchased B&W stock on the NYSE during the Class Period and has been damaged thereby.  St. Paul Electrical was established to provide benefits for those in the electrical industry.  As of September 2016, St. Paul Electrical managed approximately $580 million in assets in the referenced funds.

### C. Defendants

36.     **Defendant B&W** is a Delaware corporation that is headquartered at 13024 Ballantyne Corporate Place, Suite 700, Charlotte, North Carolina 28277.  B&W is a spin-off of the fossil and renewable power generation and environmental equipment businesses of BWC.  The spin-off was approved by the BWC board of directors on June 8, 2015.  On June 30, 2015, B&W common stock was distributed to all BWC shareholders as of the record date of June 18, 2015, pursuant to a registration statement that became effective on June 16, 2015.  B&W's stock began "regular way" trading on the NYSE on July 1, 2015, under the ticker symbol "BW."

37.     At the start of the Class Period, B&W operated in three segments:  Global Power, Global Services, and Industrial Environmental.  On June 28, 2016, the Company announced a

13

reorganization, changing the reportable segments to Power, Renewable, and Industrial. Financial reporting under the new divisions began in the third quarter of 2016.

38.     B&W's Renewable business is largely conducted through its wholly-owned subsidiary, Babcock & Wilcox Volund A/S ("B&W Volund"), which is headquartered in Esbjerg, Denmark. B&W Volund reportedly specializes in the manufacture, construction, maintenance, and operation of renewable energy plants, including waste-to-energy, biomass, and mixed fuel systems.

39.     At all relevant times, top B&W executives occupied management roles within B&W Volund. For example, D. Paul Scavuzzo ("Scavuzzo") was B&W's Senior Vice President of Global Power in 2015 and its Senior Vice President of Renewable from June 2016 through December 2016, while also serving as B&W Volund's Chairman of the Supervisory Board. B&W's 2015 Form 10-K states that Scavuzzo was, *inter alia*, "responsible for our Denmark-based subsidiary, Babcock & Wilcox Volund A/S . . . ." Similarly, Mark S. Low ("Low") was B&W's Senior Vice President of Global Services in 2015 and the Senior Vice President of Renewable after Scavuzzo, and was a B&W Volund Board member through at least 2015.

40.     **Defendant E. James Ferland** ("Ferland") has been the Company's Chairman and Chief Executive Officer ("CEO") throughout the Class Period. Ferland was President and CEO of BWC from April 2012, until the spin-off of B&W. Ferland signed B&W's annual reports and quarterly and annual certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") and the Exchange Act, stating that the financial information contained in the Company's financial reports was accurate and disclosed any material changes to B&W's internal control over financial reporting. During the Class Period, Ferland participated in each of the Company's quarterly earnings conference calls described herein. Given his senior position within the Company, Ferland

possessed the power and authority to control the contents of the press releases, investor and media presentations, and all filings B&W made with the SEC during the Class Period. Ferland was a direct and substantial participant in the fraud.

41.    **Defendant Jenny L. Apker** ("Apker") has been the Company's Chief Financial Officer and Senior Vice President throughout the Class Period. Prior to the spin-off of B&W, Apker served as Vice President, Treasurer, and Investor Relations for BWC beginning in August 2012, and as Vice President and Treasurer since joining BWC in June 2010. During the Class Period, Apker signed B&W's annual reports and quarterly and annual certifications pursuant to SOX and the Exchange Act, stating that the financial information contained in the Company's financial reports was accurate and disclosed any material changes to B&W's internal control over financial reporting. During the Class Period, Apker participated in each of the Company's quarterly earnings conference calls described herein. Given her senior position within the Company, Apker possessed the power and authority to control the contents of the press releases, investor and media presentations, and all filings B&W made with the SEC during the Class Period. Apker was a direct and substantial participant in the fraud.

42.    Defendants Ferland and Apker are referred to collectively as the "Individual Defendants."

## IV.    B&W WAS EXPERIENCING SIGNIFICANT, UNDISCLOSED PROBLEMS IN ITS RENEWABLE BUSINESS DURING THE CLASS PERIOD

### A.    B&W Began Rapidly Growing Its Renewable Business Through Its European Subsidiary, B&W Volund, in 2014 and 2015, and Touted this Growth As Key to the Company's Future Value.

43.    Throughout the Class Period, B&W was increasingly shifting its business away from fossil fuels toward renewable energy products and services. B&W touted the Company's

15

Renewable energy business as its key growth platform, and lauded their expertise in this business area.

44.     On June 17, 2015, the Company hosted an Analyst/Investor Day.  By this time, Defendants knew or were reckless in not knowing that there were significant piping design problems at Copenhill.  Nonetheless, Ferland falsely represented B&W's engineering and design capabilities and its "core competency" in delivering on projects to customers, stating:

> [W]e're a technology company, ***we do engineering and design, we're really good at both of those. Our customers value that and they're willing to pay us for it. We're really good at complex project management.*** We're good in getting better at strategic sourcing. . . . ***That's why I think we can command the margins, we commanded the market today*** and we can probably do better, right. Manufacturing, facility operation and on-site installation, that's a key part of delivering a complete project to a customer.

Referring to B&W's "Custom Technology Solutions," "Engineering and Design," "Complex Project Management," and "Strategic Sourcing," Ferland further assured, "***we're going to make sure that we maintain that core competency all the time***."

45.     Ferland also cited B&W's new waste-to-energy projects in Europe as creating "a ton of momentum" there, adding "we're leveraging our technology, we're delivering a finished product quite often to the customer, and we're partnering where we need to."  Ferland further stated, "our job in the renewable waste-to-energy business is to ***leverage the success we've had in the U.K., which is great, and that's good for at least 2 or 3 years for us***, is to find the next market[.]"

46. The Company's Renewable contract signings and backlog were closely followed by analysts as the anticipated source of its future growth and profitability.[6]  For example, on July 1, 2015, analyst William Blair initiated coverage of the stock with an "outperform rating," noting:

> Despite headwinds in its legacy U.S. coal-fired power market, ***the company is working diligently to grow its business internationally and has shown early signs of success over the last two quarters with robust awards leading to 30% year-over-year backlog growth*** (as of first quarter 2015), in turn providing the company with above-average visibility into solid revenue growth through the remainder of 2015 and into 2016.

47. The report further stated that "the company's efforts have been validated by a number of major awards," including four renewable contracts (three in the U.K. and one in Denmark), as seen in an incorporated exhibit:

**Recent International Awards**

| Location | Scope | Contract Value | Booked |
|---|---|---|---|
| Dominican Republic | Design and manufacture two coal-fired boilers | Not disclosed | Third quarter 2014 |
| Denmark | Build a biomass power plant | $80 million | Third quarter 2014 |
| United Kingdom (Scotland) | Engineer, procure, and construct a wate-to-energy plant | $160 million | Fourth quarter 2014 |
| Vietnam | Supply supercritical coal-fired boiler | Not disclosed | Fourth quarter 2014 |
| United Kingdom (Wales) | Engineer, procure, and operate biomass plant | $200 million | First quarter 2015 |
| United Kingdom | Design, manufacture and operate biomass plant | $220 million | First quarter 2015 |

Sources: Company documents and William Blair & Company, L.L.C. estimates

48. The report continued its focus on B&W's renewable efforts stating that "[m]ost notably, [B&W] is leveraging its Volund subsidiary in Denmark, which specializes in building turnkey waste-to-energy and multifuel plants . . . . With an installed base of equipment in 30

---

[6]  In its Form 10-K for the year ended December 31, 2015, B&W defines "backlog" as follows:

> [B]acklog represents the dollar amount of revenue we expect to recognize in the future from contracts awarded and in progress. Not all of our expected revenue from a contract award is recorded in backlog for a variety of reasons, including that some projects are awarded and completed within the same fiscal period. We generally include expected revenue from contracts in our backlog when we receive written confirmation from our customers authorizing the performance of work and committing the customer to payment for work performed. Accordingly, we exclude from backlog orders or arrangements that have been awarded but that we have not been authorized to begin performance.

countries, the Volund subsidiary is well positioned to capture renewable energy projects, particularly across Europe . . . ." and including an additional exhibit depicting B&W Volund's contribution to Global Power's reported revenue:



49. In discussing the Company's growth strategy, the report called Global Power B&W's "most project- and backlog-driven segment[.]" The report highlighted B&W Volund as "***a key part of Babcock & Wilcox's growth strategy***," stating that it alone "***accounted for 31% of the segment's revenue and gross profit in 2014***." "Global power is likely to generate the majority of [B&W's] organic growth over at least the next several years," the report continued, especially given "the global waste-to-energy market, which we believe will be able to offset slower demand in the company's legacy coal-fired" businesses.

50. Other analysts were in lockstep with William Blair's analysis. For example, on July 1, 2015, UBS released its analyst report, giving B&W an opening "Buy rating" and noting that a key reason for investors to purchase the stock was B&W's shift away from coal to renewables, calling renewables one of "the biggest offsets" of the decline in coal.

> *[W]e think diversification away from the coal power market is a necessary strategic move*. Going forward, we believe renewables will make up a larger portion of BW's annual revenues, as the company targets global waste-to-energy

projects. We believe by 2017 coal will make up 35-40% of sales, down from 55%, renewables will make up 30% of sales, up from 18%, and industrial/other will make up 20-25% (but likely up from 21%).

The UBS report included the following graphics, noting (1) the shift over time away from coal and (2) global interest in renewable plants:



**Figure 4: US electricity generation by type of fuel**

Source: EIA, UBS estimates

**Figure 13: Global interest in waste to energy plants**

| Date | Source | Note |
|---|---|---|
| 3/24/2015 | Executive Magazine | The country of Lebanon is tendering several municipal service waste contracts as part of a broader plan that could result in new waste-to-energy plants. |
| 4/1/2015 | Biomass Magazine | Fortum is pursuing plans to build a $215m biomass/mixed fuel plant in Zabrze, Poland. |
| 6/9/2015 | Paterson Times | Delta Thermo Energy is pursuing plans to build a 50k sqft waste to energy plant in Pennsylvania. |
| 6/16/2015 | Bloomberg | Wermuth Asset Management (in Europe) is seeking waste to energy investment opportunities. |
| 6/23/2015 | The Nation | Thailand is seeking to generate 160mw from waste. WTE plants generating >10mw may not need an environmental impact assessment. |
| 6/27/2015 | India Info Line | India's Minister of Power and New and Renewable Energy Sources said the government is committed to support waste to energy projects. |
| 6/29/2015 | Renewable Energy Magazine | Poland's president signed a law on 3/11/15 to support renewable energy, with the focus on wind, solar, hydro and biomass plants. |
| 6/30/2015 | Transparency Market Research | The global waste to energy market could grow at an 8.1% CAGR from 2013 to 2019. |

Source: various

51. Similarly, analyst BB&T in its July 10, 2015 report, noted its "favorable view of the global power generation[,]" specifying how "[m]anagement is bullish on international renewables and hopes to book one or two more waste-to-energy plants this year, likely in Europe."

52.     As noted above, a large portion of B&W's Renewable business—31% of Global Power's revenue and gross profit in 2014—was derived from B&W Volund.  B&W Volund produces waste-to-energy, biomass, and multi-fuel energy systems and technology.

53.     In 2012, B&W Volund won a $170 million contract to:  (1) design the Amager Resource Center ("ARC") waste to energy plant, dubbed "Copenhill," in the Danish capital city of Copenhagen; (2) supply the combustion system from crane through feeding, grate, and boiler to ash handling; and (3) build the particle and nitrogen-oxide reduction system.  Engineering and design work on the project began in 2012, and on March 4, 2013, B&W Volund broke ground on Copenhill.

54.     In 2014 and 2015, the Renewable business began to book significantly more work through B&W Volund.  In addition to the large Copenhill project that was underway, B&W Volund booked and/or was working on several other large renewable projects, including:

          a.      A contract announced on July 23, 2014, for more than $80 million to build and install two biomass boiler systems at Skaerbaek Power Station in Fredericia, Denmark ("Skaerbaek").  B&W Volund began engineering and design work for the Skaerbaek project in 2014, and estimated completion in April 2017.

          b.      A $230 million contract announced on December 22, 2014, to engineer, procure, and construct a waste-to-energy power plant near Dunbar, Scotland ("Dunbar").  The plant was scheduled to go online in the fourth quarter of 2017.

          c.      A contract for more than $200 million announced on January 28, 2015, to engineer, procure, and operate a state-of-the-art biomass power plant in Margam, Wales ("Margam").  Construction was scheduled to be completed on the Margam plant in the second quarter of 2017.  According to Ferland, the Margam project demonstrated B&W's focus on

growing its international power business. "The Margam project is the fifth major coal, renewable or waste-to-energy contract announced by B&W's power generation subsidiary in the last seven months," Ferland said. "We continue to look globally for opportunities to grow our business in the fossil power and renewable sectors, while maintaining limited exposure to the impact of a turbulent global oil market."

        d.    Contracts totaling more than $220 million announced on March 11, 2015, to design, manufacture, and operate the Templeborough Biomass Power Plant in Rotherham, South Yorkshire, England ("Templeborough"). Plant completion was scheduled for third quarter of 2017.

        e.    Contracts announced on September 21, 2015, for more than $190 million to design, build, operate, and maintain the Teesside Renewable Energy Plant near Middlesbrough, England ("Teesside"). Construction was scheduled for completion in the first quarter of 2018; and

        f.    Installation of a new waste-to-energy line at the Nordforbraending plant in Horsholm, Denmark ("Norfors"), which was scheduled to be completed in 2016.

    55.    Additionally, in 2016 B&W announced three more Renewable projects booked for B&W Volund:

        a.    A $90 million contract announced on January 26, 2016, to design, manufacture, and build a waste-to-energy plant near Haresfield, Gloucestershire, U.K.;

        b.    A nearly $40 million contract announced on November 29, 2016, to design a waste-to-energy boiler for Shenzhen Energy Environmental Engineering Co. Ltd. in Shenzhen, Guangdong Province, China; and

        c.    A $35 million contract announced December 21, 2016, to design, supply, and construct a waste-to-energy boiler for a power plant in Boden, Sweden.

56.     According to CW 1, a Construction Manager in B&W Volund's Denmark headquarters from approximately 2009 through May 2015 with responsibility for all construction site managers, B&W Volund's rapid revenue growth during the period of his employment produced challenges in key personnel resources. CW 1 explained that both the size of projects and the scope of what B&W Volund had to deliver had expanded, and B&W Volund had to bring in consultants or contractors and increase the hiring of employees in order to staff projects. CW 1 received weekly reports from all of the project sites providing details regarding construction progress at each site, which he forwarded to B&W Volund Engineering Director Lars Busch ("Busch").

57.     As discussed below, numerous, significant problems with at least seven Renewable projects arose during, or were ongoing throughout the Class Period, as a result of B&W's insufficient professional resources and capabilities to perform these projects on time and within budget.

**B.      At the Same Time B&W Was Initiating A Number Of New Projects in Its Power Business, It Also Embarked On A Cost-Cutting Initiative.**

58.     As B&W was ramping up its Renewable contract signings, it was embarking on significant cost-cutting measures that impacted the business. As Apker explained at the June 17, 2015 Analyst/Investor Day event, those cost-cutting measures included: (1) global manufacturing consolidation; (2) supply-chain optimization efforts; (3) engineering initiatives; (4) organizational efficiency improvements; and (5) international efficiency improvements. As an example of the engineering initiatives, Apker noted that the Company was using less expensive engineers from TBWES for the design engineering on certain international boiler projects. Ferland further stated that one new waste-to-energy plant would "go through" TBWES.

59.     CW 2, a Process Engineer from November 2004 to 2010 and Estimating Specialist from 2010 to June 2016 at B&W's Barberton, Ohio office, recalled B&W implementing significant cost-cutting measures in early 2015.  As a part of these measures, CW 2 said that Ferland made a "big push" to use cheaper, inexperienced subcontractors in India, who were paid a fraction of what U.S. employees earned ($15 per hour versus $55 per hour for a U.S. employee).  CW 2 further stated that the Indian subcontractors' work was inferior and routinely had to be corrected by employees in B&W's Barberton office.

60.     CW 3 was a Supervisor of Marketing Strategy in the Company's Renewable segment from 2008 through June 2016 in B&W's Barberton, Ohio office.  His responsibilities included assisting product managers with development and integration of strategic marketing efforts for all divisions and all products.  According to CW 3, there was a declining corporate culture prior to his departure in June 2016 in which Ferland ignored several red flags highlighting a declining demand and the Company's inability to deliver on Renewable projects.  CW 3 noted that engineering errors had curtailed the Company's ability to deliver on renewable projects.  While B&W generally expected renewable projects to take two to three years to complete, CW 3 had witnessed many projects which extended to four years due to multiple design and engineering problems.

61.     Despite representing the growth of renewable energy plant contracts as the key driver of the Company's future revenue growth and its cost cutting measures as driving margins, Defendants failed to disclose that they had not built up the operational capacity necessary to perform these contracts on budget and on schedule and that its cost cutting measures relied on inexperienced subcontractors.  As a result, the Company suffered substantial problems in the development and construction of virtually every Renewable facility for which B&W Volund

23

received a contract from 2013 through 2015 which led to losses and/or substantially reduced profits for these projects and the Company and the Company permanently ceasing bidding on renewable projects of comparable scope. Nonetheless, in order to maintain B&W's valuation based on its Renewable segment growth, Defendants concealed the myriad problems B&W was experiencing with its renewable energy projects.

### C. Defendants Were Fully Informed About Business Developments and Project Scheduling at B&W Volund Throughout the Class Period.

62. B&W maintained extensive oversight over B&W Volund projects. Top executives of B&W, such as Scavuzzo and Low, also served as board members of B&W Volund. Moreover, there was substantial, detailed reporting from B&W Volund to B&W executives, as described by multiple confidential witnesses.

63. CW 4—a senior level construction manager at B&W Volund from late 2013 through February 2017—observed that B&W maintained strong oversight over B&W Volund. For instance, B&W Volund Business Controller Todd Blevins ("Blevins"), an American expatriate, was part of CW 4's management team.[7] Blevins reported to the B&W U.S. Vice President of Finance for the Global Power division, Rod Carlson,[8] and had frequent, regular calls and email exchanges with his B&W U.S. contacts.

---

[7] According to Blevins' LinkedIn profile, in addition to being the Business Unit Controller for B&W Volund from June 2015 to present, Blevins has been the Global Joint Venture and Licensing Lead Analyst for B&W from January 2014 to present, with responsibilities that include financial management of global branch offices.

[8] According to TBWES's website (at http://www.tbwes.com/about-us/leadership/), Carlson is the Vice President of Operations Finance, responsible for all operational financial reporting and forecasting activities for B&W since June 2015. Carlson is also presently listed on B&W Volund's website (at http://www.volund.dk/About_us/Organisation/Board_of_directors) as its Chairman of the Board, and as B&W U.S.'s Vice President of Finance for the Renewable business.

64.     Additionally, CW 4 described a Monthly Management Report that was prepared and transmitted to Scavuzzo and his group.  The Monthly Management Report included an update on each project, describing what had happened during the prior month and what was projected for the following month.  It also identified any problems with each project and the solutions that were being developed and attempted.

65.     CW 4 stated that issues with projects—including the Copenhill, Skaerbaek, and U.K. project problems discussed below—were "clearly communicated" by B&W Volund to B&W U.S., through Scavuzzo and his financial controller, as soon as they were discovered.  In addition to being written up in the Monthly Management Reports, they were openly discussed in phone calls and emails between B&W Volund and B&W U.S. personnel.

66.     CW 4 also stated that there were Quarterly Performance Conference Calls with Scavuzzo and his group, which included a budget update and a discussion of selected projects.  CW 4 recalled that the Copenhill, Skaerbaek, and U.K. projects were discussed on the Quarterly Performance Conference Calls with Scavuzzo.  Similar Performance Calls were held on a monthly basis internally at B&W Volund.

67.     CW 5 was a mid-level manager involved in the day-to-day project management for B&W Volund from 2012 through mid-2016.[9]  Although based in B&W Volund's headquarters in Esbjerg, Denmark, CW 5 worked mainly out of the Copenhagen office pursuant to his work on Copenhill.  According to CW 5, the Project Manager and Controller for each project had to prepare monthly reports designed by B&W U.S., written in English, to be presented to B&W Volund senior management.  CW 5 stated that the reports included information on scheduling, delays, any new

---

[9] CW 5 remained employed by B&W Volund through December 2016, but was no longer involved in managing projects after June 2016.

Case 3:17-cv-00109-MOC-DCK   Document 40   Filed 09/28/17   Page 29 of 121

subcontractors, budget to actual data, work completed to date, work in progress, forecasted work remaining, risks, and a new budget, if any. CW 5 said that these monthly reports were sent to and reviewed by B&W U.S. management, and that his team would sometimes receive questions from the U.S. which were conveyed by either B&W Volund's CFO, Jacob Rosenhoj Jorgensen ("Jorgensen"),[10] or B&W Volund's Director of New Energy Plants.

68.     Additionally, CW 5 stated that a Project or Commissioning Manager named Gary from B&W's Barberton, Ohio office visited B&W Volund in approximately January 2016 to report back to U.S. leadership on the progress and problems at Copenhill. Additionally, a financial professional from B&W U.S., who reported to a senior financial professional at the B&W Barberton, Ohio office, was on-site at B&W Volund from June 2015 through at least June 2016. CW 5 also recalled receiving occasional questions from B&W U.S. concerning the Copenhill project.

69.     CW 2 confirmed CW 5's account that Monthly Reports were issued on each project. CW 2 stated that these reports indicated when the Company began to experience delays on the projects, including those undertaken through B&W Volund. CW 2 also stated that the Company had additional reports, called Accounting Reports, which were prepared by the Company Controllers and shared with the Project Managers. These Accounting Reports included descriptions of the project's initial budget, costs to date, anticipated costs to complete, and other similar information. CW 2 reported that each quarter, the Project Managers would present details from the Monthly Reports and Accounting Reports to B&W's senior management, including

---

[10]  According to his LinkedIn profile, Jorgensen was B&W Volund's Financial Director from August 2001 through June 2016.

J. Randall Data, Low, Brandy Johnson, and Walt Nischt.  CW 2 further stated that both the Monthly Reports and the Accounting Reports were available via the Company's intranet site.

70.     CW 6—a Technical Coordinator/Senior Engineer at B&W Volund from mid-January 2017 through mid-May 2017, involved with the U.K. projects—said that milestone reports were routinely provided from Department Managers to Project Managers to Project Directors, and ultimately, to B&W U.S., and that these lines of communication had been in place prior to when he joined B&W Volund.

> **D.     Defendants Were Aware of Significant Engineering and Other Problems With Multiple Major Renewable Projects at the Start of the Class Period.**

71.     At the start of the Class Period, B&W was experiencing significant, undisclosed problems with the engineering design for the Copenhill project.  According to CW 1, Copenhill was sold as a low margin project.

72.     According to CW 5, work on Copenhill began in 2012 with Process Design, which took approximately eighteen months and involved the efforts of approximately 120 engineers. CW 5 stated that Pipe Design began during Process Design, and was initially being performed by B&W Volund, but independent contractors were quickly brought in to assist.[11]   According to CW 5, pipe design is not complicated but it must proceed in the proper order or else it can result in incorrect stress calculations for the pipes.  CW 5 further explained that running steam through pipes makes them hot and forces them to expand, increasing the stress on the pipes.  If stress calculations are incorrect, pipes may exceed the allowable stress and "blow."

---

[11]  As Ferland explained in a June 28, 2016 call with analysts discussing Copenhill, "we typically do in-house or certainly control[] in-house, the basic piping design in stress analysis work. Quite often on larger projects like this we utilize some outside resources to supplement our engineering but we remain in control of oversight and management on all that work."

73.     While a typical B&W Renewable project, according to CW 5, used approximately 30 tons of piping, the Copenhill project called for two boilers requiring a vastly greater tonnage of piping.

74.     CW 5 stated that many independent contractors were brought in to work on the pipe design, and that for a period in the process, *only* independent contractors were working on it. The contractors that were brought in, however, were the "wrong guys" for the job, according to CW 5, because they lacked the piping experience needed.

75.     CW 5 observed a growing piping problem in 2014 and discussed the piping design issue with B&W Volund Managing Director John Veje Olesen ("Olesen"), Jorgensen, and B&W Volund Engineering Director Busch. He also raised the issue in his monthly reports starting in 2014, and reported the problem to both his supervisor, the Director of New Energy Plants, and to Nils Peter, the Department Manager for the Piping Department ("Peter"). Specifically, CW 5 was alarmed by the calculations he was running concerning the weight of steel being dedicated to piping versus that for support beams and structures. CW 5 stated that the piping weight figures being supplied by Peter and B&W Volund staff to Busch were wrong, and different from the figures supplied to CW 5 by the contractors performing the work.

76.     Finally, in November 2015, CW 5 approached CEO Olesen with his own calculations related to the piping design, specifically the amount of steel allocated to piping versus the amount allocated to support beams. CW 5 said that Olesen was immediately concerned about the Copenhill piping design issues and asked Busch to spot check the piping with an experienced piping engineer. According to CW 5, at this point, not one B&W Volund piping engineer was assigned to the project, so Busch brought in B&W Volund Lead Engineer Niels Beck Nielsen ("Nielsen") from another project. Neilsen performed the spot checks and confirmed to Olesen that

the piping was wrong. CW 5 stated that further checks confirmed that largely all of the piping was wrong and needed to be redone. According to LinkedIn.com, Nielsen was made the Piping Lead for Copenhill in November 2015.

77. CW 4 recalled hearing of significant problems with a defectively designed piping system at Copenhill around Christmas 2015, at which time a B&W Volund working group or task force was formed to dig into the problems. CW 4 stated that the piping design was based on incorrect stress calculations and that the piping and other areas of the plant could have been destroyed if the plant had gone into operation due to the pressure generated by the system.

78. In order to correct the problems created by the faulty piping design, CW 5 stated that B&W Volund had to rework the piping engineering and redesign and re-size the pipes. CW 5 explained that the piping engineering budget of less than 5,000 hours for Copenhill had been vastly exceeded by the time of his departure in June 2016, with more than 40,000 piping engineering hours being expended, and the project still not completed. According to CW 4, the design error should never have happened and resulted in huge cost overruns which made the project four or five times more expensive than budgeted.

79. In addition to Copenhill, B&W had begun to experience problems with at least one additional plant at or near the beginning of the Class Period. On July 23, 2014, B&W announced that B&W Volund had been awarded a contract for more than $80 million to build a 280 megawatt-thermal (MWth) biomass boiler system for the Skaerbaek plant near Fredericia, Denmark. The plant, owned by DONG Energy Thermal Power A/S, was to consist of two 140 MW biomass-fired boilers to supply district heating and power to residents in the region. The boilers—to be designed and built by B&W Volund—would be fueled primarily by wood chips as well as other biomass residue. Specifically, B&W Volund's role in project was to design, manufacture, supply,

construct, and commission the plant's boiler system. B&W Volund began engineering and design work for the Skaerbaek project in 2014 and estimated completion in April 2017.[12]

80.     According to CW 1—a B&W Volund Construction Manager from 2009 through May 2015 with responsibility for all construction site managers—Skaerbaek suffered from many problems arising in 2014 and 2015, including a defective boiler and production problems.[13] CW 1 stated that the defective boiler was manufactured in India by TBWES. According to CW 4, the welding on the boiler was inadequate and had to be redone. Likewise, CW 7—a B&W Volund Construction Manager from October 2015 through February 2017 with responsibility for Skaerbaek and several other projects[14]—stated that the boiler they received was pure scrap, and fixing it cost the Company six month's work and approximately 40 million Danish krones (or approximately $8 million). CW 7 further recalled that the Company had to call in approximately 150 extra welders to remedy the problem.

81.     According to CW 4, shipments related to Skaerbaek continued through 2016 and the situation grew worse and worse. CW 4 stated that coordination for resolving the problem was run through B&W's U.S. offices. CW 4 further explained that issues were highlighted for B&W U.S. in the Monthly Management Report, and conference calls and meetings were held between

---

[12] On May 25, 2017, DONG Energy announced that the ***project had experienced delays*** and that conversion work was now estimated to be completed in October 2017—approximately six months later than planned.

[13] CW 1 learned of the defective boiler, delivery of which occurred after he left B&W Volund, through his ongoing contacts with B&W Volund employees.

[14] CW 7 worked out of B&W Volund's headquarters in Esbjerg, Denmark. CW 7's responsibilities encompassed all B&W Volund construction projects, and included management responsibility for site management and site supervisors. CW 7 reported to the Manager for Construction, Knud Boesvang, who reported to the Director for Service and Production.

B&W U.S. and B&W Volund to identify, understand, and resolve the issues. CW 4 stated that B&W dealt with the Indian manufacturer while B&W Volund primarily managed the relationship with the customer (DONG Energy). CW 4 estimated the cost of resolving the issue at approximately $10 million.

82. The cost overruns at Skaerbaek were exacerbated in early 2016 when the Company diverted needed engineering and other resources and personnel to Copenhill for approximately twelve months. As disclosed in the Company's Form 10-K for the year ended December 31, 2016, Skaerbaek became a loss contract for B&W in the fourth quarter of 2016 due to $30.1 million in charges recorded related to the project ($25.2 million in the fourth quarter alone). By December 31, 2016, B&W also recorded estimated liquidated damages of $6.9 million for the Skaerbaek project.

83. CW 11 worked for B&W Volund as a Piping Engineer from October 2016 until April 2017. According to CW 11, there were already various problems with Skaerbaek when he began working for Volund in late 2016 and the project was "in a bit of a state." CW 11 was hired specifically to help fix the ongoing problems and was "trouble-shooting on a daily basis." According to CW 11, the main issue at Skaerbaek was that there were not enough employees working on the project. Specifically, CW 11 felt that each project needed between ten to twenty workers but Skaerbaek only had a "small squad" comprised of what CW 11 believed was around five workers. The lack of sufficient personnel resources resulted in delays and employees taking "shortcuts." In addition, the lack of employee resources and knowledge meant that the 3-D Computer Aided Design software was being used improperly, as the "catalogue and specification" system was not being employed as it should be for modeling, which led to "everything not being correct in the 3-D model," and work being done twice. Because of the lack of resources,

the Skaerbaek project was "massively behind schedule." When 11 was pulled from Skaerbaek in January 2017, the project was about 90% complete.

84. According to the Company's Report on Form 10-Q for the quarter ended June 30, 2017, B&W recorded additional contract losses on the Skaerbaek project due to increased estimated costs to finish the project:

> During the three and six months ended June 30, 2017, we recognized additional contract losses of $2.7 million and $5.5 million, respectively, as a result of changes in the estimated costs at completion. Our estimate at completion as of June 30, 2017 includes $7.3 million of total expected liquidated damages for schedule delays. As of June 30, 2017, the reserve for estimated contract losses recorded in "other accrued liabilities" in our consolidated balance sheet was $1.5 million.

### E. Defendants Knew that Their Efforts to Fix the Engineering Design Flaws at Copenhill Would Negatively Impact the Progress and Profitability of Several Other Renewable Projects.

85. According to CW 4, once projects started losing money, B&W became substantially involved in the decision-making process. CW 4 stated that B&W directed B&W Volund to divert staff from other projects to fix the piping design problems at Copenhill. CW 5 confirmed that, beginning in January 2016, at least ten to fifteen engineers were diverted from three B&W Volund U.K. projects (Margam, Teesside, and Dunbar) to work on the Copenhill project after the piping problems were brought to a head. At this time, CW 5 added that Busch and Nielsen took responsibility for the piping of Copenhill and supervised the engineers brought over to work on it. Those engineers remained on the Copenhill project through at least June 2016, according to CW 5.

86. According to CW 4, the U.K. projects were much larger than those previously performed by B&W Volund, and the construction organizations at the projects were new. CW 4 stated that the diversion of staffing resources to Copenhill meant that B&W Volund did not have

sufficient qualified personnel on site at the U.K. projects, and inexperienced management caused delays and budget problems with the U.K. projects.

87.     Additionally, CW 4 stated that because he was needed on site at Copenhill and Skaerbaek from approximately April 2016 through August 2016, CW 4 had to cut down on travel to the U.K. project locations.

88.     According to CW 4, B&W was expressly warned that the focus on Copenhill would cause losses on other projects.  CW 4 recalled that B&W Volund CEO Olesen discussed the issue with B&W management and expressed concern that B&W had "put all their eggs in one basket" with their decision to focus on Copenhill.  CW 4 said Olesen warned that the Company would lose time and money on its other projects as a result of the decision to focus on Copenhill, and that the other projects would suffer untimely procurement and completion as a result.

89.     In addition to diverting staff from other projects, CW 4 stated that B&W dispatched engineers, construction personnel, and other personnel to assist with procurement from its U.S. offices to Denmark to assist with the Copenhill problems.  These B&W personnel added an additional layer to the decision-making process at Copenhill as they needed high level approval from B&W management for any decisions.  The B&W personnel participated in normal project meetings and reported back to B&W management.

90.     As had been forewarned, CW 4 stated that the diversion of staff from other projects to Copenhill created problems in the other projects, including delays and budget overruns. Additionally, CW 5 learned from the Norfors Project Manager, Per Rams, that the Norfors project experienced piping design problems as well.  CW 5 expected that the U.K. projects would also experience problems with their piping and learned from former colleagues after he left B&W Volund in June 2016 that the U.K. projects did, in fact, have piping problems.

**F.** **Defendants Were Aware of Significant Problems at Other Renewable Projects Throughout the Class Period.**

91.     As revealed by the dramatic, negative market reaction to the Company's disclosure of the Copenhill problems on June 28, 2016, the problems at Copenhill alone were of great concern to investors. In addition to the Copenhill problems (and those at Skaerbaek discussed above), however, numerous other projects experienced significant delays which, if publicly disclosed, would have alerted investors to the Company's inability to realize the value of its Renewable backlog and execute its publicly stated Renewable growth goals.

### 1.     Norfors Plant in Denmark

92.     In July 2013, B&W announced that B&W Volund was awarded a contract worth approximately $40 million to engineer and supply steam generating equipment, ash handling systems, and combustion control systems for Norfors. B&W Volund was to supply waste-firing equipment, including an advanced DynaGrate® combustion grate for the plant's steam generator. The new facility was projected to burn 80,000 tons of waste per year. Start-up of the plant was anticipated in the spring of 2016.

93.     According to CW 5, the Norfors project also was experiencing piping design problems.[15]  Norfors was being worked at the same time as Copenhill, but was a smaller project. Additionally, CW 8, who worked as a Process Engineer in B&W's Golstrup, Denmark office from April 2013 to approximately June 2016, confirmed that the Norfors project suffered from several problems, including planning issues, contract requirement/identification issues, client permitting problems, environmental permit issues and construction permit issues. CW 8 stated that these problems caused delays and put the project behind schedule.

---

[15]  CW 5 learned of these piping design problems from the Norfors Project Manager, Per Rams.

## 2. Waste to Energy and Biomass Plants in the U.K.

94. As CW 4 explained, B&W Volund won several projects in the U.K. in or around late 2014 or 2015. These projects were much bigger projects than those that B&W Volund had previously undertaken. CW 4 stated that it was clear that the B&W U.S. team had a good understanding of challenges inherent in doubling and tripling its revenues from the project business and entering into new contract types within the U.K.—i.e., B&W U.S. management had clear knowledge of what type projects and associated risks were being undertaken in the U.K. CW 4 indicated his belief that the commitment to the U.K. projects, in conjunction with the problems at Copenhill, placed B&W Volund under tremendous pressure. According to CW 4, this was no surprise; the construction organization at the U.K. projects was new and it was known that it would be problematic from the start.

95. CW 1 likewise stated that the U.K. projects were bigger in contract size and scope than previous B&W Volund contracts. At the time of CW 1's departure in May 2015, he stated that there were significant problems with the U.K. projects due to delays caused by the civil engineers. Additionally, CW 1 anticipated more problems arising in these projects because three of them started at approximately the same time, making resources stretched, and B&W Volund was experiencing problems with its partners on the projects.

96. CW 12 was a senior level B&W Volund from employee August 2016 to mid-July 2017, and was involved in piping engineering and responsible for expediting and follow-up detail engineering and prefabrication for the Margam, Templeborough, and Teesside projects. Specifically, CW 12 was responsible for progress reporting, design inspection, sub-supplier audits, and solving technical queries for these Renewable projects.

97. CW 12 said that the main problem with Margam, Templeborough, and Teesside was that B&W Volund had taken on these big contracts without procedures or models for an

Engineering, Procurement, Construction, and Installation ("EPCI") execution. He immediately recognized that B&W did not have "site execution" models (i.e., electrical, piping, and structural) or EPCI plans at these facilities, despite these being common arrangements used in the renewable energy construction process. CW 12 also stated that the basic design was released too early to the detail design contractor, resulting in many changes to the basic design. He witnessed many piping design problems and issues with poor communication between project managers and suppliers at these three projects, which ultimately led to missed milestones.

98. Knowing they would not be meeting project deadlines, in mid-September 2016 there was a meeting in Copenhagen which CW 12 attended between certain B&W Volund Project Managers (including at least Johannes Engelsby Hansen (Margam Project Manager) and Clause Risum Korsgaard (Templeborough Project Leader)) and project managers with the subcontractor responsible for detailed designs, prefabrication, and onsite assembly of piping for the projects. At the meeting, the subcontractor's project managers reiterated their concerns that the sites were not ready for them to start work as they were still missing basic necessities such as areas for site fabrication and storage, electric power, and facilities for the workers. CW 12 stated that the subcontractor also warned that the projects were "moving too fast" and had basic design flaws.

99. According to CW 12, by July 2017, the issues at the Margam, Templeborough, and Teesside projects were improving, but "there was no way to save these projects . . . the damage was already done."

100. CW 13 was formerly on the Managers Team of a subcontractor with responsibility for managing pipe designs and design corrections for some of B&W Volund's projects including

the Margam, Templeborough, and Teesside projects.[16] CW 13's tenure with the subcontractor was approximately nine years from 2008 through the end of 2016. According to CW 13, his subcontractor employer was contracted by B&W Volund in the Spring 2016 to provide detailed designs, prefabrication, and onsite assembly of piping for projects including Margam, Templeborough, and Teesside. CW 13 explained that B&W Volund would provide the initial basic designs of the projects and the company he worked for would then create more detailed designs drawn from those basic designs. According to CW 13, prefabrication included welding pipes together and providing bends for pipes, after which his company would assemble the pipes at the job sites.

101. CW 13 stated that the Margam, Templeborough, and Teesside projects all experienced serious delays due to B&W Volund's poor basic designs for those projects. CW 13 recalled that when his company first received the basic designs for piping for Margam, Templeborough, and Teesside, his company had to correct flaws in the basic designs, such as incorrect diameters for pipes that required bends and other design miscalculations. CW 13 further stated that his company sent lists with hundreds of design changes to B&W Volund for approval, which led to weeks of back and forth before approval for the changes was given. According to CW 13, this caused further delay in the scheduling of other aspects of these three projects.

102. CW 13 recalled that around September 2016, B&W U.S. employees began making regular visits to B&W Volund projects, including Copenhill, Margam, Templeborough, and Teesside. CW 13 confirmed that one B&W U.S. employee would stay in Europe for a few weeks, then be replaced by another B&W U.S. employee. CW 13 confirmed that this was because the

---

[16] CW 13 has requested that his employer, a subcontractor for B&W Volund beginning in 2016, not be identified herein by name.

projects were behind schedule. CW 13 recalled one such employee, Matt Kurian, who came from the B&W U.S. location in Ohio to B&W Volund in approximately September 2016. According to CW 13, during this time, Kurian was kept well-informed about delays and problems being experienced at Margam, Templeborough, and Teesside by several means, including: daily conference calls via Skype with B&W Volund management in which Kurian often participated; in-person on site meetings with subcontractors including CW 13; email communications from CW 13 to Kurian; and bi-weekly in-person meetings at B&W Volund which Kurian and CW 13 both attended. CW 6 was a Technical Coordinator/Senior Engineer at B&W Volund from mid-January 2017 through mid-May 2017 with responsibility for the projects in Dunbar, Margam, Templeborough, and Teesside. Specifically, he was responsible for following up and monitoring the progress of the subcontractors, which made-up a large amount of the workforce.

103. According to CW 6, each of these projects were behind schedule when he started in mid-January 2017. He stated that the problems originated from shoddy original design and poor communication to inexperienced subcontractors who were frequently being replaced by project managers who were also unfamiliar with proper turnkey production. CW 6 learned of several flaws in the original designs of these projects, including incorrect stress calculations in the piping design and foundation design errors. Additionally, there were no proper execution models provided by the project managers.

104. B&W announced that in the fourth quarter of 2016, two of the U.K. projects had become loss contracts and two others suffered reduced profitability due to delays caused by the diversion of staffing resources from these projects to Copenhill. Specifically, one of the U.K. projects incurred charges of $28.1 million for 2016 (with $23.0 million of the total in the fourth

quarter) and another U.K. project recognized a charge of $16.4 million for 2016 ($16.2 million of which was in the fourth quarter).

105.     Further details of some of the problems and delays at these U.K. projects are set forth below.

### (a)     Dunbar

106.     On December 22, 2014, B&W announced that a consortium that included B&W Volund had been awarded a $230 million contract to engineer, procure and construct a waste-to-energy power plant near Dunbar, Scotland.   Viridor U.K. selected B&W Volund and its construction partner, Interserve Strategic Projects, to design and build the plant.  B&W Volund's scope purportedly accounted for more than two-thirds of the contract value and included two waste-to-energy boilers, advanced DynaGrate® dynamic fuel combustion system, steam turbine, and a dry flue gas cleaning system.  The plant was scheduled to go online in the fourth quarter of 2017.

107.     CW 9 worked as a mid-level manager involved in day to day project management for B&W Volund's subsidiary, Miljo, in Gothenburg, Sweden from approximately April 2015 through February 2017.  During his tenure, CW 9 worked on two B&W Volund projects in the U.K., both of which experienced problems:  the Dunbar waste to energy plant in Scotland, and the Teesside project in Port Clarence, England.  According to CW 9, the Dunbar plant experienced problems and delays resulting from the work or inefficiency of B&W Volund's main construction partner, Interserve.  CW 9 and his team were working on delivering flue gas abatement treatments on the two-boiler project at Dunbar.  CW 9 explained, based on his on-site observations, that B&W Volund had to frequently revise time schedules and deliveries attributable to phases of the project due to delays caused by Interserve.

108.   Additionally, as noted above, CW 5 was aware of engineers being diverted from the U.K. projects to work on Copenhill starting in approximately January 2016 and continuing through at least June 2016. CW 5 expected that the U.K. projects would experience problems with their piping, and learned from former colleagues after leaving B&W Volund, that they did, in fact, have piping problems.

109.   CW 9 stated that the Dunbar project team met weekly or at least bi-weekly and reported out. CW 9 sent data concerning Interserve delays to the B&W Volund Project Director for Dunbar, Peter Gedbjerg, who reported the data to the B&W Volund Director of New Energy Plants at least monthly.

110.   CW 11 worked on the Dunbar project for approximately eight weeks, beginning in January 2017. CW 11 indicated that the Dunbar project suffered from engineering issues similar to those at the Skaerbaek project. In addition, B&W Volund hired a Croatian contractor, which, according to CW 11, provided "cheap labor." Hiring this Croatian contracting company put the Dunbar project behind schedule due to "lots of poor communication" and mistakes. According to CW 11, as a result of these mistakes, some of the work at Dunbar had to be done twice.

111.   According to the Company's Report on Form 10-Q for the quarter ended June 30, 2017, B&W recorded contract losses on the Dunbar project due to increased estimated construction costs to finish the project and schedule delays.

**(b)     Margam**

112.   On January 28, 2015, B&W announced that B&W Volund had been awarded contracts by Margam Green Energy Ltd. for more than $200 million to engineer, procure, and operate a state-of-the-art biomass power plant in Margam, Wales. The plant would feature advanced environmental controls designed by B&W Volund and its Götaverken Miljö AB subsidiary, including a dry flue gas desulfurization system (dry FGD), fabric filter baghouse,

continuous emissions monitoring equipment, and an advanced DynaGrate® dynamic fuel combustion system. Construction was scheduled to be completed in the second quarter of 2017.

113. According to the press release announcing the award of the project, Ferland confirmed that the project demonstrated B&W's focus on growing its international power business. "***The Margam project is the fifth major coal, renewable or waste-to-energy contract announced by B&W's power generation subsidiary in the last seven months***," Ferland said. "We continue to look globally for opportunities to grow our business in the fossil power and renewable sectors, while maintaining limited exposure to the impact of a turbulent global oil market."

114. CW 10 was a supervisor for B&W Volund from October 2015 to August 2016 who reported to Site Manager Brian Nielsen and worked on two projects in the U.K.—Margam and Templeborough. CW 10 reported that, from the outset, both projects experienced problems with labor shortages and issues with Interserve. CW 10 explained that Interserve, who partnered with B&W Volund on these two projects, was not familiar with and did not understand power plant construction, leading to mistakes and delays. Interserve created "a lot of problems" during the project. CW 10 further stated that B&W had contracted with Portuguese steel erectors and Croatian boiler makers who had difficulty gaining permission to work because of the Construction Design and Management regulations in the U.K., which resulted in manpower shortages and delays in work and deliveries. The project schedules had to be adjusted because of the delays that resulted from these issues.

115. CW 7 confirmed that B&W Volund experienced problems with the principal contractors at the U.K. sites and that these problems caused delays. Like CW 10, CW 7 stated that the contractors did not know how to build power plants and that the contractors knew nothing about running projects. CW 7 explained that despite this lack of knowledge, the contractors could

and did overrule B&W Volund on issues and the multiple levels of supervision created further issues. While CW 7 was responsible for supervising construction, CW 10 could not manage the contractors' work as they had their own supervisors.

116. Additionally, as noted above, CW 5 was aware of engineers being diverted from the U.K. projects to work on Copenhill starting in approximately January 2016 and continuing through at least June 2016. CW 5 expected that the U.K. projects would experience problems with their piping, and learned from former colleagues after leaving B&W Volund, that they did, in fact, have piping problems.

117. According to the Company's Report on Form 10-Q for the quarter ended June 30, 2017, B&W recorded contract losses on the Margam project due to increased estimated construction costs to finish the project and schedule delays.

### (c) Templeborough

118. On March 11, 2015, B&W announced that contracts totaling more than $220 million were awarded to B&W Volund and Interserve Strategic Projects to design, manufacture, and operate the Templeborough Biomass Power Plant in Rotherham, South Yorkshire, England ("Templeborough"). Plant completion was scheduled for the third quarter of 2017.

119. As described by CW 10 in connection with Margam, above, Templeborough experienced problems related to B&W Volund's partner, Interserve, which was not familiar with and did not understand power plant construction, leading to mistakes and delays which impacted the schedule for completion.

120. According to the Company's Report on Form 10-Q for the quarter ended June 30, 2017, B&W recorded contract losses on the Templeborough project due to increased estimated construction costs to finish the project and schedule delays.

**(d)    Teesside**

121.    On September 21, 2015, B&W announced that a joint venture that included B&W Volund had been awarded a contract to design and build the Teesside Renewable Energy Plant near Middlesborough, England.  B&W Volund was also awarded a separate contract to provide operations and maintenance services for the plant.  B&W's portions of the two contracts totaled more than $190 million.  The project scope included a boiler and environmental controls designed by B&W Volund and B&W's Götaverken Miljö AB subsidiary.  Construction was scheduled for completion in the first quarter of 2018, after which B&W Volund would operate the plant under a fifteen-year contract.

122.    CW 9 reported that Teesside experienced delays.  CW 9 and his team were working on delivering flue gas abatement treatments at Teesside.  The time schedule problems and resulting delays were exacerbated by severe union/employment issues in the industrial community surrounding the site.

123.    Additionally, as noted above, CW 5 was aware of engineers being diverted from the U.K. projects to work on Copenhill starting in approximately January 2016 and continuing through at least June 2016.  CW 5 expected that the U.K. projects would experience problems with their piping, and learned from former colleagues after leaving B&W Volund, that they did, in fact, have piping problems.

124.    CW 9 stated that the Teesside project team met weekly or at least bi-weekly, and had the same reporting obligations to the B&W Volund Director of New Energy Plants as applied to Dunbar.

125.    According to the Company's Report on Form 10-Q for the quarter ended June 30, 2017, B&W recorded contract losses on the Teesside project due to increased estimated construction costs to finish the project and schedule delays.

43

## V. DEFENDANTS MADE MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS CONCERNING THE PROBLEMS IN B&W'S RENEWABLE DIVISION AND MISREPRESENTED THE COMPANY'S FINANCIAL PROSPECTS AND INTERNAL CONTROLS

126.    Defendants made materially false and misleading statements and omissions concerning the growth and financial prospects of the Company's Renewable business segment throughout the Class Period.

### A.    June 17, 2015 Analyst/Investor Day Statements

127.    On June 17, 2015, B&W held an Analyst/Investor Day at which the Individual Defendants touted B&W's strategy of growing the Global Power division and the renewable business within that segment. Ferland stated, for example, that "the strategy in the power segment, it's about growth, it's about targeted opportunities where we can really make money, investing in business development, so we can find those opportunities."

128.    Ferland presented a slide listing seven contracts awarded in the last year (including four of the renewable projects noted above—Templeborough, Margam, Dunbar, and Skaerbaek) with a total value of $730 million, and stated:

> This is a really good story. ***This provides a ton of momentum for B&W coming out of the spin. There's a lot of new work right here, most of it just getting started, a lot of it carries into 2016, 2017***. Really good story on this page.

129.    He further told investors that he expected to win one or two more renewable contracts "between now and the end of the year," and presented a "case study" slide on the Copenhill project, noting that the project is "***a big piece of our business***."

130.    Apker highlighted the Company's strong and growing backlog, stating:

> As Jim mentioned, we've been fortunate to book a number of very large projects in the last several months, which is [sic] had a nice impact on the size of our backlog. ***This backlog increase is evidence of the effectiveness of our new – and our focus on executing our second strategic objective to grow international sales***. Strong bookings in the back half of 2014 and first quarter of 2015 boosted backlog,

including those 2 international coal boiler projects, and 4 European renewables projects.

131.    Defendants' statements in paragraphs 127 through 130 above, touting the Company's addition of new projects to its backlog and its ability to execute on its Renewable growth strategy, and their discussion of the Copenhill, Skaerbaek, Templeborough, Margam, and Dunbar projects were materially false and misleading because:  (a) they concealed that, due to rapid growth in the Renewable segment and cost cutting strategies, the Company lacked sufficient professional resources and capabilities to perform on time and within budget the Renewable contracts in its backlog, thereby rendering the backlog an improbable and unrealistic source of profitability, as discussed above at Sections IV.A and IV.B; (b) the Company was experiencing a significant, undisclosed problem with engineering design at Copenhill, as discussed above at Section IV.D; and (c) there were ongoing, undisclosed material problems at other major Renewable projects, as discussed above at Sections IV.D through IV.F.  Having elected to speak about the purported strength of the Company's Renewable business, Defendants violated their duties to disclose these material facts so as to render their statements not misleading. Moreover, had such material facts been disclosed, it would have reasonably called into doubt the truth of the above statements.

132.    Analysts relied on B&W's ability to execute on the renewable growth projects where it had signed contracts in issuing favorable ratings for the Company at the start of the Class Period.  For example, one analyst initiated coverage of B&W on July 1, 2015, with an "outperform" rating and a "core growth company" profile, citing in part that B&W is "working diligently to grow its business internationally and has shown early signs of success over the last two quarters with *robust awards leading to 30% year-over-year backlog growth (as of first quarter 2015), in turn providing the company with above-average visibility into solid*

45

*revenue growth through the remainder of 2015 and 2016*." The analyst further explained that Global Power—the segment that at the time housed the Renewable business—was expected to generate the majority of B&W's organic growth over the next several years, with "[t]he largest growth opportunity" in the global waste-to-energy market.

### B. June 30, 2015 Final Prospectus

133. On June 30, 2015, B&W filed a final prospectus for the long-term incentive plan related to its spin-off (the "Prospectus"). The Prospectus touted B&W's "competitive strengths," stating:

> • ***Leading Market Position in the Global Power Generation Market:*** We are a proven leader and brand in the design, engineering, manufacture, supply, construction and maintenance of steam generating and environmental control systems for power generation providers worldwide.

134. Additionally, in describing its strategy going forward as a new company, the Prospectus noted opportunity in "a global need for renewable and carbon neutral power applications requiring steam generation and environmental control technologies to enable beneficial use of municipal waste and biomass," stating further: "***We expect the growth in backlog since December 31, 2014, which relates primarily to recent international coal boiler and renewable bookings, will provide revenue growth in this segment.***"

135. B&W's statements in paragraphs 133 and 134 above, touting the Company's Renewable growth strategy and backlog in the Prospectus were materially false and misleading because: (a) they concealed that, due to rapid growth in the Renewable segment and cost cutting strategies, the Company lacked sufficient professional resources and capabilities to perform on time and within budget the Renewable contracts in its backlog, thereby rendering the backlog an improbable and unrealistic source of profitability, as discussed above at Sections IV.A and IV.B; (b) the Company was experiencing a significant, undisclosed problem with engineering design at

Copenhill, as discussed above at Section IV.D; and (c) there were ongoing, undisclosed material problems at other major Renewable projects, as discussed above at Sections IV.D through IV.F. Having elected to speak about the purported strength of the Company's Renewable business, Defendants violated their duties to disclose these material facts so as to render their statements not misleading.

### C. August 4, 2015 Press Release and 10-Q

136. On August 4, 2015, the Company filed a Form 8-K with the SEC, announcing its second quarter 2015 financial results. The release noted "an increase of $110.1 million, or 33.6%," in revenues from the second quarter of 2014. These earnings were mainly attributed to Global Power which "had the largest increase with revenues of $157.4 million . . . driven by an increase in new build steam projects." Ferland trumpeted these results, stating that "B&W continues to deliver on our strategy and build a solid track record of performance[.]" Ferland attributed the earnings to "*a significant increase in revenues in Global Power driven by the new international project awards in line with our growth strategy.*"

137. In the Company's Form 10-Q for the second quarter of 2015, also filed with the SEC on August 4, 2015, Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations again touted the Company's Renewable business growth strategy and backlog, stating:

> Globally, efforts to reduce the environmental impact of burning fossil fuels may create opportunities for us as existing generating capacity is replaced with cleaner technologies.

> \* \* \*

> *We expect the recent growth in backlog, which relates primarily to recent international coal boiler and renewable bookings, will provide revenue growth in [the Global Power] segment*, although the rate of backlog growth is dependent on many external factors described above and may vary from period to period.

138. Additionally, in a section titled "Backlog" under Item 2, the Form 10-Q showed a jump in Global Power backlog from $946 million on December 31, 2014 to $1.185 billion on June 30, 2015. It also stated that the Company expected to recognize revenue from the Global Power backlog as follows: $322 million in 2015; $448 million in 2016, and; $415 million "thereafter."

139. B&W's statements in paragraphs 136 through 138 above, touting the Company's Renewable/Global Power growth strategy and backlog and its anticipated revenue recognition were materially false and misleading because: (a) they concealed that, due to rapid growth in the Renewable segment and cost cutting strategies, the Company lacked sufficient professional resources and capabilities to perform on time and within budget the Renewable contracts in its backlog, thereby rendering the backlog an improbable and unrealistic source of profitability, as discussed above at Sections IV and IV.B; (b) the Company was experiencing a significant, undisclosed problem with engineering design at Copenhill, as discussed above at Section IV.D; and (c) there were ongoing, undisclosed material problems at other major Renewable projects, as discussed above at Sections IV.D through IV.F. Having elected to speak about the purported strength of the Company's Renewable business, Defendants violated their duties to disclose these material facts so as to render their statements not misleading.

140. Concerning certain cost cutting measures, the Form 10-Q stated, "[w]e are also targeting additional structural change initiatives that we expect . . . to drive further margin improvement in our Global power and Global Services segments." It further stated that "cost savings from these programs are expected to make our offerings more cost-competitive through both direct and overhead cost reductions, allowing us to more aggressively pursue new business opportunities and other initiatives to increase stockholder value."

141.     B&W's statements in paragraph 140 above, touting the Company's cost-cutting measures were materially false and misleading because they concealed that, as a result of the cost cutting strategies, the Company lacked sufficient professional resources and capabilities to perform on time and within budget the Renewable contracts in its backlog, as discussed above at Sections IV.A and IV.B.  Having elected to speak about the purported benefits of the cost-cutting strategies, Defendants violated their duties to disclose these material facts so as to render their statements not misleading.

142.     The Form 10-Q included Sarbanes-Oxley ("SOX") certifications signed by Ferland and Apker, which stated, in part:  "information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company as of the dates and for the periods expressed in the Report."

143.     The quarterly report also included Exchange Act certifications signed by Ferland and Apker, which stated as follows:

> Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report[.]

144.     For the reasons noted in paragraphs 139 and 141 above, these certifications were false and misleading.

**D.     August 5, 2015 Earnings Call Statements**

145.     In the earnings call concerning second quarter results the next day in which Ferland and Apker participated, Ferland confirmed that "***[o]ur global power division is our primary organic growth engine as we seek to expand our presence worldwide***."  In further discussing this segment, Ferland stated:  "We . . . feel good about the revenue outlook given the ***visibility of the backlog in this business through 2017***."  Ferland stated further that "we're in good position to

generate growth as we slowly diversify the business to reduce our dependence on US coal and *leverage our core competencies and strong balance sheet to expand our presence in the growing renewables and industrial environmental segments.*"

146.     Commenting on the bid pipeline, Ferland noted that it had been steady around $2.5 billion, which was "a pretty good sign in that we booked an awful lot of large projects in the last nine months give or take . . . . The new business development teams that we have in place working with our . . . operations folks continue to source good opportunities for us both on the renewable side . . . as we look to . . . continue our success in the – in the U.K. and begin to expand our renewables business worldwide."

147.     Defendants' statements during the August 5, 2015 conference call in paragraphs 145 and 146 above, concerning "organic growth," "core competencies," and the company's backlog and/or pipeline of new projects, were materially false and misleading because: (a) they concealed that, due to rapid growth in the Renewable segment and cost cutting strategies, the Company lacked sufficient engineering and other resources to perform on time and within budget the Renewable contracts in its backlog, thereby rendering the backlog an improbable and unrealistic source of profitability, as discussed above at Sections IV.A and IV.B; (b) the Company was experiencing a significant, undisclosed problem with engineering design at Copenhill, as discussed above at Section IV.D; and (c) there were ongoing, undisclosed material problems at other major Renewable projects, as discussed above at Sections IV.D through IV.F.  Having elected to speak about the purported strength of the Company's Renewable business, Defendants violated their duties to disclose these material facts so as to render their statements not misleading.

### E.     September 21, 2015 Statements

148.     On September 21, 2015, the Company announced the award of contracts worth over $190 million for its subsidiary, B&W Volund, to design, build, operate, and maintain the Teesside

Renewable Energy Plant in Middlesbrough, England. In the announcement, Scavuzzo, Senior Vice President of the Global Power division, touted the Company's technology and expertise, stating, "[w]ith more than 500 biomass and waste-to-energy units installed worldwide and O&M experience, *we bring unmatched capabilities* to this important project." The announcement further stated that project engineering for Teesside was underway, with project completion scheduled for the first quarter of 2018.

149. The statements in paragraph 148 above, which touted the growth of the Renewable business at B&W Volund and its "unmatched capabilities," were false and misleading because: (a) they concealed that, due to rapid growth in the Renewable segment and cost cutting strategies, the Company lacked sufficient professional resources and capabilities to perform on time and within budget the Renewable contracts in its backlog, including the Teesside contract, as discussed above at Sections IV.A and IV.B; (b) the Company was experiencing a significant, undisclosed problem with engineering design at Copenhill, as discussed above at Section IV.D; and (c) there were ongoing, undisclosed material problems at other major Renewable projects, as discussed above at Sections IV.D through IV.F. Having elected to speak about B&W's purported capabilities, Defendants violated their duties to disclose these material facts so as to render their statements not misleading.

150. Analysts relied on Defendants' statements about Teesside, with KeyBanc, for example, stating that the Teesside contract is "important [] for BW from a strategic perspective, as the Company looks to expand its power market beyond its traditional core domestic coal power plant market and as investors look for further evidence of the Company leveraging its global business development initiatives."

### F.     November 3, 2015 Form 10-Q

151.    On November 3, 2015, the Company filed a Form 10-Q for the third quarter of 2015 with the SEC.  In a section titled "Backlog" under Item 2, the Form 10-Q showed a jump in Global Power backlog from $946 million on December 31, 2014 to $1.253 billion on September 30, 2015.  It further stated that the Company expected to recognize revenue from the Global Power backlog as follows:  $175 million in 2015; $519 million in 2016, and; $559 million "thereafter."

152.    B&W's statements touting the Company's backlog and its anticipated revenue recognition in paragraph 151 above were materially false and misleading because:  (a) they concealed that, due to rapid growth in the Renewable segment and cost cutting strategies, the Company lacked sufficient professional resources and capabilities to perform on time and within budget the Renewable contracts in its backlog, thereby rendering the backlog an improbable and unrealistic source of profitability; (b) the Company was experiencing a significant, undisclosed problem with engineering design at Copenhill; and (c) there were ongoing, undisclosed material problems at other major Renewable projects.  Having elected to speak about the purported strength of the Company's backlog, Defendants violated their duties to disclose these material facts so as to render their statements not misleading.

### G.     November 4, 2015 Earnings Conference Call

153.    On November 4, 2015, the Company hosted an earnings conference call regarding third quarter 2015 results.  Participating on the call from B&W were Ferland and Apker.  During the call, Ferland again touted the "strong performance in Global Power," stating that "*[g]lobal Power's awards, including the new waste energy plant announced this quarter are keeping the backlog high*."  Apker echoed this sentiment, stating "the Global Power segment again posted strong revenue growth . . . . due to the strength in both utility and renewable businesses[.]"

52

154.     Additionally, Ferland touted "the continuing success of our efforts to grow revenue, primarily in Global Power," and stated that, "*[w]e're confident that our expanding backlog in Global Power and continued focus on margin improvement will generate significant core growth in 2016*."

155.     In the Q&A segment of the conference call, Ferland elaborated regarding renewable business growth, stating:  "Global Power, in particular the waste-to-energy project in Europe, right, we have several projects we've signed. We are just—*we are in the process of ramping up revenues right now that's going to continue into 2016, and our bid pipeline is actually up, not down.*"

156.     Additionally, Ferland explained B&W's role as original equipment manufacturer in waste-to-energy projects and how the Company partners with outside construction companies to build the plants.  Using the Teesside project, where the Company was contracted to provide the plant equipment and operate and maintain the plant once completed, Ferland stated:  "That's a very traditional work scope for us. We stick to our knitting. We do what we're good at and we find a partner who knows how to do construction and they do what they are good at. *We've had good success in not only booking that work but executing that work.*"

157.     In response to questions from analysts about B&Ws bid pipeline, Ferland stated, in part:

> [O]ur bid pipeline remains strong. As a matter of fact, it's actually growing despite the fact that we continue to sign these large projects, at which time they come off our bid pipeline. We're getting some traction on both fronts. We continue to see waste energy opportunities currently in Europe . . . .
>
> *      *      *
>
> **So, again, we feel good about revenue growth, the bid pipeline is strong, and we would expect some more success in 2016**.

158.    Defendants' statements in paragraphs 153 through 157 above, concerning the Company's backlog/pipeline, its revenue growth, and its purported ability to "execute" on its projects were materially false and misleading because:  (a) they concealed the fact that, due to rapid growth and cost cutting strategies in the Renewable segment, the Company lacked sufficient engineering and other resources to perform on time and within budget the Renewable contracts in its backlog, thereby rendering the backlog an improbable and unrealistic source of profitability, as discussed above at Sections IV.A and IV.B; (b) the Company was experiencing a significant, undisclosed problem with engineering design at Copenhill, as discussed above at Section IV.D; and (c) there were ongoing, undisclosed material problems at other major Renewable projects, as discussed above at Sections IV.D through IV.F.  Having elected to speak about the above matters, Defendants violated their duties to disclose these material facts so as to render their statements not misleading.

159.    Analysts relied on Defendants' materially false and misleading statements. For example, an analyst with William Blair noted "limited downside risk (especially on revenue) given the company's solid backlog[.]"  Likewise, Credit Suisse referenced B&W management's comments on Global Power as the "primary organic growth engine for the Company" and stated that the Company's backlog provided "good visibility" through 2017.  KeyBanc reiterated its "Overweight rating" observing that "[i]n particular, color on forward-looking backlog burn makes us incrementally comfortable on the level of contribution from outside of coal power into 2H15/2016;" and noted further the "***backlog burn profile as an important positive in terms of visibility for non-coal revenue contribution as per management's diversification strategy***."  Whitesand Research recounted B&W's "recent wins in waste-to-energy" and stated that they

"remain bullish" as "**BW will target growth in Global Power, largely through waste-to-energy . . . ." as it "diversif[ies] away from US coal business which is in secular decline**."

### H.    February 25, 2016 Press Release

160.    On February 25, 2016, the Company issued a news release announcing its financial results for the fourth quarter and full year 2015.  The release announced fourth quarter revenues increased by 13.1% to $502.7 million, compared to fourth quarter 2014, primarily due to increased volume in Global Power.  Full year revenues increased 18.3% to $1.76 billion, compared to 2014.

161.    Additionally, the announcement disclosed Global Power revenues for the fourth quarter of 2015 had increased 55.2% to $198.7 million, compared to the same period of 2014.  Global Power gross profit for the fourth quarter increased by $8.2 million to $38.4 million, compared to fourth quarter 2014.

162.    The release quoted Ferland, as follows:

> **Through a combination of revenue growth driven by our strong backlog and robust bid pipeline**, continued margin improvement and share buybacks through February 2016, we are projecting 12% adjusted EPS growth in 2016, relative to our original adjusted EPS guidance for 2015 . . . .  **We are confident that we will provide meaningful growth to our core business in 2016**, while continuing to leverage our strong balance sheet to pursue acquisitions and/or additional share repurchases.

163.    Defendants' statement touting the Company's "robust pipeline" and "strong backlog" in paragraph 162 above, was materially false and misleading because:  (a) it concealed that, due to rapid growth in the Renewable segment and cost cutting strategies, the Company lacked sufficient professional resources and capabilities to perform on time and within budget the Renewable contracts in its backlog, thereby rendering the backlog an improbable and unrealistic source of profitability, as discussed above at Sections IV.A and IV.B; (b) the Company was experiencing a significant, undisclosed problem with engineering design at Copenhill, which would impact the completion and profitability of several other projects, as discussed above

at Section IV.D; (c) there were ongoing, undisclosed material problems at other major Renewable projects, as discussed above at Sections IV.D through IV.F; and (d) staffing and other resources were being diverted to Copenhill from the other major Renewable projects which exacerbated the latent problems at those projects, as discussed above at Section IV.E. Having elected to speak about the purported strength of the Company's backlog/pipeline, Defendants violated their duties to disclose these material facts so as to render their statements not misleading. Moreover, had such material facts been disclosed, it would have reasonably called into doubt the truth of the above statements.

### I. February 25, 2016 Form 10-K

164. On the same day, the Company filed its Form 10-K annual report for the year ended December 31, 2015. In a section titled "Backlog" under Item 1. Business, the Form 10-K showed an increase in Global Power backlog from $946 million on December 31, 2014 to $1.118 billion on December 31, 2015. Further, it stated that the Company expected to recognize revenue from the Global Power backlog as follows: $548 million in 2016; $229 million in 2017, and $341 million "thereafter."

165. Included with the Company's Form 10-K for the year ended December 31, 2015 were SOX and Exchange Act certifications signed by Ferland and Apker (and virtually identical to the certifications cited at paragraphs 142 and 143), which were false and misleading for the reasons set forth in paragraph 163, above.

166. B&W's statements touting the Company's backlog and its anticipated revenue recognition in paragraph 164 above were materially false and misleading because: (a) they concealed that, due to rapid growth in the Renewable segment and cost cutting strategies, the Company lacked sufficient professional resources and capabilities to perform on time and within budget the Renewable contracts in its backlog, thereby rendering the backlog an improbable

56

and unrealistic source of profitability, as discussed above at Sections IV.A and IV.B; (b) the Company was experiencing a significant, undisclosed problem with engineering design at Copenhill, which would impact the completion and profitability of several other projects, as discussed above at Section IV.D; (c) there were ongoing, undisclosed material problems at other major Renewable projects, as discussed above at Sections IV.D through IV.F; and (d) staffing and other resources were being diverted to Copenhill from the other major Renewable projects, which exacerbated the problems at those projects, as discussed above at Section IV.E. Having elected to speak about the purported strength of the Company's backlog, Defendants violated their duties to disclose these material facts so as to render their statements not misleading.

**J.     February 25, 2016 Earnings Conference Call**

167.     The next day, February 26, 2016, the Company hosted an earnings conference call regarding the fourth quarter and full year 2015 earnings.  Participating on the call from B&W were Ferland and Apker.  During the call, Ferland stated that "***our backlog remains strong at $2.3 billion.  We were pleased to see our bid pipeline grow approximately $200 million in the last quarter to $2.9 billion***. ***This combination gives us confidence in our workload for 2016.***"

168.     Additionally, Ferland touted the Company's shift toward European renewable projects as follows:

> O***ur strategy to grow internationally continues to deliver. Our Global Power segment has transitioned*** from projects primarily focused on adding new environmental controls equipment to existing coal plants in the U.S. ***to a portfolio dominated by renewable waste energy plants being built in the European marketplace. Last month we announced our sixth contract to build a new renewable waste energy plant in the UK*** just after successfully complet[ing] our first unit at Peterborough in England at the end of 2015.
>
> While the UK is an important market for us, the investment in our International Business Development team is helping us to reach other markets that are poised to build renewable waste to energy plants in the next few years, as well as opportunities to sell and service additional coal-fired power plants and environmental equipment. ***We are working on technical qualifications and***

*developing relationships with partners to be ready when the opportunities emerge.*

169.     Regarding growing the renewable energy business, Ferland stated:  "[O]ur primary focus is organically expanding beyond Northern Europe, primarily the U.K., and we are making some progress.  We've made significant investments on the business development side. ***We're doing a good job of lining up partners and tracking specific projects***."  As result of their efforts, Ferland said, "we've announced one—it was a U.K. project—a couple weeks ago. We would expect the rest of these opportunities to manifest themselves over the next six to 18 months."

170.     With respect to revenue growth in Global Power, Ferland stated:

> ***Global Power, it remains strong for us***. We're projecting about a 5% growth year-over-year.  We know bookings were a little light in Q4 in the Global Power division. We've told folks that those are going to be up and down and you can see that we announced early in 2015 another $90 million waste-to-energy plant win. So we feel pretty good about Global Power.

171.     Additionally, regarding Global Power backlog, Ferland noted that because these are "two-to-three year projects," an increase in backlog in 2015 translates into revenue from approximately 2016 through 2018.

172.     Concerning changes in profit margins on renewable energy projects, Ferland explained:

> Waste energy projects, over two to three years, from a margin perspective, they're going to tend to start off light—some of its upfront engineering and procurement—and then we get into actual on-site work. Just by the nature of those projects, the margins will be lower upfront. As we reach major milestones, or perhaps actually complete projects, that allows us to free up contingency that we had not been taking to the bottom line. ***So on bulk of those larger projects, it starts slow, and assuming we do a good job, which we do on most of them, finish strong from a margin perspective.***

173.     Defendants' statements concerning the Company's backlog, its growth strategy, and its profit margins in paragraphs 167 through 172 above, were materially false and misleading because:  (a) they concealed that, due to rapid growth in the Renewable segment and cost cutting

58

strategies, the Company lacked sufficient expertise or engineering and other resources to perform on time and within budget the Renewable contracts in its backlog, thereby rendering the backlog an improbable and unrealistic source of profitability, as discussed above at Sections IV.A and IV.B; (b) the Company was experiencing a significant, undisclosed problem with engineering design at Copenhill, which would impact the completion and profitability of several other projects, as discussed above at Section IV.D; (c) there were ongoing, undisclosed material problems at other major Renewable projects, as discussed above at Sections IV.D through IV.F; and (d) staffing and other resources were being diverted to Copenhill from the other major Renewable projects, which exacerbated the problems at those projects, as discussed above at Section IV.E. Having elected to speak about the purported strength of the Company's growth strategy/backlog/pipeline, Defendants violated their duties to disclose these material facts so as to render their statements not misleading. Moreover, had such material facts been disclosed, it would have reasonably called into doubt the truth of the above statements.

### K. May 10, 2016 Press Release and 10-Q

174. On May 10, 2016, the Company filed an 8-K, announcing its financial results for the first quarter of 2016. The earnings release announced revenues of $404.1 million and EPS $0.20. Additionally, it reported Global Power revenues increased by 5.3% from $123.9 million to $130.5 million and gross profit increased by 19.3% to $24.4 million, compared to the first quarter 2015.

175. Ferland summarized the results, stating, "[f]irst quarter performance exceeded our internal projections and provided a solid start to 2016." He also touted the Global Power segment, noting that "*[s]trong performance in Global Power is expected to offset challenges in Industrial Environmental throughout the year* as the soft climate for U.S. industrial markets persists in the near-term."

176.     Defendants' statements touting the Global Power segment's "strong performance" in paragraph 175 above, were materially false and misleading because:  (a) they concealed that, due to rapid growth in the Renewable segment and cost cutting strategies, the Company lacked sufficient professional resources and capabilities to perform on time and within budget the Renewable contracts in its backlog, thereby rendering the backlog an improbable and unrealistic source of profitability, as discussed above at Sections IV.A and IV.B; (b) the Company was experiencing a significant, undisclosed problem with engineering design at Copenhill, which would impact the completion and profitability of several other projects, as discussed above at Section IV.D; (c) there were ongoing, undisclosed material problems at other major Renewable projects, as discussed above at Sections IV.D through IV.F; and (d) staffing and other resources were being diverted to Copenhill from the other major Renewable projects, which exacerbated the problems at those projects, as discussed above at Section IV.E.  Having elected to speak about the purported strength of the Company's performance, Defendants violated their duties to disclose these material facts so as to render their statements not misleading.

177.     B&W also filed its quarterly report on Form 10-Q for the period ended March 31, 2016 that day.  The 10-Q reiterated the financial results in the May 10, 2016 news release and contained SOX and Exchange Act certifications signed by Defendants Ferland and Apker, identical to the certifications set forth in paragraphs 142 and 143 above, which are false and misleading for the reasons set forth in paragraph 176 above.

178.     Additionally, in a section titled "Backlog" under Item 1. Business, the Form 10-K showed an increase in Global Power backlog from $1.118 billion on December 31, 2015 to $1.184 billion on March 31, 2016.  It further stated that the Company expected to recognize

revenue from the Global Power backlog as follows: $461 million in 2016; $302 million in 2017, and $421 million "thereafter."

179.    B&W's statements touting the Company's backlog and its anticipated revenue recognition in paragraph 178 above were materially false and misleading because: (a) they concealed that, due to rapid growth in the Renewable segment and cost cutting strategies, the Company lacked sufficient professional resources and capabilities to perform on time and within budget the Renewable contracts in its backlog, thereby rendering the backlog an improbable and unrealistic source of profitability; (b) the Company was experiencing a significant, undisclosed problem with engineering design at Copenhill, which would impact the completion and profitability of several other projects; (c) there were ongoing, undisclosed material problems at other major Renewable projects; and (d) staffing and other resources were being diverted to Copenhill from the other major Renewable projects, which exacerbated the problems at those projects. Having elected to speak about the purported strength of the Company's backlog, Defendants violated their duties to disclose these material facts so as to render their statements not misleading.

**L.    May 11, 2016 Earnings Conference Call**

180.    On May 11, 2016, the Company hosted an earnings conference call regarding first quarter 2016 results. Participating on the call from B&W were Ferland and Apker. During the call, Ferland continued to tout Global Power, which "had a good quarter with a 19% increase in gross profit that was driven by higher volume and ***upside from a couple of well-executed projects that are nearing completion***." Ferland summarized expectations for the year, stating, "we're confident that Global Power will step up to cover the shortfall" and "[w]e believe Global Power has enough upside to cover the soft industrial market that is affecting the Industrial Environmental business."

Ferland also stated:

> In reviewing our strategic priorities, ***our margin improvement program remains on track to deliver $15 million of savings in 2016 and again in 2017. Our efforts to pursue core growth internationally are also gaining traction as our Business Development team is finding opportunities in international markets and expanding our reach.*** We've been working on both of these initiatives long before the spin and are pleased to see them making progress consistent with our plans.

181.    Apker likewise noted that Global Power increased gross profit "led by the several renewables projects as well as the recognition of project improvements associated with a couple of projects nearing completion."

182.    Ferland continued to tout expected growth in the Global Power pipeline and B&W Volund projects, stating:

> [T]he overall pipeline remains strong for us. We would expect to book one to two additional large projects in Global Power, beyond the two we've already announced, in 2016. ***We continue to see opportunities in Europe which is where we've had an awful lot of success the last couple of years. . . . We have a great technology and a great product to bring to the marketplace and a very good name in Volund backed by B&W***.

183.    Additionally, Ferland explained that expectations for the Global Power segment had not changed, stating, "Global Power, that business remains a strength for us. ***We continue to see an increasing number of opportunities and we continue to perform well on the projects***, so I don't think that's different from last year. We feel good about it today just like we did in the past."

184.    In explaining why Global Power revenue performance had exceeded internal expectations, Ferland stated:  "We had a couple of ***projects we've been performing very well on***, which is great, but we figured the upside opportunities for those projects would be more in Q2, and it moved back into Q1."

185.    B&W's statements concerning first quarter 2016 results described in paragraphs 180 through 184 above, were materially false and misleading because:  (a) they concealed the fact that, due to rapid growth in the Renewable segment and cost cutting strategies, the Company

lacked sufficient expertise or engineering and other resources to perform on time and within budget the Renewable contracts in its backlog, thereby rendering the backlog an improbable and unrealistic source of profitability, as discussed above at Sections IV.A and IV.B; (b) the Company was experiencing a significant, undisclosed problem with engineering design at Copenhill, which would impact the completion and profitability of several other projects, as discussed above at Section IV.D; (c) there were ongoing, undisclosed material problems at other major Renewable projects, as discussed above at Sections IV.D through IV.F; and (d) staffing and other resources were being diverted to Copenhill from the other major Renewable projects, which exacerbated the problems at those projects, as discussed above at Section IV.E. Having elected to speak about the purported strength of the Company's growth strategy/backlog/pipeline, Defendants violated their duties to disclose these material facts so as to render Defendants' statements not misleading. Moreover, had such material facts been disclosed, it would have reasonably called into doubt the truth of the above statements.

## VI. THE TRUTH IS GRADUALLY REVEALED, BUT DEFENDANTS CONTINUED TO CONCEAL THE TRUE EXTENT OF THE FRAUD UNTIL AUGUST 2017

### A. June 28, 2016 Press Release and Investor Call

186. On June 28, 2016, B&W issued a press release entitled, "B&W Announces Restructuring of Traditional Power Business and Updates Guidance for 2016." The announcement revealed "an engineering design error on a new build renewable energy plant in Europe" which resulted in a pretax charge of $32 million in the quarter and a full-year ($0.51) EPS impact. Due primarily to the impact of the engineering problem, the Company lowered 2016 EPS guidance from $1.25-$1.45 (consensus was $1.38) to $0.63-0.83. The Company maintained revenue guidance of $1.8 billion, however, based on anticipated revenue from an acquisition closing in the third quarter 2016. The press release described the renewable project issue as an "isolated" one:

During construction, B&W self-discovered a deficiency in the piping design of one of our renewable waste to energy projects. The correction requires engineering and then physical rework. B&W is working closely with our customer to minimize any delays and ensure the delivery of a high-quality facility that meets or exceeds all performance guarantees. "Our B&W Volund subsidiary has completed 25 projects in the last ten years," said Ferland. "Of those projects, 23 out of 25 were profitable, and significant project improvements were achieved due to good execution. ***We believe this is an <u>isolated issue</u> and have performed reviews to ensure this piping design issue is not present in the other projects.***"

187.    The Company also held an investor call on June 28, 2016 concerning the subjects of the press release.  Participating on the call from B&W were Ferland and Apker.  On the call, Ferland stated that the renewable project was "roughly three-quarters complete" when the piping design issues were discovered.  He further stated that "[w]e've augmented the project management resources to ensure that this project is completed per the new schedule and cost estimate."

188.    Ferland repeatedly assured investors that the problem was "isolated" and "a single project issue," providing further details, as follows:

We're disappointed as well in what we believe is ***a single project issue*** in Volund. So, the project in question is scheduled to complete very late this year, very early next year, so there's only a few months left on the project. Let me give you a little bit of background, both as to what happened and as to why we think this is an isolated issue.

***It is a piping design issue. That is normally a core competence of ours. This is right in our normal zone where we execute very well.*** In this particular case, the piping engineering design, and in particular, some of the backup calculations inside that design were incorrect. ***We did not discover that until very late in the process.*** Normally, we have sequential reviews that take place on those engineering designs, and for some reason on this one particular project those design reviews did not take place. I would say that our discovery process of this error was somewhat slow as well. We discovered it in pieces and it took us some time to step back and realize that the engineering design just needed to be redone.

The reason the end result is such a large number is that the plant is essentially built and we're having to go back in, re-complete engineering, change piping design, change some steel around in order to facilitate the new engineering design, and at this stage in construction, that is not an easy thing to do. All that said, again, in regard to this particular project, we have obviously changed the Delivery Team. We have supplemented the project management resources, including some very talented resources out of the United States, and ***Jenny and I have spent significant***

*time over there with the Team and in the plant and believe we can complete this project within the current budget and schedule.* Having the same experience that you have had where these problems can linger on, we've done everything we can do to put our arms around this one and we believe we have a schedule and a cost estimate we can deliver on.

So, Part B of that question *in regard to the isolated nature of this, we have taken a look at all of the other Renewable Energy projects we have in Europe, including the larger projects that are just kicking off in the UK, and we have looked at the engineering process and the engineering output, even though these projects are much earlier in process, and we do believe that this is an isolated issue*.

\* \* \*

*We expect the one problem project in Volund to be complete and Volund to be back on track with a pretty strong year. Despite what will be some headwinds in the US coal aftermarket business, we think our proactive restructuring will allow us to hold gross margins constant in that business, even at a slightly reduced revenue number in '17.* So on the whole, we think '17 will be a little bit better than the original '16 guidance today.

189.    Additionally, concerning the steps being taken to improve operations around execution, Ferland stated:

We've augmented the project management resources to ensure that this project is completed per the new schedule and cost estimate. ***We have also reviewed our other projects and believe this is an isolated issue and that the other projects do not have similar piping design challenges***. Our Renewable Energy business and our B&W Volund subsidiary has a solid track record with 25 major project completions in the last 10 years. Of those 25 projects, only two had minor losses, and as a group, they've delivered considerable upside through strong project execution.

\* \* \*

[E]xecution issues, particularly of this magnitude, are unacceptable. So there are a couple off the bat. Number one, the way we've restructured the business as a result of the changes we're making today, on the Renewable side, the Renewable business will be a pure Renewable business and Paul Scavuzzo, for example, will no longer be distracted with some of the New Coal Build in Asia. His sole focus is on the Renewable business, and his primary job is on execution, right; and then secondary job is supporting the business development efforts going forward.

So there's one change. *We recognize that there's challenge inherent in the significant growth of the Renewable business over the last couple of years and we need to better focus Management on execution.* We've also, not surprisingly,

as a result of the Volund problems, made some changes in the management Team and Volund as well that we think will enhance our project management execution.

Second . . . as a part of the restructuring today, we've also—we've taken the Construction business and we've elevated it to the B&W level as opposed to being positioned inside the Power business, right. That allows increased focus on project execution. It allows us also to take the improved project execution process that we've put into the Construction business, and spread it across the Company around the world.

So, we recognize that project execution challenges, in particular of this magnitude, are not acceptable, and it's my belief *we're taking the actions we need to make sure that does not happen again*.

190. Regarding any further risk in the timing of completion of the problem project, Ferland downplayed such risk:

*[W]e've obviously gone in and put together a highly scrutinized new schedule and cost estimate, which we believe is achievable*. We also have contingency in the event that moves around a little bit, and the contingency would include items like increased cost, *directly increased cost from the schedule moving out*, and any potential exposure to the customer as a result of the shifting end dates. So I think we have a solid budget and schedule and I think we have a little bit of contingency built in, in case we have a couple of challenges.

191. In response to a question of whether B&W performed all of the pipe engineering on the problem project and whether it was the same type of design as other Renewable projects, Ferland stated that "each is somewhat unique but *this is an engineering competency that we have* and then we supplement the resources on a project by project basis." He also assured that even when outside resources were used, "*we remain in control of oversight and management on all that work.*"

192. In response to the June 28, 2016 disclosures, B&W's share price dropped significantly, on high volume, from its closing price on June 27, 2016 of $18.94 per share to $14.92 per share on June 28, 2016—a 21% drop.

193.    Following the press release and conference call with management, on June 28, 2016, Chase Jacobson of William Blair issued an analyst report on B&W attributing the sell-off in the Company's stock to the charge on the Copenhill Renewable power project.  Jacobson reported:

> [T]he key reason for the sell-off in our view, is the renewable project charge incurred in second quarter 2016. Management was confident that the charge recognized on the project will sufficiently cover incremental costs . . . that the project will be complete by late 2016 or early 2017, and that there are no similar issues on other projects in backlog. ***European renewable power has been the company's largest backlog growth driver over the last one to two years***, making strong execution on the remainder of the project portfolio and good progress on the problem project imperative to investor confidence in the forward earnings outlook.

194.    Similarly, on June 28, 2016, Tahira Afzal of KeyBanc Capital Markets issued an analyst report on B&W entitled "BW: Reiterate OW, Lowering Price Target Post Guidance Revision."  Afzal reported that:

> **Comfortable on Isolated Nature of Design Issue Oversight** – Post our follow-up with management, we feel better about the risk entailed for the current problem project as well as the other large WTE projects that the Company is executing. Our comfort is driven by the nature of the operational hiccup, which is oversight-related and quickly rectified through managerial changes/enhanced oversight (adherence to oversight requirements would have translated into a minimal to nil impact with design changes being incorporated earlier on). Given BW's limited number of large projects, we gauge the review process on other projects has been quick to conduct and has yielded no similar issues.

195.    Although Defendants' June 28, 2016 statements set forth in paragraphs 186 through 191 revealed the existence of the engineering problems at Copenhill, they constituted merely a partial disclosure or materialization of risks concealed by Defendants' fraud, as the statements misrepresented and failed to disclose that:  (a) Defendants knew or should have known about the piping design issues at Copenhill as early as 2014, as discussed above at Section IV.D; (b) due to rapid growth in the Renewable segment and cost cutting strategies, the Company lacked sufficient expertise or engineering and other resources to perform on time and within budget the Renewable contracts in its backlog, thereby rendering the backlog an improbable and unrealistic source of

profitability, as discussed above at Sections IV.A and IV.B; and (c) there were ongoing, undisclosed material problems with other major Renewable projects in addition to Copenhill that the undisclosed diversion of resources to address Copenhill exacerbated, as discussed above at Sections IV.D through IV.F. Having elected to speak about the purported strength of the Company's Renewable business, Defendants violated their duties to disclose these material facts so as to render Defendants' statements not misleading.

### B. August 9-10, 2016 Financial Results and Earnings Call

196. On August 9, 2016, B&W announced second quarter results of $383.2 million in revenues and a GAAP loss per share of $1.25. Compared to the second quarter of 2015, revenues were 12% lower and the loss per share was $1.17 higher, and higher than street estimates of a $0.14 to $0.16 loss per share.

197. In the announcement, Ferland continued to minimize the impact of the Renewables problems, stating, "[a]lthough the previously announced *isolated issue* on a European renewable energy contract is weighing on this quarter's adjusted results, our recent acquisition, continued focus on international market development, and proactive restructuring of the U.S. power business have set us up for much improved results in 2017."

198. In B&W's Form 10-Q filed the same day, the Company described the financial impact of the Renewable project problem as follows:

> During the quarter ended June 30, 2016, we recorded a *$31.7 million charge* related to a change in estimate of the forecasted cost to complete a Global Power renewable energy contract in Europe that adversely affected revenue by $26.4 million during the quarter, including the *reversal of $6.8 million of revenue that had been recognized through the first quarter of 2016*. Management has concluded the second quarter change in estimate is a result of a deficiency in the piping design detected in late May 2016. This contract became a loss contract during the three months ended June 30, 2016. *The project is approximately 73% complete* as of June 30, 2016, and B&W's performance on this contract is expected to be completed by early 2017. The *$6.4 million reserve for the estimated loss* on this

uncompleted contract is included in other accrued liabilities on our condensed consolidated and combined balance sheet at June 30, 2016.

199.    Additionally, in a section titled "Backlog" under Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations, the Form 10-Q touted Global Power backlog of $1.094 billion as of June 30, 2016.  It further stated that the Company expected to recognize revenue from the Global Power backlog as follows:  $361 million in 2016; $332 million in 2017, and $401 million "thereafter."

200.    On August 10, 2016, the Company held an investor call concerning second quarter results.  Participating on the call from B&W were Ferland and Apker.  During the call, Ferland assured that ***"[w]e continue to closely monitor the challenged project and are encouraged that recovery efforts remain on track*** for completion of this project early next year. In addition, ***we reviewed our projects in the UK and have determined that they do not have a piping design issue***."

201.    Following the releases, one analyst commented, "[p]ast project performance does not suggest all of BW's waste-to-energy projects will have losses . . . . We do not expect BW to record any further charges on other waste-to-energy projects."

202.    Defendants' August 9 and 10, 2016 statements in paragraphs 197 through 200 above, misrepresented and failed to disclose that:  (a) due to rapid growth in the Renewable segment and cost cutting strategies, the Company lacked sufficient expertise or engineering and other resources to perform on time and within budget the Renewable contracts in its backlog, thereby rendering the backlog an improbable and unrealistic source of profitability, as discussed above at Sections IV.A and IV.B; and (b) there were ongoing, undisclosed material problems with other Renewable projects in addition to Copenhill, that the undisclosed diversion of resources to address Copenhill exacerbated, as discussed above at Sections IV.D through IV.F.  Having elected

to speak about the purported strength of the Company's Renewable business, Defendants violated their duties to disclose these material facts so as to render Defendants' statements not misleading.

203.    The Company's Form 10-Q included SOX and Exchange Act certifications signed by Ferland and Apker, which are identical to the certifications cited at paragraphs 142 and 143, and are materially false and misleading for the reasons set forth in paragraph 202 above.

### C.    November 2-3, 2016 Financial Results and Earnings Call

204.    B&W announced disappointing third quarter results on Form 10-Q after the market closed on November 2, 2016, but noted that it "*continue[ed] to expect strength moving into 2017 as we remain focused on* revenue diversification, margin improvement and *excellence in project execution*."

205.    The announcement also reported Renewable segment revenues of $124.3 million, an increase of $37.4 million over third quarter 2015, driven by increased activity in renewable contracts.   The Renewable segment's gross profit of $18.6 million was negatively impacted by the problem project, as Ferland explained:   "[w]e would normally expect higher gross margin from our Renewable segment, but in the short term we continue to recognize revenue from our challenged European renewable contract at zero gross profit margin."   Ferland also stated that:

> During the third quarter, the net estimated costs to complete the project improved by $1.0 million with site productivity related cost increases more than offset by a probable project related insurance recovery. Ramp down of construction activities on the site is underway, and will continue into early 2017 as we complete key milestones on this project.

206.    In the third quarter Form 10-Q filed the same day, the Company disclosed a $14 million charge recorded for the problem Renewable project (Copenhill) because "complexities associated with the nature of the remediation, combined with lower than expected labor efficiencies, extended the anticipated schedule."   The Company also, however, "determined it was probable that we would receive 100 million Danish Krones ("DKK") ($15.0 million) insurance

recovery for a portion of the losses on this contract, which represents the full amount available under the insurance policy." It thus recognized the $15 million as a reduction in costs during the third quarter of 2016. Reserves for losses on the Copenhill contract were increased to $7.8 million (from the $6.4 million reserve the previous quarter). Additionally, the Company's Form 10-Q stated that the project was approximately 79% complete as of September 30, 2016, and that "[w]e expect B&W's construction on the project will be completed in early 2017, with remaining commissioning and turnover activities linked to the customer's operation of the facilities through mid-2017."

207.    In a section titled "Bookings and backlog" under Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations, the Form 10-Q showed Renewable backlog of $1.289 billion as of September 30, 2016 and stated that the Company expected to recognize revenue from Renewable backlog as follows: $136 million in 2016; $297 million in 2017, and $856 million "thereafter."

208.    On November 3, 2016, the Company held an investor call concerning third quarter 2016 results. Participating on the call from B&W were Ferland and Apker. During the call, Ferland stated:

> Renewable-segment revenues increased 43% for the third quarter 2016 compared to the prior year. Gross profits are up year over year, due to higher levels of activity in the segment. The challenged project we discussed last quarter had a net benefit of $1 million for the quarter. Lower-than-expected labor productivity caused the project time line to slip, *resulting in a $14-million increase in the estimated cost to complete the project*. However, this was offset by a probable project-related insurance recovery of $15 million. We expect key project milestones will complete in early 2017 Ramp-down of onsite construction personnel began this month and will continue into the first quarter.

209.    Additionally, Ferland described the progress on the troubled Renewable project, Copenhill, in positive terms:

71

That project—and we've mentioned this before—it's relatively complex for us to go back in and retrofit the piping and the steel into what's essentially a complete plant. And as a result of that, we did experience lower productivity than we anticipated.

We had ramped the number down, the productivity number down, already in our original estimates. It turns out, it was a little bit lower than that, and that is the bulk of the $14-million difference. That said*, we are making significant progress on that project.* I'll give you a couple of data points.

The two major systems that we continue to work on I would classify as piping and electrical. And we are nearing completion on those.

For example, in mid-July, piping was about 39% complete. Today, piping is 83% complete. Electrical in mid-July was 40% complete, and today is 78% complete. And as I mentioned on the call, we are already beginning the ramp-down process of onsite construction labor, which reduces our run rate.

So when you put those together, *we continue to see this project finishing up early Q1 2017. And our spend rate is dropping already, and it will be significantly lower by December-January than it is today.*

*So we remain confident that the numbers we have out there today are doable, and the variability in those numbers continues to shrink as we near completion on the project*.

210.    With regard to progress in the Renewable division overall, Apker stated that:

"*[e]xcluding the challenged project, our other renewable projects are progressing as expected*."

211.    On the Renewable business, Ferland stated, in part:

As the year comes to a close, we'll be focused on completing our challenged renewable project and broadly improving our project execution consistency, continuing to integrate B&W SPIG and capitalizing on the synergies from this acquisition, and closing project bookings to ensure we produce stronger results in 2017.

\* \* \*

*The renewable business, we continue to see long-term opportunities to grow that business going forward, at least to margins that we've projected.*

\* \* \*

*So we continue to push -- again, moving into 2017, we have a nice backlog. We have a large number of projects underway, and we'll continue to emphasize*

72

***project execution on that front,*** while we try to bring in the new work, both to bolster 2017, as well as to build the backlog for 2018 and 2019.

212.     Apker also discussed the impact of the troubled project on cash flow from operations, as follows:

> The 2016 cash-flow story is really all about that problem project in Europe, which for the full year 2016, which includes Q3 and Q4, that's going to have a negative impact of about $75 million to $80 million on our cash flow, in part from the increased costs, which we have to absorb, but primarily due to those milestone-payment shifts from 2016 to 2017.

> So to the extent we're delayed in achieving project milestones, we can't bill our customer and we can't collect those billings. And those dollars don't come in 2016 in our forecast, but we are expecting that they will come in 2017.

> Positively, when we achieve those milestones, we'll bill the cash and we'll collect it in 2017, which actually provides a pretty nice tailwind to 2017 free cash flow. I think Q4 will produce positive cash flow, but because of the story of the problem project, probably not sufficient in Q4 to make the full year positive.

213.     In response to the Company's third quarter 2016 earnings release, B&W's share price fell by $1.61, almost 11%, to close at $14.00 on November 3, 2016.

214.     Defendants' November 2 and 3, 2016 statements in paragraphs 204 through 212 above, misrepresented and failed to disclose that: (a) due to rapid growth in the Renewable segment and cost cutting strategies, the Company lacked sufficient expertise or engineering and other resources to perform on time and within budget the Renewable contracts in its backlog, thereby rendering the backlog an improbable and unrealistic source of profitability, as discussed above at Sections IV.A and IV.B; and (b) there were ongoing, undisclosed material problems with other major Renewable projects in addition to Copenhill that the undisclosed diversion of resources to address Copenhill exacerbated, as discussed above at Sections IV.D through IV.F. Having elected to speak about the purported strength of the Company's Renewable business, Defendants violated their duties to disclose these material facts so as to render Defendants' statements not misleading.

73

215.     The Company's Form 10-Q included SOX and Exchange Act certifications signed by Ferland and Apker, which are identical to the certifications cited at paragraphs 142 and 143, and are materially false and misleading for the reasons set forth in paragraph 214 above.

**D.     February 28 - March 1, 2017 Financial Results and Earnings Call**

216.     Additional information about the problems, delays, and cost overruns in the Company's Renewable segment and its effects on the Company's revenues and 2016 full year performance was revealed on February 28, 2017 when the Company filed a Report on Form 8-K, after the market closed, with a press release announcing B&W's financial results for the fourth quarter and year ended December 31, 2016.   The Company announced disappointing fourth quarter 2016 results due to significant delays and cost overruns on seven renewables projects caused by the diversion of resources to fix the previously disclosed engineering problems at a single plant.   Specifically, the Company reported overall fourth quarter 2016 revenues of $380.0 million, down $122.7 million or 24.4% from the fourth quarter of 2015, and adjusted EPS of a loss of $1.60 versus a profit of $0.47 for the fourth quarter of 2015.   The poor performance was driven by an $82.6 million loss in the Renewable business for the fourth quarter of 2016. The Company explained the results as follows:

> Revenues in the Renewable segment were $55.6 million for the fourth quarter of 2016, versus $115.2 million in the corresponding period in 2015, a decrease of $59.7 million driven by the increased costs to complete and lengthened schedule on several contracts. The Renewable segment has grown significantly over the past two years and resources used to address previously disclosed issues at one project led to productivity and scheduling issues at others. The Company appointed a new management team and is taking actions to address these issues, including investing in enhanced engineering and project management capabilities and infrastructure.

217.     The Company's Form 10-K for the year ended December 31, 2016 filed with the SEC the same day disclosed that three additional Renewable projects had become losses as a result

of delays caused by resource constraints related to the original problem project. Specifically, the 10-K reported the following charges to the four Renewable projects which suffered losses:

> During 2016, we recorded a total of $141.1 million in losses from changes in the estimated revenues and costs to complete renewable energy contracts in Europe, of which $98.1 million were recorded in the fourth quarter of 2016. These 2016 losses include $35.8 million of anticipated liquidated damages that reduced revenue.

> As we disclosed in prior reports, we incurred $30.9 million in charges (net of $15.0 million of a probable insurance recovery) due to changes in the estimated cost to complete a contract during the second and third quarters of 2016 related to one European renewable energy project. ***Additional changes in the fourth quarter of 2016 resulted in $19.4 million of additional charges on this project, and this project adversely impacted other European renewable energy projects due to the limited pool of internal and external resources available for these projects, such as engineering, procurement and construction resources, which in turn caused us to revise downward our estimates with respect to our other European renewable energy projects, including three other projects that became loss contracts.*** As of December 31, 2016, this project is approximately 88% complete. We continue to expect construction activities to be completed and the unit to be operational in early 2017, with remaining commissioning and turnover activities linked to the customer's operation of the facility through mid-2017.

> ***The second project became a loss contract in the fourth quarter of 2016, resulting from a charge of $28.1 million in 2016 ($23.0 million in the fourth quarter).*** As of December 31, 2016, this second project was approximately 67% complete. We expect this second project to be completed in late-2017.

> ***The third project became a loss contract in the fourth quarter, resulting from $30.1 million of the 2016 charges ($25.2 million in the fourth quarter of 2016).*** As of December 31, 2016, this third project was approximately 82% complete. We expect this third project to be completed in mid-2017.

> ***The fourth project became a loss contract in the fourth quarter of 2016, resulting from $16.4 million of the 2016 charges ($16.2 million in the fourth quarter).*** As of December 31, 2016, this fourth project was approximately 61% complete. We expect this fourth project to be completed in 2018.

218. Despite this negative news, the Company's Form 10-K included the following representations regarding internal controls:

**Management's Report on Internal Control Over Financial Reporting**

B&W's management is responsible for establishing and maintaining adequate internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Securities Exchange Act of 1934, as amended). Our internal control over financial reporting includes, among other things, policies and procedures for conducting business, information systems for processing transactions and an internal audit department. Mechanisms are in place to monitor the effectiveness of our internal control over financial reporting and actions are taken to remediate identified internal control deficiencies. Our procedures for financial reporting include the involvement of senior management, our Audit and Finance Committee and our staff of financial and legal professionals. Our financial reporting process and associated internal controls were designed to provide reasonable assurance to management and the Board of Directors regarding the reliability of financial reporting and the preparation of our consolidated financial statements for external reporting in accordance with accounting principles generally accepted in the United States of America.

Management, with the participation of our principal executive and financial officers, assessed the effectiveness of our internal control over financial reporting as of December 31, 2016. Management based its assessment on criteria established in Internal Control–Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework). Because of its inherent limitations, a system of internal control over financial reporting can provide only reasonable assurance as to its effectiveness, and may not prevent or detect misstatements. Further, because of changing conditions, effectiveness of internal control over financial reporting may vary over time. ***Based on our assessment, management has concluded that B&W's internal control over financial reporting was effective at the reasonable assurance level described above as of December 31, 2016.***

219. In a section titled "Backlog" under Item 1. Business, the Form 10-K showed Renewable backlog of $1.241 billion as of December 31, 2016, and stated that the Company expected to recognize revenue from Renewable backlog as follows: $348 million in 2017, $191 million in 2018 and $702 million "thereafter."

220. On March 1, 2017, the Company hosted an earnings conference call regarding the fourth quarter and full year 2016 earnings. Participating on the call from B&W were Ferland and

Apker. During the call, Ferland described the Company's failure to expand resources to keep up with the growth of the Renewable business as causing the reported delays and losses, stating:

> Turning now to the Renewable business, since the spinoff we've been focused on growing our revenue and market share in this segment, and have accomplished that much faster than expected. In early 2015 the Renewable business began to book significantly more work and revenues increased from $230 million in 2014 to $349 million in 2016.

> Due to this growth, our resources and capabilities across the business became stretched. Specifically, our previously disclosed efforts to address matters on a Renewable project in Northern Europe diverted resources, and despite our mitigation plans, late in the fourth quarter began to impact other projects. As a result, we are experiencing productivity and schedule issues that are impacting our estimated cost to complete these projects.

> *We took charges in the fourth quarter, reducing margins and increasing contingency on these projects*. We are committed to completing these projects in line with our revised timelines and budgets.

> *We've already made key changes to this business, and are working with urgency to address these issues*. We appointed Jimmy Morgan as the head of the segment in December before we became aware of the extent of the issues and their impact late in the fourth quarter.

> \* \* \*

> We also replaced on-site project managers at three key sites, dedicated significant US talent and leadership to both the engineering and project management groups in Europe, and are investing in enhanced project management processes that will span projects from their inception through bidding and execution. In addition, *we have elected to limit bidding on new Renewable contracts that involve our European resources for at least the first six months of 2017*.

221. Ferland further reported:

> We have, *in addition to the one loss project we had discussed previously, there are three other loss projects*.

> You can see the details quite clearly in the K. *There are approximately four other projects in the UK that we saw margins decrease on, but remain positive.*

222. With regard to fixing the problems in the Renewable business, Ferland stated that the Company's "[n]umber one and the initial focus is beefing up our engineering processes in

depth and improving our overall project management. That will help us not only execute the projects we have but bid projects more accurately in the future."

223. Additionally, Ferland seemingly reversed his prior statements about B&W's expertise in piping design work, which he had described as "a core competency" of the Company's, and now stated that, going forward, "we're going to emphasize the piece of the power plant that we are really good at, which is the boiler and the grate" and "*perhaps find someone that does the piping and electrical every day.* That might be a better model for us going forward, and we will be looking to make that shift between now and late summer when we bid projects again."

224. Despite disclosing some information about the problems in the Renewable segment, Defendants continued to hide the true extent of the schedule delays and cost overruns. For example, Defendants made the following false or misleading statements and omissions on the March 1, 2017 call:

> Ferland:  *We anticipate the revenue impact of this pause on bidding to slow, but not significantly impair revenue growth in this segment over the medium term[.]*
>
> *   *   *
>
> While there is much work to do, *this business has significant upside* and the more we focus on our core boiler and grate technology going forward, the better we will be able to deliver consistent growth and bottom-line value.
>
> *   *   *
>
> Apker:  We expect 2017 revenues will grow to be approximately $1.8 billion. *This reflects stability in Power and Renewable revenues and growth in our Industrial segment.*
>
> Going into 2017, our Companywide pipeline of opportunities stands at approximately $2.9 billion. We are confident that there are sufficient opportunities in our backlog and our pipeline to support our revenue projections.

225. With respect to the Company's reassessment of costs and schedules at all Renewable projects in Denmark and the UK, Ferland stated:

> ***We took a lot of time in January and February to dig into each of these projects and ensure we have the right cost to complete, and probably more importantly, we have enough contingency on those projects to give us comfort that we can make it through the rest of 2017, which is when we expect the bulk of these projects to complete, or be near completion***.

226. In response to a question from analyst Bob Labick of CJS Securities as to whether the Company felt confident it had "looked at everything else" in Renewables, and "solved the problem, this should not occur going forward" and whether it would impact existing projects or bidding on new Renewable projects, Ferland replied:

> That ties back to the reason we have put a pause on bidding new projects for the first six months of 2017. There are a handful of projects, at least one if not more, that we had the potential to book either late 2016 or early 2017 that we chose not to bid. The reason being, bidding takes engineering resources and the very first phase of each one of these projects, right after we win it, is heavy on the engineering front. We made the decision to keep our engineering resources focused and deployed on the existing projects, not distract them with either new bids or a new ramp-up on new work. We anticipate by mid to late summer we will be through enough of the engineering on the other projects that we'll be in a position to reinstitute bidding going forward.

227. Defendants' statements in paragraphs 216 through 226 misrepresented and failed to disclose that: (a) due to rapid growth in the Renewable segment and cost cutting strategies, the Company lacked sufficient expertise or engineering and other resources to perform on time and within budget the Renewable contracts in its backlog, thereby rendering the backlog an improbable and unrealistic source of profitability, as discussed above at Sections IV.A and IV.B; (b) there were ongoing, undisclosed material problems with other major Renewable projects that the diversion of resources to address Copenhill exacerbated, as discussed above at Sections IV.D through IV.F; (c) the Company would never resume bidding on Renewable projects of comparable revenue and scope to those alleged due to the Company's inability to timely perform its existing

Renewable construction contracts; and (d) there was an undisclosed material weakness in internal control over financial reporting in the Renewable segment, as discussed below at paragraphs 240 and 247. Having elected to speak about the purported strength of the Company's Renewable business, Defendants violated their duties to disclose these material facts so as to render Defendants' statements not misleading.

228. The Company's Form 10-Q included SOX and Exchange Act certifications signed by Ferland and Apker, which are identical to the certifications cited at paragraphs 142 and 143, and are materially false and misleading for the reasons set forth in paragraph 227 above.

229. The market's reaction to the Company's news of the pervasive issues, delays, and losses in the Company's Renewable segment was swift and severe. After closing at $16.50 per share on February 28, 2017, the stock opened at $11.09 on March 1, 2017 and ultimately dropped 37% to close at $10.33 per share on abnormally high trading volume of 7.9 million shares traded. In one day, approximately ***$300 million*** of the Company's market capitalization was erased.

230. Following the Company's disclosures on March 1, 2017, Jamie Cook of Credit Suisse issued an analyst report on B&W attributing the sell-off in the Company's stock to cost overruns on seven projects within the Renewable segment. Cook reported:[17]

> BW's stock closed down 37% after missing Q4'16 estimates related to cost overruns on seven [sic] projects within the Renewable segment. This is key as Renewable was viewed as BW's growth platform. From the seven [sic] projects, four are in a loss position while for the remaining three [sic] projects BW assumes lower margins. The majority of the projects are expected to be completed by the end of 2017 and now comprise approximately $300M of BW's ~$2.0B in backlog. Management changes have been made subsequently and BW will slow new awards in Renewables in the first half of 2017 to ensure the execution. Still and

---

[17] In the excerpt quoted, Jamie Cook appears to erroneously refer to seven projects, rather than eight, of which three have lowered profit margins, rather than four. Later in the report, Cook states, consistent with Ferland's statements in the related earnings conference call, that "[b]esides the original problem project, there appear to be 3 additional projects generating a loss as well as other 4 projects in the UK where BW saw margin deterioration though still remain profitable[.]"

unfortunately, the lower profitability associated with these projects drags into 2017 adjusted EPS which is expected to be $0.75-$0.95 and compares to the consensus estimate of $1.26. . . FCF is also now negative this year expected to be ($120M) and BW amended its credit facility to ensure ample room for liquidity.

### E.    May 9-10, 2017 Financial Results and Earnings Call

231.    On May 9, 2017, the Company filed a Form 8-K with the SEC, announcing its first quarter 2017 financial results.  The release reported first quarter 2017 revenues of $391.1 million, a decrease of $13.0 million, or 3.2%, compared to the first quarter of 2016, and adjusted EPS of $0.04 for the three months ended March 31, 2017, compared to adjusted earnings per share of $0.29 in the prior year period.  Regarding the results, Ferland stated:

> ***Our Renewable segment project portfolio is performing within the revised cost and schedule forecast we provided earlier in the year***. . . . We remain committed to our longer-term strategy of optimizing the Power business, broadening the Renewable segment's global footprint under an improved business model, and growing the Industrial segment.
>
> ***Our transformation into a more diversified engineered solutions company is on track***, and while our focus is on project execution and integration in the near-term, we look forward to pursuing additional value-added acquisitions in 2018, focusing on industrial companies with good technology and synergy potential, thereby driving value for both our customers and our shareholders.

232.    In the Company's Form 10-Q for the quarter ended March 31, 2017, filed on May 9, 2017, a section titled "Bookings and backlog" under Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations showed Renewable bookings of $36 million for the three months ended March 31, 2017.  It also listed Renewable backlog of $1.171 billion as of March 31, 2017, and stated that the Company expected to recognize revenue from Renewable backlog as follows:  $283 in 2017; $189 million in 2018, and $699 million "thereafter."

233.    Additionally, under Item 4. Controls and Procedures, the Form 10-Q stated that the Company's management, including Ferland and Apker, had evaluated the effectiveness of the

design and operation of the Company's disclosure controls and procedures, and that Ferland and Apker had concluded:

> . . . that the design and operation of our disclosure controls and procedures are effective as of March 31, 2017 to provide reasonable assurance that information required to be disclosed by us in the reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the rules and forms of the Securities and Exchange Commission, and such information is accumulated and communicated to management as appropriate to allow timely decisions regarding disclosure.

234.    Included with the Company's Form 10-Q were SOX and Exchange Act certifications signed by Ferland and Apker, which were virtually identical to the certifications cited at paragraphs 142 and 143) and which certified that the Company's internal controls were effective.

235.    On May 10, 2017, the Company hosted an earnings conference call on the first quarter 2017 results. Participating on the call from B&W were Ferland and Apker. During the call, Ferland again touted improvement in the Renewables segment, stating:

> ***In the Renewables segment, we're working to position the business for the future and are making progress toward the completion of our projects currently in our portfolio***. On a net basis, project costs across our Renewable portfolio were in line with the updated estimated cost to complete we provided in the fourth quarter results.

> ***In the quarter we continued to improve our project management leadership and internal review processes across our Renewable business. We are intently focused on execution.*** With respect to the segment's two large non-U.K. projects, construction on the first is essentially complete and the other project is well into commissioning. Both of these projects are expected to be turned over to the respective customers in the second half of 2017. As the projects reach completion, we will continue to transition our resources to the other projects in our portfolio.

> \*   \*   \*

> ***In Renewable, our focus in the near term is on execution.*** In the medium to long term, we continue to see a strong market for our highly reliable and flexible waste-to-energy technology.

> \*   \*   \*

Looking at 2017 and beyond, B&W is well positioned to deliver shareholder value. . . . For the remainder of 2017, *we're focused on project execution* and on the integration of our recent acquisitions. ***In the coming months we look forward to re-entering the European renewable marketplace with a strengthened business model.***

236.    Defendant Apker also touted the Company's renewed focus on execution in the Renewable segment and cost control throughout the Company:

[T]he quarter benefited from the timing of work moving into Q1, mostly in Power, and good cost control throughout the organization.

* * *

Renewable segment revenues were $106 million, up from $84 million in the prior year quarter. As expected, gross profit decreased due to the previously disclosed changes in estimated cost to complete on multiple contracts. As Jim discussed, ***contract performance was largely in line with our expectations during the quarter and we continue to expect the segment to generate low double-digit gross margins for the full year 2017***.

237.    Defendants' May 9 and 10, 2017 statements in paragraphs 231 through 236 misrepresented and failed to disclose that:  (a) due to rapid growth in the Renewable segment and cost cutting strategies, the Company lacked sufficient expertise or engineering and other resources to perform on time and within budget the Renewable contracts in its backlog, thereby rendering the backlog an improbable and unrealistic source of profitability, as discussed above at Sections IV.A and IV.B; (b) there were ongoing, undisclosed material problems with other major Renewable projects that the undisclosed diversion of resources to address Copenhill exacerbated, as discussed above at Sections IV.D through IV.F; (c) the Company would never resume bidding on Renewable projects of comparable revenue and scope to those alleged due to the Company's inability to timely perform its existing Renewable construction contracts; and (d) there was an undisclosed material weakness in internal control over financial reporting in the Renewable segment, as discussed below at paragraphs 240 and 247.  Having elected to speak about the

purported strength of the Company's Renewable business, Defendants violated their duties to disclose these material facts so as to render Defendants' statements not misleading.

238.    Analysts repeated B&W's representations regarding better execution and improvement in the Renewables segment.  For example, in a research report dated May 10, 2017, Jamie Cook of Credit Suisse wrote:

**Jumping Snake River Canyon**

■ **Thoughts Post Call:** BW's stock got a lift after reporting Q1'17 adj. EPS above the street and reiterating the FY'17 guide. The beat was on better Renewables profitability / execution. To mgmt.'s credit, BW did not take any additional charges on the 8 problem projects announced last quarter and continues to work within the revised cost estimates.

239.    Similarly, a research report from Tahira Afzal of KeyBanc Capital Markets, dated May 10, 2017, stated:

**Key Investment Points**
**Progress on Problem Renewable Projects Is Encouraging** - We are encouraged by a Renewable segment performance in line with the cost and schedule forecast conveyed in 4Q16, which drove a solid EPS beat for the quarter. Importantly, management indicated that the two non-U.K. problem renewable projects are now substantially complete – we estimate that these two projects accounted for roughly 57% of the project charges in 2016. We view the intact low-double-digit gross margin guidance for the Renewable segment and no material project revisions in 1Q17 as important positives. Management is looking to reenter the European waste-to-energy market in 2H17 and is exploring partnership opportunities that will lower the risk profile. While growth commentary on the European waste-to-energy market was incrementally positive, we are modeling a slight decline in Renewable revenues in 2018, leaving potential 2H17 bookings as upside.

**F.    August 9, 2017 Financial Results and Earnings Call**

240.    The full truth about the problems, delays, and additional charges in the Company's Renewable segment and their effects on the Company's revenues and 2017 projections was not revealed until August 9, 2017 when the Company filed a Report on Form 8-K, after the market closed, attaching a press release announcing B&W's financial results for the second quarter ended

June 30, 2017. The Company announced disappointing second quarter 2017 results due to additional cost overruns and delays on six Renewable projects, which necessitated additional financing. Additionally, the Company disclosed a material weakness in the Company's internal controls over financial reporting at B&W Volund. Specifically, the Company reported overall second quarter 2017 revenues of $349.8 million, a decrease of $33.4 million, or 8.7%, compared to the second quarter of 2016. The Company posted an adjusted operating loss of $119 million, or $2.56 a share for the three months ended June 30, 2017, compared to an adjusted loss per share of $0.18 in the prior year period. According to Thomson Reuters, Wall Street had expected a 6-cent profit.

241. The poor performance was driven by $115 million in charges in the Renewable segment for the second quarter of 2017. The Company explained the results as follows:

> Our second quarter financial results reflect a $115.2 million charge arising from unexpected cost and schedule issues in the Renewable segment," said E. James Ferland, Chairman and Chief Executive Officer. "We have revamped our go-forward business model for this segment and have also entered into new financing arrangements. These arrangements provide us the financial flexibility to focus on completing our U.K. Renewable projects while executing our three prong business strategy to optimize our Power business, pursue profitable growth under our new execution model in Renewable, and grow our Industrial segment."

> \* \* \*

> "As we advanced engineering, and re-estimated overall productivity levels on six new-build projects in the Renewable segment, late in the quarter we concluded we would not hit our cost and schedule targets," Mr. Ferland said. "We are diligently working with all parties involved to complete these projects within the revised time lines."

> \* \* \*

> Revenues in the Renewable segment were $48.1 million for the second quarter of 2017, versus $85.5 million in the corresponding period in 2016, a decrease of $37.4 million. The Renewable segment gross loss was $110.9 million in second quarter 2017, compared to a gross loss of $17.5 million reported in second quarter 2016, due to the recognition of a $115.2 million, or $2.36 per share, charge for increased

estimated costs to complete six projects in backlog, as the result of lower-than-forecasted productivity and schedule delays.

* * *

"Going forward, under a revised business model, we will focus on our core technologies with balance of plant and civil construction scope being executed by a partner. . . ."

* * *

*Revising 2017 Outlook*

Renewable: full year 2017 revenue of approximately $350 million with positive gross margins returning in second half 2017

242. The Company's 8-K also disclosed that on August 9, 2017 B&W had entered into a loan agreement with Lightship, which required that B&W purchase all of Lightship's approximately 10% equity interest in B&W effective August 9, 2017:

On August 9, 2017, the Company entered into a second-lien term loan agreement with Lightship Capital LLC, an affiliate of American Industrial Partners, and amended the terms under its existing revolving credit facility. Under the second-lien term loan, which matures on December 30, 2020, the Company borrowed $176 million. The second-lien term loan also provides for an additional $20 million of borrowing capacity subject to conditions in the agreement. The Company will use the proceeds to reduce borrowings under its existing revolving credit facilities, and as a condition of the second-lien loan agreement, it will repurchase Lightship Capital's 4.8 million share equity stake in the Company. The purchase of these shares will reduce the Company's shares outstanding correspondingly . . . .

243. That same day, the Company hosted an earnings conference call. Participating on the call from B&W were Ferland and Apker. During the call, Ferland provided additional detail about the charges and changes in the Renewables segment:

In the quarter, we recorded $115 million charge for increases in estimated cost to complete projects in our backlog, the large majority of which related to 4 construction projects in the U.K. ***The main items behind the estimated cost increases are higher quantities and lower overall productivity levels, which led to lengthened schedules, higher cost and increased reserves for liquidated damages***. We've also recognized the need to include additional float related to potential variations in the project schedules and now to identify project risks in our revised

forecast. Specific to the 4 ongoing projects in the U.K., these estimates represent 20% of estimated remaining spend compared to 14% at the end of the first quarter.

\* \* \*

During the second quarter, we completed our review of potential new business models and also a review of the broader renewable waste energy and biomass markets. We concluded that there is demand for our proprietary and reliable boiler, grate and environmental equipment technologies. ***Going forward, however, our business model will change. We will focus primarily on our core technologies with the balance of plant and civil construction scope being executed by a partner. Although this execution model reduces our addressable market opportunity from a revenue per project standpoint,*** it carries lower execution risk and better profitability potential and is more consistent with our company-wide strategy of being an industrial equipment technology and solutions provider. We have completed extensive analysis of potential partners, and we plan to return to bidding renewable projects in Europe under our new execution model in the second half of 2017. Profitability and risk management will be key moving forward.

\* \* \*

So the revenue per project piece is pretty straightforward. We expect -- in the past, we've told folks that the average Renewable projects, we would expect roughly $100 million in revenue for B&W. ***Under the new business model, we'd expect it to be about half of that per project. So we'll be focusing going forward only on our core technology, boiler, grate, perhaps environmental controls and ash. And we'll be leaving the balance of plant portion to our partners in the future. So on a per project basis, about half.***

244.    Additionally, Apker explained that the loan from Lightship and changes to an existing revolving credit facility were needed "[a]s a result of the additional charges in the Renewable segment[.]"

245.    The Company's Form 10-Q filed with the SEC on August 9, 2017 disclosed that two additional Renewable projects had become losses as a result of scheduling delays, reduced productivity, and increased costs in the quarter ended June 30, 2017.  Specifically, the 10-K reported the following charges to six Renewable projects which were operating as loss contracts:

***During the three months ended June 30, 2017, two additional renewable energy projects in Europe became loss contracts. During the three and six months June 30, 2017, we recorded a total of $115.2 million and $112.2 million,***

87

*respectively, in net losses resulting from changes in the estimated revenues and costs to complete these six European renewable energy loss contracts. . . . The charges recorded in the second quarter of 2017 are . . . primarily as a result of scheduling delays and shortcomings in our subcontractors' estimated productivity. Also included in the charges recorded in the second quarter of 2017 were corrections to estimated contract costs at completion of $4.9 million and $6.2 million relating to the three months ended December 31, 2016 and March 31, 2017, respectively.* Management has determined these amounts are immaterial to the consolidated financial statements in both previous periods.

246.    Additionally, the Form 10-Q provided further detail on the status of the six Renewable loss projects as of June 30, 2017, as follows:

        a.    The first loss contract (Copenhill), initially disclosed in the second quarter of 2016, was approximately 94% complete.   In the second quarter of 2017, B&W recognized additional contract losses of $10.5 million resulting from increased costs and schedule delays.

        b.    The second loss contract, initially disclosed in the fourth quarter of 2016, was approximately 69% complete.  During the three and six months ended June 30, 2017, B&W recognized additional contract losses of $41.2 million and $37.4 million, respectively, as a result of increased construction cost estimates and schedule delays.

        c.    The third loss contract, initially disclosed in the fourth quarter of 2016, was 95% complete.   During the three and six months ended June 30, 2017, B&W recognized additional contract losses of $2.7 million and $5.5 million, respectively, as a result of increased estimated costs at completion.

        d.    The fourth loss contract, initially disclosed in the fourth quarter of 2016, was approximately 66% complete.  During the three and six months ended June 30, 2017, B&W revised estimated revenue and costs at completion of the contract, resulting in additional contract losses of $23.8 million and $21.9 million, respectively.

        e.    The fifth loss contract was approximately 57% complete.  During the three months ended June 30, 2017, B&W revised estimated revenue and costs at completion of the contract, resulting in additional contract losses of $23.3 million in the same period.

        f.    The sixth loss contract was approximately 59% complete.  During the three months ended June 30, 2017, B&W revised estimated revenue and costs at completion of the contract, resulting in additional contract losses of $18.5 million for the same period.

247.    The Company's Form 10-Q for the second quarter of 2017 also disclosed a material weakness in the Company's internal controls over financial reporting at B&W Volund, which had

not been fully remediated at the timing of the filing of the second quarter 2017 Form 10-Q.

Specifically, the 10-Q stated:

*Internal control over sources of information used in project accounting at Volund*

As of March 31, 2017, we did not maintain effective internal control over the completeness and accuracy of the information used in the percentage of completion ("POC") accounting for three European renewable energy projects at Volund, a business unit within our Renewable segment. Based on our detailed investigation, we determined Volund's project accountants and project management did not timely identify certain subcontractor costs and required quantities of certain labor and equipment needed to complete ongoing projects, which resulted in an understatement of our consolidated net loss in the first quarter of 2017. Though the error was not material, the related internal control deficiency was considered a material weakness because it could have resulted in material errors in our financial statements. The correction of the immaterial error was included in the $115.2 million charge we recognized for changes in POC accounting estimates recorded in our statement of operations in the second quarter of 2017. Factors that contributed to the material weakness in internal control over financial reporting during the first quarter of 2017 were turnover of key project and supply chain personnel at Volund and the relocation of certain project management responsibilities from Volund's administrative offices to the project sites during a period of significant changes in subcontractors' scopes of work. As a result, our processes and internal controls associated with the completeness and accuracy of information used to estimate revenue and related costs in the application of POC accounting for these three projects were ineffective.

*Remediation of the material weakness in internal control over financial reporting*

As of June 30, 2017, we have not yet fully remediated the material weakness at Volund. With the oversight of our senior management and the Audit and Finance Committee of our Board of Directors, we have taken and will continue to take steps intended to address and remediate the underlying causes of the material weakness in internal control over financial reporting at Volund.

248.    On these shocking disclosures, B&W's stock price plummeted more than 72% on August 10, 2017, falling from $9.75 per share on August 9, 2017 to close at $2.70 per share on August 10, 2017 on unusually high trading volume.

249.    On August 10, 2017, Jamie Cook of Credit Suisse issued a Research Report on B&W entitled "*It All Boils Down to Renewables*," in which Cook, who rated B&W an "underperform," wrote:

> **Thoughts Post Call**: BW's stock closed down 72% after reporting more charges, totaling ~$115M, on six renewable projects. Of the six projects, only two are complete with the remaining four not expected to be finished until mid-2018. Management believes it has been prudent in re-estimating costs to complete as well as baking in additional contingency vs prior estimates and accounted for unidentified risks associated with the 4 ongoing projects. Even so, given the projects continue into 2018, the margins in the Renewable segment will continue to be challenged relative to historic margins that have been in the high teens, weighing on 2018 earnings. While BW believes the charges will be contained to this quarter, we believe the market will remain concerned about the potential for additional charges until the projects are complete, and as such concerns will continue to weigh on the name.

250.    KeyBanc reiterated its "Sector Weight" rating, stating: "we view severe renewable charges as a setback after encouraging progress updates through mid-June. We remain on the sidelines looking for further evidence of stabilization in the Renewable segment/comfort around mgmt's [sic] return to market strategy."

251.    Likewise, on August 13, 2017, UBS downgraded B&W to "Neutral" as the "Renewables issues create uncertainty," and reduced its price target to $3 (from $13) "to reflect lower earnings, ongoing project issues and more debt on the balance sheet."

252.    As a result of Defendants' false statements and material omissions, B&W stock traded at artificially inflated prices during the Class Period. After the above disclosures or materializations of risks concealed by Defendants' fraud, the price of B&W stock declined significantly as the artificial inflation was removed.

## VII.    ADDITIONAL EVIDENCE OF SCIENTER

253.    Throughout the Class Period, the Individual Defendants held themselves out to investors as the persons most knowledgeable about B&W's business. The Individual Defendants

voluntarily and repeatedly chose to speak on these issues throughout the Class Period and, in doing so, either knew or recklessly disregarded that their statements were contrary to the underlying facts alleged herein while making the specific and detailed statements alleged herein.

254.    B&W and the Individual Defendants participated in a scheme to defraud investors about problems in the Company's Renewable business which were impacting B&W's costs to complete projects, resulting in decreased profit margins and worsening financial performance, and that the Company's Renewable business suffered from problematic on-site project management and a lack of resources in engineering and project management groups, which resulted in overly aggressive project bidding, project delays, and engineering errors.  The Individual Defendants were personally aware of, designed, and implemented the deceptive practices detailed herein.

255.    In addition to the allegations set forth above, during the Class Period, B&W and the Individual Defendants had both the motive and opportunity to commit fraud.  They also had actual knowledge of the misleading nature of the statements they made or acted with reckless disregard for the true information known to them at the time for the reasons discussed above.  In so doing, B&W and the Individual Defendants committed acts and practiced and participated in a course of business that operated as a fraud or deceit on purchasers of B&W's common stock during the Class Period.

256.    As set forth herein, statements by former employees of B&W corroborate that Defendants knew or were reckless in not knowing of the serious problems, delays, and cost over-runs both in Copenhill and in other major ongoing projects in the Renewable segment.

**A.    Growth in the Renewable Segment (B&W Volund) Was Critical to the Company's Success After the Spin-Off.**

257.    Throughout the Class Period, B&W was increasingly shifting its business away from fossil fuels toward growing revenue and market share in renewable energy products and

services. According to CW 4, prior to the Class Period, B&W Volund was relatively small and grew substantially as it acquired more projects between 2014 and 2016. Indeed, starting in 2014, the Renewable business began to book significantly more work, with revenues increasing from $230 million in 2014 to $349 million in 2016.

258. B&W touted its renewable energy business as its key growth platform, and the Company's Renewable contract signings and backlog were closely followed by analysts. European renewable power had been the Company's largest backlog growth driver since 2014.[18] In connection with the announcement of the B&W spin-off on June 30, 2015, Defendants stated: "*We expect the growth in backlog since December 31, 2014, which relates primarily to recent international coal boiler and renewable bookings, will provide revenue growth in this segment*."

259. The Individual Defendants voluntarily and repeatedly chose to speak about the growth in the Renewable business throughout the Class Period and in doing so either knew or recklessly disregarded that their statements were contrary to the underlying facts alleged herein while making the specific and detailed statements alleged herein. For example, the Individual Defendants made the following representations during investor conferences and conference calls during the Class Period:

a. On June 17, 2015, at the B&W Analyst/Investor Day, Ferland stated, "*the strategy in the power segment, it's about growth*, it's about targeted opportunities where we can really make money, investing in business development, so we can find those opportunities."[19]

---

[18] "*Sell Off Likely Overdone, but Flawless Execution a Must Following Project Charge and Coal Power Business Reset*," William Blair, June 28, 2016.

[19] As set forth above, before the restructuring announced on June 28, 2016, the Renewable segment was part of B&W's Global Power segment. Global Power included Renewables and environmental equipment for power plants.

b.     In the earnings call on August 5, 2015, Ferland confirmed that "Our global power division is our ***primary organic growth engine*** as we seek to expand our presence worldwide." Ferland also stated that "[w]e . . . feel good about the revenue outlook given the visibility of the backlog in this business through 2017." Ferland further stated that "we're in good position to generate growth as we slowly diversify the business to reduce our dependence on US coal and leverage our core competencies and strong balance sheet to expand our presence in the growing renewables and industrial environmental segments."

c.     In the earnings call on November 4, 2015, Ferland again touted the "strong performance in Global Power," stating that "Global Power's awards, including the new waste energy plant announced this quarter are keeping the backlog high." Apker echoed this sentiment, stating "the Global Power segment again posted strong revenue growth . . . . due to the strength in both utility and renewable businesses[.]"

d.     In an earnings call on May 11, 2016, Ferland continued to tout expected growth in the Global Power pipeline and B&W Volund projects, stating: "the overall pipeline remains strong for us. . . . We continue to see opportunities in Europe which is where we've had an awful lot of success the last couple of years. . . . We have a great technology and a great product to bring to the marketplace and a very good name in Volund backed by B&W."

260.    Similarly, in public filings, B&W emphasized that the Renewable segment was an important driver of Company growth. For example:

a.     The Prospectus stated: "We expect the growth in backlog since December 31, 2014, which relates primarily to recent international coal boiler and ***renewable bookings, will provide revenue growth in this segment***."

b.     In the August 4, 2015, Report on Form 8-K, Ferland attributed the strong earnings to "a significant increase in revenues in Global Power driven by the new international project awards *in line with our growth strategy*."

c.     In the second quarter 10-Q filed on August 4, 2015, in Management's Discussion and Analysis of Financial Condition and Results of Operations, the Company touted its renewable business backlog, stating: "We expect the recent growth in backlog, which relates primarily to recent international coal boiler and renewable bookings, will provide revenue growth in [the Global Power] segment. . . ."

261.   The critical importance of the Renewable segment also was reflected in analysts' focus on the segment. For example:

a.     William Blair initiated coverage of B&W on July 1, 2015 with an "outperform" rating and a "core growth" company profile, citing in part that "*the company is working diligently to grow its business internationally* and has shown early signs of success over the last two quarters with robust awards leading to 30% year-over-year backlog growth (as of first quarter 2015), in turn providing the company with above-average visibility into solid revenue growth through the remainder of 2015 and 2016." *The analyst further explained that Global Power was expected to generate the majority of B&W's organic growth over the next several years, with "[t]he largest growth opportunity" in the global waste-to-energy market.*

b.     On June 28, 2016, William Blair issued an analyst report which noted that "European renewable power has been the company's largest backlog growth drivers over the last one to two years."

c.     On March 1, 2017, Jamie Cook of Credit Suisse issued an analyst report on B&W attributing the sell-off in the Company's stock to cost overruns on seven projects within the

Renewable segment, and noted: "BW's stock closed down 37% after missing Q4'16 estimates related to cost overruns on seven projects within the Renewable segment. *This is key as Renewable was viewed as BW's growth platform*."

262.     Given the growing size of the Renewable segment (and corresponding shrinking size of B&W's coal business), its critical importance to the growth of B&W's overall business, and the fact that it was the Company's revenue life-blood during the Class Period, the practices discussed herein could not have occurred without the Individual Defendants' knowledge and approval.

**B.     Defendants and Former Employees Confirm that Senior B&W Management Received Frequent and Contemporaneous Reports of the Activities and Problems at all Ongoing Projects in the Renewable Segment.**

263.     On November 4, 2015, Ferland acknowledged that, during the third quarter of 2015, he met with several customers and visited several B&W projects in Europe and "*immerse[d] myself in the business*."

264.     Moreover, Ferland has acknowledged that he and other B&W senior management were informed of issues at B&W Volund, and in particular were fully informed about the problems at Copenhill and the impact that the resolution of that problem was having on other renewable segment projects. For example, during a March 1, 2017 earnings conference call, Ferland reported:

> In early December we appointed Jimmy Morgan to lead the segment, and *in late December in particular and in early January, Jimmy began to dig into each individual project in detail*.
>
> \*   \*   \*
>
> *As Jimmy delved into each of the other projects, and Jenny and I joined him, it became apparent that the mitigation strategies we put in place to ensure that the resources we were putting on our original problem project would not cause issues on the other projects, were not working*.

*The further we dug into each of those individual projects, a couple in the traditional EU and a handful in the UK, the more concerned we became about our ability to deliver those projects on time and within the estimated cost to complete*. So we took the bulk of January and the first two or three weeks of February to go project by project through each to ensure that we understood the new schedule, that we incorporated the new cost to complete the project, that we accrued money to account for any potential LBs due to the late schedule, and to increase contingency significantly on all of those projects.

265.    As set forth herein, statements by former employees of B&W corroborate the conclusion that Defendants knew or were reckless in not knowing of the serious problems, delays and cost over-runs in the problem project and in the other ongoing projects in the Renewable segment.

266.    CW 4 confirmed that there was a significant amount of reporting from B&W Volund to executives at B&W U.S. and that the reporting was quite detailed as B&W U.S. maintained a lot of oversight over B&W Volund.  For instance, CW 4 noted that B&W Volund Business Controller Blevins, an American expatriate, was part of CW 4's management team, and reported frequently to the B&W U.S. Vice President of Finance for the Global Power division, Rod Carlson, and other B&W U.S. contacts.

267.    Additionally, CW 4 described a Monthly Management Report that was prepared and transmitted to Scavuzzo and his group.  The report included an update on each project describing what had happened during the prior month and what was projected for the following month.  It also identified any problems on each project and the solutions that were being developed and attempted.

268.    CW 4 stated that problems with projects—including the Copenhill, Skaerbaek, and U.K. project problems discussed above—were "clearly communicated" by B&W Volund to B&W U.S. through Scavuzzo and his financial controller as soon as they were discovered.  In addition

to being written up in the Monthly Management Reports, they were openly discussed in phone calls and emails between B&W Volund and B&W U.S. personnel.

269. CW 4 also stated that there were Quarterly Performance Conference Calls with Scavuzzo and his group, which included a budget update and a discussion of selected projects. CW 4 recalled that the Copenhill, Skaerbaek, and U.K. projects were discussed on the Quarterly Performance Conference Calls with Scavuzzo. Similar Performance Calls were held on a monthly basis internally at B&W Volund.

270. Additionally, according to CW 5, the Project Manager and Controller for each project had to prepare monthly reports designed by B&W U.S., written in English, to be presented to B&W Volund senior management. CW 5 stated that the reports included information on scheduling, delays, any new subcontractors, budget to actual data, work completed to date, work in progress, forecasted work remaining, risks, and a new budget, if any. CW 5 said that these monthly reports were sent to and reviewed by B&W U.S. management, and that his team would sometimes receive questions coming from B&W U.S. which were conveyed by either Jorgensen or B&W Volund's Director of New Energy Plants. CW 5 further stated that a Project or Commissioning Manager named Gary from B&W's Barberton, Ohio office visited B&W Volund in approximately January 2016 to report back to U.S. leadership on the progress and problems at Copenhill. Additionally, a financial professional from B&W U.S. who reported to a senior financial professional at the B&W Barberton, Ohio office was on-site at B&W Volund from June 2015 through at least June 2016. CW 5 also recalled receiving occasional written questions from B&W U.S. concerning the Copenhill project.

271. CW 2 confirmed CW 5's account that Monthly Reports that were issued on each project. CW 2 stated that these reports indicated when the Company began to experience

delays on the projects, including those undertaken through B&W Volund. CW 2 also stated that the Company had additional reports, called Accounting Reports, which were prepared by the Company Controllers and shared with the Project Managers. These Accounting Reports included descriptions of the project's initial budget, costs to date, anticipated costs to complete, and the like. CW 2 reported that each quarter, the Project Managers would present details from the Monthly Reports and Accounting Reports to B&W's senior management, including J. Randall Data, Low, Brandy Johnson, and Walt Nischt. CW 2 further stated that both the Monthly Reports and the Accounting Reports were available via the Company's intranet site.

### C. B&W's Deal with Lightship to Obtain $125 Million in Financing at an Effective Interest Rate of Over 30% Evidences Defendants' Knowledge of the Magnitude of Financial Problems and Intent to Deceive.

272. Lightship, an affiliate of $4 billion private-equity firm American Industrial Partners ("AIP"), took a 9.9% stake in B&W in May 2017, according to a Schedule 13D filed by AIP on May 22, 2017. According to the filing, Lightship acquired 4,834,822 shares of B&W Stock.

273. On August 9, 2017, in connection with the release of the Company's financial results for the second quarter ended June 30, 2017, B&W disclosed that Lightship had agreed to lend the Company $176 million at an annual interest rate of 10%. As part of the deal, B&W used $50.9 million from the loan to repurchase Lightship's 9.9% equity stake in B&W at roughly the same price that Lightship originally paid in May 2017.

274. As discussed herein, on August 9, 2017, after the market closed, B&W reported dismal quarterly earnings that sent the stock into a tailspin.

275. By August 10, 2017, when B&W's share price closed down 72%, at $2.70 per share, Lightship's stake in B&W would have only been worth $13 million. B&W's buyback deal saved Lightship approximately $34 million in paper losses.

276. The enormity of the loan and unfavorable loan terms from Lightship evidences the severity of the Company's failing Renewable business, of which Defendants were well aware. In effect, B&W must pay 10% interest on a $176 million loan, plus an additional $34 million (i.e., the paper loss on the 9.9% equity stake bought back by the Company), in order to obtain $125 million in financing. Thus, the effective cost to B&W of this loan is equivalent to an interest rate well in excess of 30%. Ferland's statement on the August 10, 2017 earnings call that this was "the best by far" of the options available to the Company over the prior few weeks further demonstrates the scale of the problems in its Renewable business and that B&W was aware of the full severity of the problems it disclosed on August 9, 2017, well prior to that disclosure.

## VIII. LOSS CAUSATION/ECONOMIC LOSS

277. During the Class Period, as detailed herein, B&W and the Individual Defendants engaged in a course of conduct that artificially inflated the price of B&W common stock and operated as a fraud or deceit on the Class Period purchasers of B&W common stock by making the materially false and misleading statements and omissions recited above.

278. When the truth regarding the problems in B&W's Renewables segment was disclosed and the risks concealed by Defendants' fraud materialized, revealing to the market the fraudulent nature of B&W's concealment of these problems and risks, the price of B&W common stock declined precipitously as the prior artificial inflation was removed from the price of the stock. As a result of their purchases of B&W common stock at artificially inflated prices during the Class Period, Plaintiffs and other members of the Class suffered a substantial economic loss (i.e., damages under the federal securities laws). The price decline in B&W common stock was a direct result of the nature and extent of the materially false and misleading statements and omissions revealed to investors and the market. Thus, the Defendants' wrongful conduct, as alleged herein, directly and proximately caused the damages suffered by Plaintiffs and the Class.

279. The truth about B&W's business was disclosed through a series of disclosures regarding delays, problems, and cost overruns in the Company's Renewables segment which began on June 28, 2016 with the announcement of the piping issues on a major Renewable project (Copenhill) involving re-engineering, on-site rework, and delays, and concluded on August 9, 2017 with the announcement of an additional $115 million in charges on six Renewable projects in the quarter ended June 30, 2017 and the disclosure of a material weakness in the internal control over financial reporting in the Renewable segment.

280. **_June 28, 2016_**

a. As described in paragraphs 186 to 191 above, on June 28, 2016, the Company disclosed a pre-tax charge of $32 million in the second quarter 2016 to correct an engineering design error on a renewable energy plant in Denmark (the Copenhill project).

b. In reaction to these disclosures, B&W's stock price fell from a close on June 27, 2016 of $18.94 per share to a close on June 28, 2016 of $14.92 per share, or more than 21%, on unusually high trading volume. The Company's stock price remained artificially inflated after this partial disclosure or materialization of risks concealed by the fraud, however, because, as alleged above at paragraph 195, Defendants misrepresented and failed to disclose that: (a) due to rapid growth in the Renewable segment and cost cutting strategies, the Company lacked sufficient expertise or engineering and other resources to perform on time and within budget the Renewable contracts in its backlog, thereby rendering the backlog an improbable and unrealistic source of profitability, and (b) there were ongoing, undisclosed material problems with other major Renewable projects in addition to Copenhill that the undisclosed diversion of resources to address Copenhill exacerbated.

281.   ***November 2-3, 2016***

a.   As described in paragraphs 204 through 212 above, on November 2-3, 2016, the Company disclosed a $14 million charge for the problem Renewable project (Copenhill) due to "complexities" and lower than expected labor productivity, which extended the remediation schedule.

b.   In response to the Company's third quarter 2016 earnings release, B&W's share price fell by $1.61, almost 11%, on unusually high trading volume to close at $14.00 on November 3, 2016.  The Company's stock price remained artificially inflated after this partial disclosure or materialization of risks concealed by the fraud, however, because, as alleged above at paragraphs 214 and 215, Defendants misrepresented and failed to disclose that:  (a) due to rapid growth in the Renewable segment and cost cutting strategies, the Company lacked sufficient expertise or engineering and other resources to perform on time and within budget the Renewable contracts in its backlog, thereby rendering the backlog an improbable and unrealistic source of profitability, and (b) there were ongoing, undisclosed material problems with other major Renewable projects in addition to Copenhill that the undisclosed diversion of resources to address Copenhill exacerbated.

282.   ***February 28, 2017***

a.   As described in paragraphs 216 through 226 above, the Company released its financial results for the fourth quarter and fiscal year ended December 31, 2016 on February 28, 2017, and during the earnings conference call on March 1, 2017, the Company revealed cost overruns and delays on seven Renewable projects.

b.   The market reaction was swift and negative.  After closing at $16.50 per share on February 28, 2017, the stock opened at $11.09 on March 1, 2017 and ultimately

dropped 37% to close at $10.33 per share on abnormally high trading volume of 7.9 million shares. The Company's stock price remained artificially inflated after this partial disclosure or materialization of risks concealed by the fraud, however, because, as alleged above in paragraphs 227 and 228, Defendants failed to disclose that: (a) due to rapid growth in the Renewable segment and cost cutting strategies, the Company lacked sufficient expertise or engineering and other resources to perform on time and within budget the Renewable contracts in its backlog, thereby rendering the backlog an improbable and unrealistic source of profitability; and (b) there were ongoing, undisclosed material problems within the Renewable segment that were exacerbated by the undisclosed diversion of resources.

283.    *August 9, 2017*

a.    As described in paragraphs 240 through 247 above, the Company announced its financial results for the second quarter ended June 30, 2017 on August 9, 2017 during an earnings conference call, revealing disappointing second quarter 2017 revenues and an adjusted EPS loss of $2.56 for the three months ended June 30, 2017 compared to an adjusted loss per share of $0.18 in the prior year period.  The poor performance was driven by $115 million in charges on six Renewable projects which were now operating as loss contracts.  The Company also disclosed a material weakness in its internal controls over financial reporting at B&W Volund, which had not been fully remediated at the timing of the filing of the second quarter Form 10-Q.

b.    On these disclosures, B&W's stock price plummeted more than 72% on August 10, 2017, falling from $9.75 per share on August 9, 2017 to close at $ 2.70 per share on August 10, 2017 on usually high trading volume.

## IX.    CLASS ACTION ALLEGATIONS

284.    Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons and entities who purchased B&W publicly-traded

common stock on the NYSE or other U.S. exchanges or in a U.S. transaction during the Class Period (the "Class"). Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of any Defendant who is an individual; (iii) any person who was an officer or director of B&W during the Class Period; (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest; (v) B&W's employee retirement and benefit plan(s) and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (vi) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person.

285. The members of the class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. As of the Company's Report on Form 10-Q for the quarter ended June 30, 2017, B&W had 48,880,390 shares outstanding, owned by thousands of persons.

286. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

     a.       Whether the Exchange Act was violated by Defendants;

     b.       Whether Defendants omitted and/or misrepresented material facts;

     c.       Whether Defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

     d.       Whether the Defendants acted with the requisite state of mind;

     e.       Whether the price of B&W common stock was artificially inflated; and

f.	The extent of damage sustained by Class members and the appropriate measure of damage.

287.	Plaintiffs' claims are typical of those of the Class because Plaintiffs and the Class sustained damages from the Defendants' wrongful conduct.

288.	Plaintiffs will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation.  Plaintiffs have no interests which conflict with those of the Class.

289.	A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## X.	PRESUMPTION OF RELIANCE

290.	Plaintiffs will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

a.	Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

b.	The omissions and misrepresentations were material;

c.	The Company's common stock traded in an efficient market;

d.	The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

e.	Plaintiffs and other members of the Class purchased B&W common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

291.	At all relevant times, the market for B&W common stock was efficient for the following reasons, among others:

a.	As a regulated issuer, B&W filed periodic public reports with the SEC;

104

b.    B&W regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

c.    B&W was followed by several securities analysts employed by major brokerage firm(s) including: (1) KeyBanc Capital Markets; (2) Sidoti & Company; (3) Credit Suisse; (4) William Blair; (5) UBS Securities LLC; (6) BB&T Capital Markets; and (7) R. W. Pressprich, and which wrote reports which were distributed to those brokerage firms' sales force and certain customers and which were publicly available and entered the public marketplace; and

d.    B&W common stock was actively traded in an efficient market, the NYSE, where the Company's common stock trades under the ticker symbol "BW."

292.    As a result of the foregoing, the market for B&W common stock promptly digested current information regarding B&W from all publicly available sources and reflected such information in B&W common stock. Under these circumstances, all purchasers and acquirers of B&W common stock during the Class Period suffered similar injury through their purchases or acquisitions of B&W common stock at artificially inflated prices, and the presumption of reliance applies.

293.    Further, to the extent that Defendants concealed or improperly failed to disclose material facts with regard to the Company and its operations, Plaintiffs are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972).

## XI.    INAPPLICABILITY OF STATUTORY SAFE HARBOR

294.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to the allegedly false statements pled in this complaint.

The statements alleged to be false and misleading herein all relate to then-existing facts and circumstances. To the extent certain of the statements alleged to be false and misleading may be characterized as forward-looking, they were not adequately identified as "forward-looking" statements when made, and were not accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor is intended to apply to any forward-looking statements pled herein, B&W and the Individual Defendants are liable for those false and misleading forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false and misleading, and/or the forward-looking statement was authorized and/or approved by an executive officer of B&W who knew that those statements were false and misleading when made.

## XII. CLAIMS FOR RELIEF

### COUNT I

**For Violation of Section 10(b) of the Exchange Act and Rule 10b-5
Against All Defendants**

295. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

296. During the Class Period, B&W and the Individual Defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were materially false and misleading in that they contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

297. B&W and the Individual Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

a. Employed devices, schemes and artifices to defraud;

b. Made untrue statements of material facts or omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; or

c. Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of B&W common stock during the Class Period.

298. Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for B&W's publicly traded common stock. Plaintiffs and the Class would not have purchased B&W common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by the Defendants' misleading statements.

299. As a direct and proximate result of the wrongful conduct of B&W and the Individual Defendants, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of B&W common stock during the Class Period.

### COUNT II

**For Violation of Section 20(a) of the Exchange Act**
**Against the Individual Defendants**

300. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

301. The Individual Defendants acted as controlling persons of B&W within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level

positions, participation in and awareness of the Company's operations, and knowledge of the statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading. The Individual Defendants were provided with, or had unlimited access to copies of, the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

302. In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

303. As set forth above, B&W and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions, each as a controlling person, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of B&W's and the Individual Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## XIII.  PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for judgment as follows:

a.  Declaring the action to be a proper class action pursuant to Fed. R. Civ. P. 23;

b.  Awarding Plaintiffs and the members of the Class damages, including interest;

c.  Awarding Plaintiffs' counsel reasonable costs and attorneys' fees; and

d.  Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## XIV.  JURY DEMAND

Plaintiffs demand a trial by jury.

Dated: September 28, 2017

**KAPLAN FOX & KILSHEIMER LLP**

/s/ *Frederic S. Fox*
Frederic S. Fox (*pro hac vice*)
Donald R. Hall (*pro hac vice*)
Melinda Campbell (*pro hac vice*)
850 Third Avenue, 14th Floor
New York, NY 10022
Telephone: (212) 687-1980
Facsimile: (212) 687-7714

*Lead Counsel for Lead Plaintiff and the Class*

Dhamian Blue
**BLUE LLP**
205 Fayetteville Street
Raleigh, North Carolina 27601
Telephone: (919) 833-1931
Facsimile: (919) 833-8009
N.C. Bar No. 31405

*Liaison Counsel*

109

*Additional Counsel for Lead Plaintiff:*

Andrew L. Zivitz
Geoffrey C. Jarvis
Matthew L. Mustokoff
Margaret E. Onasch
**KESSLER TOPAZ MELTZER & CHECK, LLP**
280 King of Prussia Road
Radnor, Pennsylvania 19087
Telephone: 610-667-7706
Facsimile: 610-667-7056

*Additional Counsel for Named Plaintiff and Lead Plaintiff:*

Jonathan Gardner
Christine M. Fox
Marisa N. DeMato
Christopher L. Mooney
**LABATON SUCHAROW LLP**
140 Broadway
New York, New York 10005
Telephone: 212-907-0700
Facsimile: 212-818-0477

# CERTIFICATION

I, Rod Graves, as Deputy Director of Lead Plaintiff Arkansas Teacher Retirement System ("Arkansas Teacher"), hereby certify as follows:

1.     I am fully authorized to execute this Certification on behalf of Arkansas Teacher. Arkansas Teacher has reviewed the Second Amended Consolidated Complaint for Violations of Federal Securities Laws against Babcock & Wilcox Enterprises, Inc. ("B&W") and authorizes its filing.

2.     Arkansas Teacher did not purchase common stock of B&W at the direction of Arkansas Teacher's counselor in order to participate in any private action under the federal securities laws.

3.     Arkansas Teacher is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.     Arkansas Teacher's transactions in B&W stock during the Class Period are reflected in Schedule A, attached hereto.

5.     Arkansas Teacher is currently serving or has served as a representative party in the following class actions filed under the federal securities laws during the three years prior to the date of this Certification:

> *Haan v. Five Below, Inc., et al.*, No. 2:15-cv-94 (E.D. Pa.)
>
> *In re Virtus Investment Partners, Inc. Securities Litigation*, No. 1:15-cv-1249 (S.D.N.Y.)
>
> *Arkansas Teacher Retirement System v. Insulet Corp., et al.*, No. 1:15-cv-12345 (D. Mass.)
>
> *In re Vipshop Holdings Ltd. Securities Litigation*, No. 1:15-cv-3870 (S.D.N.Y.)
>
> *Kasper v. AAC Holdings, Inc., et al.*, No. 3:15-cv-923 (M.D. Tenn.)
>
> *In re Nimble Storage, Inc. Securities Litigation*, No. 4:15-cv-5803 (N.D. Cal.)
>
> *Horowitz v. SunEdison, Inc., et al.*, No. 4:15-cv-1769 (E.D. Mo.) (transferred to the Southern District of New York as *In re SunEdison, Inc., Securities Litigation*, No.

1:16-cv-07917-PKC)

*Hong v. Extreme Networks, Inc., et al.*, No. 5:15-cv-4883 (N.D. Cal.)

*St. Lucie County Fire District Firefighters Pension Trust Fund v. Stericycle, Inc., et al.*, No. 1:16-cv-7145 (N.D. Ill.)

*In re RH, Inc. Securities Litigation*, No. 4:17-554 (N.D. Cal.)

*Oklahoma Law Enforcement Retirement System v. Adeptus Health Inc.*, No. 4:17-cv-449 (E.D. Tex.)

*In re Celadon Group, Inc. Securities Litigation*, No. 1:17-cv-2828 (S.D.N.Y.)

*In re Aarons, Inc. Securities Litigation*, No. 1:17-cv-2270 (N.D. Ga.)

*Ollila v. Babcock & Wilcox Enterprises, Inc*., No. 3:17-cv-109 (W.D.N.C.)

6.     Arkansas Teacher has sought to serve as a representative party in the following class actions filed under the federal securities laws during the three years prior to the date of this Certification but either withdrew its motion or was not appointed as of the date of this Certification:

*Ong v. Chipotle Mexican Grill, Inc., et al.*, No. 1:16-cv-141 (S.D.N.Y.)

*Friedman v. Endo International PLC, et al.*, No. 1:16-cv-03912 (S.D.N.Y.)

*Knurr v. Orbital ATK Inc., et al.*, No. 1:16-cv-1031 (E.D. Va.)

*Depickere v. Celadon Group, Inc., et al.*, No. 2:17-cv-3319 (D.N.J.) (action voluntarily dismissed in favor of *In re Celadon Group, Inc. Securities Litigation*, No. 1:17-cv-2828 (S.D.N.Y.), where Arkansas Teacher was appointed)

7.     Arkansas Teacher will not accept any payment for serving as a representative party on behalf of the class beyond Arkansas Teacher's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this __28__ day of __September__ 2017.

**Arkansas Teacher Retirement System**

By: _____

Rod Graves
*Deputy Director*

# SCHEDULE A

| Security | Buy/Sell | Date | Quantity | | Price |
|---|---|---|---|---|---|
| Common Stock | Received as a Result of Spinoff | 7/1/2015 | 14,000 | | - |
| Common Stock | Buy | 7/16/2015 | 25,100 | $ | 18.41 |
| Common Stock | Buy | 7/16/2015 | 62,877 | $ | 18.41 |
| Common Stock | Buy | 7/16/2015 | 72,664 | $ | 18.44 |
| Common Stock | Buy | 7/17/2015 | 19,454 | $ | 18.34 |
| Common Stock | Buy | 7/17/2015 | 9,000 | $ | 18.46 |
| Common Stock | Buy | 7/20/2015 | 25,831 | $ | 18.51 |
| Common Stock | Buy | 7/21/2015 | 32,272 | $ | 18.46 |
| Common Stock | Buy | 7/22/2015 | 29,631 | $ | 18.60 |
| Common Stock | Buy | 7/24/2015 | 6,449 | $ | 18.56 |
| Common Stock | Buy | 7/24/2015 | 7,567 | $ | 18.64 |
| Common Stock | Buy | 7/27/2015 | 8,870 | $ | 19.10 |
| Common Stock | Buy | 7/28/2015 | 24,995 | $ | 19.51 |
| Common Stock | Buy | 7/30/2015 | 16,086 | $ | 19.87 |
| Common Stock | Buy | 8/3/2015 | 14,422 | $ | 19.82 |
| Common Stock | Buy | 8/4/2015 | 51,770 | $ | 19.98 |
| Common Stock | Buy | 8/5/2015 | 14,603 | $ | 20.67 |
| Common Stock | Buy | 8/5/2015 | 15,200 | $ | 20.72 |
| Common Stock | Buy | 8/6/2015 | 30,242 | $ | 20.00 |
| Common Stock | Buy | 9/21/2015 | 13,499 | $ | 17.57 |
| Common Stock | Buy | 9/25/2015 | 7,003 | $ | 17.20 |
| Common Stock | Buy | 9/25/2015 | 9,150 | $ | 17.03 |
| Common Stock | Buy | 9/28/2015 | 20,994 | $ | 16.94 |
| Common Stock | Buy | 9/28/2015 | 2,018 | $ | 16.99 |
| Common Stock | Buy | 10/13/2015 | 8,788 | $ | 17.65 |
| Common Stock | Buy | 10/21/2015 | 22,787 | $ | 16.18 |
| Common Stock | Buy | 10/21/2015 | 36,928 | $ | 16.12 |
| Common Stock | Buy | 10/23/2015 | 3,272 | $ | 16.98 |
| Common Stock | Buy | 10/27/2015 | 4,483 | $ | 16.75 |
| Common Stock | Buy | 11/2/2015 | 12,136 | $ | 16.91 |
| Common Stock | Buy | 11/3/2015 | 21,599 | $ | 17.00 |
| Common Stock | Buy | 3/1/2016 | 2,900 | $ | 19.03 |
| Common Stock | Buy | 3/1/2016 | 1,000 | $ | 19.16 |
| Common Stock | Buy | 3/2/2016 | 6,400 | $ | 19.00 |
| Common Stock | Buy | 3/2/2016 | 3,245 | $ | 19.17 |
| Common Stock | Buy | 6/28/2016 | 59,393 | $ | 14.96 |
| Common Stock | Buy | 6/30/2016 | 12,900 | $ | 14.54 |
| Common Stock | Buy | 12/6/2016 | 7,245 | $ | 16.77 |
| Common Stock | Buy | 12/7/2016 | 1,821 | $ | 17.03 |
| Common Stock | Buy | 12/7/2016 | 2,804 | $ | 17.04 |
| Common Stock | Buy | 12/12/2016 | 21,686 | $ | 17.25 |
| Common Stock | Buy | 12/12/2016 | 9,201 | $ | 17.25 |
| Common Stock | Buy | 12/13/2016 | 29,008 | $ | 17.02 |
| Common Stock | Buy | 12/13/2016 | 27,511 | $ | 17.06 |
| Common Stock | Buy | 12/14/2016 | 7,276 | $ | 16.77 |

| | | | | | |
|---|---|---|---|---|---|
| Common Stock | Buy | 12/15/2016 | 8,000 | $ | 16.75 |
| Common Stock | Buy | 12/16/2016 | 19,406 | $ | 16.83 |
| Common Stock | Buy | 12/19/2016 | 14,376 | $ | 16.86 |
| Common Stock | Buy | 12/21/2016 | 11,555 | $ | 17.10 |
| Common Stock | Buy | 12/22/2016 | 9,607 | $ | 17.17 |
| Common Stock | Buy | 12/28/2016 | 13,012 | $ | 16.95 |
| Common Stock | Buy | 1/3/2017 | 14,658 | $ | 16.79 |
| Common Stock | Buy | 1/4/2017 | 9,791 | $ | 16.79 |
| Common Stock | Buy | 1/6/2017 | 22,590 | $ | 16.20 |
| Common Stock | Buy | 1/11/2017 | 10,283 | $ | 15.95 |
| Common Stock | Sell | 10/1/2015 | 10,794 | $ | 16.39 |
| Common Stock | Sell | 10/2/2015 | 10,413 | $ | 16.14 |
| Common Stock | Sell | 12/7/2015 | 7,727 | $ | 19.47 |
| Common Stock | Sell | 12/7/2015 | 16,746 | $ | 19.50 |
| Common Stock | Sell | 12/10/2015 | 27,443 | $ | 19.90 |
| Common Stock | Sell | 12/11/2015 | 6,273 | $ | 20.04 |
| Common Stock | Sell | 12/11/2015 | 26,366 | $ | 19.96 |
| Common Stock | Sell | 2/23/2016 | 26,258 | $ | 20.49 |
| Common Stock | Sell | 2/24/2016 | 9,165 | $ | 20.40 |
| Common Stock | Sell | 2/24/2016 | 6,685 | $ | 20.43 |
| Common Stock | Sell | 2/25/2016 | 11,146 | $ | 20.59 |
| Common Stock | Sell | 5/11/2016 | 6,730 | $ | 22.17 |
| Common Stock | Sell | 5/11/2016 | 7,822 | $ | 21.91 |
| Common Stock | Sell | 5/12/2016 | 10,981 | $ | 21.55 |
| Common Stock | Sell | 5/13/2016 | 14,064 | $ | 21.09 |
| Common Stock | Sell | 11/30/2016 | 14,445 | $ | 15.86 |
| Common Stock | Sell | 12/1/2016 | 12,000 | $ | 15.94 |
| Common Stock | Sell | 3/1/2017 | 27,342 | $ | 10.12 |
| Common Stock | Sell | 3/1/2017 | 160,625 | $ | 10.17 |
| Common Stock | Sell | 3/1/2017 | 20,068 | $ | 10.40 |
| Common Stock | Sell | 3/1/2017 | 23,736 | $ | 9.95 |
| Common Stock | Sell | 3/1/2017 | 11,515 | $ | 10.04 |
| Common Stock | Sell | 3/2/2017 | 46,378 | $ | 10.68 |
| Common Stock | Sell | 3/3/2017 | 42,374 | $ | 10.42 |
| Common Stock | Sell | 3/6/2017 | 33,162 | $ | 10.23 |
| Common Stock | Sell | 3/7/2017 | 40,989 | $ | 10.06 |
| Common Stock | Sell | 3/8/2017 | 25,787 | $ | 10.04 |
| Common Stock | Sell | 3/14/2017 | 22,000 | $ | 9.15 |
| Common Stock | Sell | 3/20/2017 | 13,787 | $ | 9.18 |
| Common Stock | Sell | 3/28/2017 | 15,750 | $ | 9.26 |
| Common Stock | Sell | 3/29/2017 | 28,120 | $ | 9.36 |
| Common Stock | Sell | 3/29/2017 | 77,960 | $ | 9.27 |
| Common Stock | Sell | 3/30/2017 | 17,583 | $ | 9.40 |
| Common Stock | Sell | 3/31/2017 | 17,907 | $ | 9.36 |
| Common Stock | Sell | 4/5/2017 | 22,859 | $ | 9.01 |
| Common Stock | Sell | 4/6/2017 | 31,197 | $ | 9.11 |
| Common Stock | Sell | 4/6/2017 | 35,000 | $ | 9.04 |
| Common Stock | Sell | 4/7/2017 | 30,161 | $ | 9.10 |

## CERTIFICATION

I, Ronald G. Ethier, as Administrator of St. Paul Electrical Construction Pension Plan, St. Paul Electrical Construction Workers Supplemental Pension Plan, and St. Paul Electrical Workers Retirement Medical Funding Plan (collectively, "St. Paul Electrical"), hereby certify as follows:

1.     I am fully authorized to enter into and execute this Certification on behalf of St. Paul Electrical. I have reviewed an amended complaint prepared against Babcock & Wilcox Enterprises, Inc. ("B&W") alleging violations of the federal securities laws;

2.     St. Paul Electrical did not purchase common stock of B&W at the direction of counsel or in order to participate in any private action under the federal securities laws;

3.     St. Paul Electrical is willing to serve as a representative party in this matter, including providing testimony at deposition and trial, if necessary;

4.     St. Paul Electrical's transactions in B&W common stock during the Class Period are reflected in Exhibit A;

5.     St. Paul Electrical has not sought to serve as a lead plaintiff or representative party in the any class action filed under the federal securities laws during the last three years;

6.     Beyond its pro rata share of any recovery, St. Paul Electrical will not accept payment for serving as a representative party on behalf of the Class, except the reimbursement of such reasonable costs and expenses (including lost wages) as ordered or approved by the Court.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct this 25th day of September, 2017.

Ronald G. Ethier
*Administrator*

FOR THE
TRUSTEES

# EXHIBIT A

## TRANSACTIONS IN BABCOCK & WILCOX ENTERPRISES, INC.

St. Paul Electrical Construction Pension Plan:

| Transaction Type | Trade Date | Shares | Price Per Share | Cost / Proceeds |
|---|---|---|---|---|
| Purchase | 12/20/16 | 1,897.00 | $17.44 | ($33,074.95) |

St. Paul Electrical Construction Supplemental Pension Plan:

| Transaction Type | Trade Date | Shares | Price Per Share | Cost / Proceeds |
|---|---|---|---|---|
| Purchase | 12/20/16 | 1,121.00 | $17.44 | ($19,545.08) |

St. Paul Electrical Workers Retirement Medical Funding Plan:

| Transaction Type | Trade Date | Shares | Price Per Share | Cost / Proceeds |
|---|---|---|---|---|
| Purchase | 12/20/16 | 858.00 | $17.44 | ($14,959.57) |