# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION
### No. 3:17-cv-00109-MOC-DCK

ERIC OLLILA, Individually and on Behalf )
of All Others Similarly Situated, )
                        )
                 **Plaintiff,** )
                        )
       **vs.** )
                        )
BABCOCK & WILCOX ENTERPRISES, )
INC., E. JAMES FERLAND, and JENNY L. )
APKER, )
                        )
            **Defendants.** )
                        )

MEMORANDUM OF LAW IN SUPPORT
OF DEFENDANTS' MOTION TO DISMISS
PLAINTIFFS' SECOND AMENDED
CONSOLIDATED COMPLAINT FOR
VIOLATIONS OF FEDERAL SECURITIES
LAWS

THOMAS G. WALKER
ALSTON & BIRD LLP
(N.C. State Bar No. 17635)
4721 Emperor Boulevard, Suite 400
Durham, North Carolina, 27703-8580
Tel: 919-862-2200
Fax: 919-862-2260
thomas.walker@alston.com

JOHN L. LATHAM
SUSAN E. HURD
JASON R. OUTLAW
ALSTON & BIRD LLP
1201 West Peachtree Street
Atlanta, Georgia 30309-3424
Tel: 404-881-7000
Fax: 404-881-7777
john.latham@alston.com
susan.hurd@alston.com
jason.outlaw@alston.com

*Counsel for Defendants*

# TABLE OF CONTENTS

I.    INTRODUCTION AND SUMMARY OF ARGUMENT ................................................. 1

II.   FACTUAL BACKGROUND ........................................................................................ 3

III.  ARGUMENT AND CITATION TO AUTHORITY ........................................................ 9

      A.    The Complaint Fails To Plead A "Strong Inference" Of Scienter ........................ 9

            1.    Plaintiffs Fail To Plead Actual Knowledge Or Severe
                  Recklessness. ......................................................................................... 10

            2.    The Allegations From Confidential Informants Do Not Support
                  Scienter. ................................................................................................. 12

            3.    More Compelling Inferences of Non-Fraudulent Intent Exist..............17

      B.    The Complaint Fails To Plead An Actionable Misstatement Or Omission.......... 20

            1.    The Safe Harbor For Forward-Looking Statements Bars Plaintiffs'
                  Claims. ................................................................................................... 22

            2.    Defendants' Statements of Optimism and Opinion Are
                  Inactionable............................................................................................ 25

      C.    Corporate Mismanagement Is Not Actionable Under The Securities
            Laws…………………………………………………………………………...28

      D.    The Complaint Does Not State A "Controlling Persons" Claim ......................... 29

IV.   CONCLUSION............................................................................................................. 29

# I.    INTRODUCTION AND SUMMARY OF ARGUMENT

Plaintiffs' Second Amended Consolidated Complaint for Violations of Federal Securities Laws ("Complaint" or "Compl.") purports to assert claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 against Babcock & Wilcox Enterprises, Inc. ("B&W" or the "Company"), E. James Ferland, and Jenny L. Apker (the "Individual Defendants," and, collectively with the Company, the "Defendants"). B&W is a technology-based provider of advanced fossil and renewable power generation equipment. (Compl. ¶ 3.) Mr. Ferland is the Chairman and CEO of B&W and Ms. Apker is the Company's CFO. (*Id.* ¶¶ 40-41.)

Plaintiffs fail to allege the most basic elements of a securities fraud claim – an actionable misstatement or omission and an intent to defraud. This is so because Plaintiffs cannot point to any indicia of fraud in this case – there has been no restatement of the Company's financials nor are there any allegations that executives profited at the expense of shareholders through stock sales or possessed any other financial motive to participate in the alleged scheme. Instead, Plaintiffs attempt to back into a claim by asking the Court to draw legally impermissible inferences by focusing on present day business set-backs. Plaintiffs argue, with the benefit of 20-20 hindsight, that Defendants should have known of hidden design flaws or unanticipated cost increases and, therefore, must have known that the Company could not execute its business plans over two years earlier.

Plaintiffs ignore the fact that the construction of cutting-edge renewable energy power plants is a highly complicated, technology-heavy endeavor and, just like any large-scale construction project, unforeseen problems can arise over the life of the project. Despite the fact that Plaintiffs have had three shots at trying to craft a viable securities fraud claim, the central thrust of their Complaint remains an attack on the business decisions made by the Company regarding, for example, how it should allocate resources and cost-savings strategies undertaken to

bid competitively. The federal securities laws do not of course provide any recourse for claims of corporate mismanagement. Investors are not allowed to "Monday morning quarterback" management's business decisions through the guise of a disclosure lawsuit. This alone requires dismissal of the Complaint.

Equally fatal to Plaintiffs' claims is the fact that they have failed to plead a compelling and cogent inference of "scienter" or fraudulent intent, which must be pled on a defendant-by-defendant and statement-by-statement basis. There is simply nothing in the Complaint that sheds any light whatsoever on what either of the two Individual Defendants supposedly knew on any pertinent topic at the time alleged misstatements were made. And because most of these statements at issue are forward-looking, Plaintiffs were required to comply with the most rigorous scienter pleading standard of all – namely, pleading a strong inference that Mr. Ferland and Ms. Apker ***actually knew*** their statements were false at the time they made them. This is not something that Plaintiffs even attempt, which is not only dispositive as to the Individual Defendants, but also disposes of the claims against the corporate entity because there are no allegations of culpable intent on the part of anyone else at B&W.

Instead, all Plaintiffs have done is offer up a parade of allegations that have long been held to be insufficient to plead scienter. Plaintiffs, for example, rely on information supplied by so-called "Confidential Witnesses," who offer gossip and innuendo, but apparently never met or interacted with the Individual Defendants and, thus, can offer nothing of real value because they were not in a position to know the facts upon which they speculate. And what these witnesses do offer are generic allegations to the effect that B&W had an internal reporting system, which is hardly surprising, and that sometimes people from the U.S. met with or spoke to personnel in

2

Europe, another equally unremarkable fact. No inference of fraud – let alone a strong inference – is possible from such facts.

Lastly, dismissal is warranted because Plaintiffs have failed to plead any actionable misstatements or omissions. Plaintiffs rely primarily on the Company's public disclosures of problems that arose at certain renewable plant construction sites. However, the Private Securities Litigation Reform Act (the "Reform Act") and literally dozens of decided cases in substantially identical circumstances clearly provide that merely arguing disclosures should have been made earlier is nothing more than "pleading fraud by hindsight," which cannot form the basis of a securities fraud claim. Plaintiffs also target statements that are simply non-actionable as a matter of law. All of the challenged statements are either (1) forward-looking statements protected from liability under the "safe harbor" provision of the Reform Act, (2) vague expressions of corporate optimism or personal opinion on which no investor reasonably relies, or (3) statements that cannot possibly be rendered false or misleading by subsequent events such as, for example, accurate statements of historical fact or commentary on the Company's past financial results, the accuracy of which Plaintiffs do not challenge. For these and other reasons discussed below, the Complaint should be dismissed.

## II. FACTUAL BACKGROUND

**Background on B&W and the Renewable Business.** B&W is headquartered in Charlotte, North Carolina. (Compl. ¶ 36.) The Company was spun off from the Babcock & Wilcox Company in June 2015. (*Id.* ¶ 6.) Initially, the Company operated in three reportable segments – Global Power, Global Services, and Industrial Environmental. (*Id.* ¶ 37.) As part of a restructuring in June 2016, the Company changed its reporting segments to Power, Renewable, and Industrial. (*Id.*) The Renewable segment accounted for approximately 23%, 19%, and 15% of B&W's 2016,

3

2015, and 2014 revenues, respectively.[1]   The majority of B&W's renewable business is run through its subsidiary Babcock & Wilcox Volund A/S ("Volund").[2]   (*Id.* ¶ 38.)   Volund is headquartered in Esbjerg, Denmark.   (*Id.*)

Volund had a track record of success in the European waste-to-energy market.   As of June 2016, it had "completed 25 projects in the last ten years [and,] . . . [o]f those projects, 23 out of 25 were profitable, and significant project improvements were achieved due to good execution."   (*Id.* ¶ 186.)   In 2014 and 2015, Volund signed a series of contracts to build new renewable energy plants in Europe.   (*Id.* ¶¶ 53-54, 128.)   By January 2016, the Company "announced [its] sixth contract to build a new renewable waste energy plant in the UK just after successfully completing [its] first unit at Peterborough in England at the end of 2015."   (*Id.* ¶ 168.)

Like any business with long-term contracts, the Company's reported "backlog" of renewable contracts increased as a result of securing new contracts.   (*Id.* ¶ 130.)   The backlog "represent[ed] the dollar amount of revenue [the Company] expect[ed] to recognize in the future from contracts awarded and in progress."   (*Id.* at 17 n.6.)   The Company warned investors that "[t]here can be no assurance that the revenues projected in [its] backlog will be realized or, if realized, will result in profits."   (B&W Form 10-K for the Fiscal Year Ending December 31, 2015, at 9 (Walker Decl. Ex. C).)   This is so because "[d]elays, . . . scope changes and poor project

---

[1] *See* B&W Form 10-K for the Fiscal Year Ending December 31, 2016, at 32, attached as Exhibit A to the Declaration of Thomas G. Walker dated November 13, 2017 ("Walker Decl.") filed concurrently herewith.   These percentages were calculated by dividing the Renewable segment's revenues by the Company's total revenues.   In ruling on a motion to dismiss, the Court "must examine the facts as a whole, including facts found in 'documents incorporated into the complaint by reference.'"   *Cozzarelli v. Inspire Pharm. Inc.,* 549 F.3d 618, 625 (4th Cir. 2008) (internal citations omitted).

[2] Volund was originally located in the Global Power segment and, post-restructuring, it was consolidated into the new Renewable segment.   (B&W Form 8-K filed June 28, 2016, Ex. 99.1 at 4 (Walker Decl. Ex. B).)

execution could materially reduce or eliminate the revenues and profits . . . actually realize[d] from projects in backlog." (*Id.*)

The Company's renewable construction projects were built under fixed-price contracts. The Company warned investors that "[f]ixed-price contracts entail more risk . . . because they require [the Company] to predetermine both the quantities of work to be performed and the costs associated with executing the work." (Walker Decl. Ex. A at 5.) In addition, the Company recognized revenue on these contracts on a percentage-of-completion ("POC") accounting basis. (*Id.*) The Company repeatedly warned that its "use of the [POC] method of accounting could result in volatility in [the] results of operations." (*Id.* at 12.) Under POC accounting, the Company "review[s] contract price and cost estimates regularly as work progresses and reflect[s] adjustments in profit proportionate to the [POC] in the periods in which [it] revise[s] estimates to complete the contract." (*Id.* at 29.) "Changes in the estimated results . . . are necessarily based on information available at the time that the estimates are made and are based on judgments that are inherently uncertain as they are predictive in nature." (*Id.*) If adjustments reflect that a contract will "result in a loss, that loss [will be] recognized in the current period as a charge to earnings and the ***full loss*** is accrued on [the Company's] balance sheet[.]" (B&W Form 10-Q for the Quarter Ending June 30, 2017, at 10 (Walker Decl. Ex. D) (emphasis added).) Additionally, when the Company "determine[s] that an uncompleted contract will not be completed on-time and the contract has liquidated damages provisions, [it] recognize[s] the estimated liquidated damages [it] will incur and record[s] them as a reduction of revenue in the period the change in estimate occurs." (Walker Decl. Ex. A at 59-60.)

Coming off a positive year in 2015 where "[f]ull year revenues increased 18.3% to $1.76 billion, compared to 2014[,]" the Company had a strong start in 2016. (Compl. ¶ 160.) In the first

quarter of 2016, the Global Power segment, which included the renewable business at that time, saw its "revenues increase[] by 5.3% from $123.9 million to $130.5 million and gross profit increase[] by 19.3% to $24.4 million, compared to the first quarter of 2015." (*Id.* ¶ 174.) These results exceeded management's expectations. (*Id.* ¶ 175.)

**Second Quarter of 2016 and the Discovery of Piping Design Issues at the Copenhill Project.** On June 28, 2016, the Company publicly disclosed that it had discovered a piping design issue at its renewable project in Copenhagen, Denmark – the "Copenhill" project. (*Id.* ¶ 186.) The Company took a $32 million charge reflecting the change in estimate for the forecasted costs to complete this project. (*Id.*) The Company discovered this issue "in pieces [because] it took [the Company] some time to step back and realize that the engineering design . . . needed to be redone." (*Id.* ¶ 188.) The losses were large because "the plant [was] essentially built and [the Company had] to go back in, re-complete engineering, change piping design, change some steel around in order to facilitate the new engineering design, and at [that late] stage in construction, that [was] not an easy thing to do." (*Id.*)

After the piping design issue was discovered, the Company "reviewed [its] other projects in the UK and . . . determined that they [d]id not have [the same] piping design issue." (*Id.* ¶ 200.) The Company also "changed the Delivery Team" for Copenhill and "supplemented the project management resources" available, including adding "some very talented resources out of the United States." (*Id.* ¶ 188.) Further, "as a result of the [Copenhill] problems, [the Company] made some changes in the management [t]eam and [at] Volund as well that [it believed would] enhance [its] project management execution." (*Id.* ¶ 189.)

**Third and Fourth Quarters of 2016.** The Company announced its results for the third quarter of 2016 on November 2, 2016. (*Id.* ¶ 204.) The "Renewable-segment revenues increased

by 43% for the third quarter of 2016 compared to [the third quarter of] the prior year" and "[g]ross profits [were] up year over year . . . ." (*Id.* ¶ 208.) The Company disclosed that it had recorded an additional charge of $14 million on Copenhill because "complexities associated with the nature of the remediation, combined with lower than expected labor efficiencies, extended the anticipated schedule." (*Id.* ¶ 206.) This charge was, however, "offset by a probable project-related insurance recovery of $15 million." (*Id.* ¶ 208.)

The Company publicly announced its results for the fourth quarter and full year 2016 on February 28, 2017. (*Id.* ¶ 216.) The Company reported, among other things, that "increased costs to complete and lengthened [project] schedules on several [renewable] contracts" had a negative impact on the results for the fourth quarter and full year. (*Id.*) Specifically, the Company disclosed that its "resources and capabilities across the business [were] stretched" and the "previously disclosed efforts to address matters on [Copenhill] diverted resources . . . [that] late in the fourth quarter began to impact other projects." (*Id.* ¶ 220.) The Company also reported that it had put in place certain "mitigation strategies . . . to ensure that the resources . . . put[] on [Copenhill] would not cause issues on the other projects . . . ." (*Id.* ¶ 264.) But after new management was appointed in December, they began to "d[i]g into each individual project in detail" and discovered that the Company's mitigation plans were not working, which resulted in "productivity and scheduling issues that . . . impact[ed] [the] estimated cost to complete these [other] projects." (*Id.* ¶¶ 220, 264.) Included in the $98.1 million charge for changes in estimated revenues and costs to complete recorded in the fourth quarter of 2016 was $35.8 million in anticipated liquidated damages. (*Id.* ¶ 217.)

Prior to discovery of these issues, the Company had "already made key changes" to the business through the appointment of a new leader for the Renewable segment. (*Id.* ¶ 220.) The

7

Company also made other changes such as "replacing on-site project managers" at various sites, "dedicat[ing] significant US talent and leadership" to the renewable projects, and "investing in enhanced project management processes . . . ." (*Id.*)  The Company also chose not to bid on new renewable projects "for at least the first six months of 2017" to keep "engineering resources focused and deployed on the existing projects . . . ." (*Id.* ¶¶ 220, 226.)

**First and Second Quarters of 2017.**  The Company announced its results for the first quarter of 2017 on May 9, 2017 and reported that "Renewable segment revenues were $106 million, up from $84 million in the prior year quarter." (*Id.* ¶¶ 231, 236.)  The Company also explained that its "Renewable segment project portfolio [wa]s performing within the revised cost and schedule forecast . . . provided earlier in the year . . . ." (*Id.* ¶ 231.)

On August 9, 2017, when the Company announced its results for the second quarter of 2017, it disclosed that those results had been adversely impacted by "a $115.2 million charge arising from unexpected cost and schedule issues in the Renewable segment . . . ." (*Id.* ¶ 241.)  As the Company "advanced engineering, and re-estimated overall productivity levels on six new-build projects in the Renewable segment," it concluded "late in the quarter" that it "would not hit [the] cost and schedule targets" for these projects. (*Id.*)

The Company also disclosed on August 9, 2017 that it had a material weakness in its internal controls "over the completeness and accuracy of the information used in the [POC] accounting for three European renewable energy projects" which had not yet been fully remediated. (*Id.* ¶ 247.)  This weakness was caused by the fact that Volund "did not timely identify certain subcontractor costs and required quantities of certain labor and equipment needed to complete ongoing projects, which resulted in an understatement of [the] consolidated net loss in the first quarter of 2017." (*Id.*)  The dollar amount of this error "was not material" and "[t]he

8

correction of the immaterial error was included in the $115.2 million charge . . . recorded . . . in the second quarter of 2017." (*Id.*)  The discovery of this error "d[id] not change [the Company's] previous conclusion that [its] internal control over financial reporting was effective at December 31, 2016. (Walker Decl. Ex. D at 44.)

## III.   ARGUMENT AND CITATION TO AUTHORITY

### A.   The Complaint Fails To Plead A "Strong Inference" Of Scienter.

The Reform Act requires that "the complaint shall, with respect to ***each*** act or omission alleged . . . , state with particularity facts giving rise to a strong inference that ***the defendant*** acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2) (emphasis added).  For non-forward-looking statements, scienter may be pled by "alleging either intentional or severely reckless conduct[.]"  *Yates v. Mun. Mortg. & Equity, LLC*, 744 F.3d 874, 884 (4th Cir. 2014).[3]  But the bulk of the challenged statements here are forward-looking and, thus, subject to an even higher pleading standard.  As to those statements, "the plaintiff must allege . . . facts showing that a defendant had ***actual knowledge*** that a forward-looking statement was false at the time it was made."  *Okla. Firefighters Pension & Ret. Sys. v. K12, Inc.*, 66 F. Supp. 3d 711, 715 (E.D. Va. 2014) (emphasis added).

The Supreme Court held in *Tellabs, Inc. v. Makor Issues & Rights Ltd.*, 551 U.S. 308 (2007), that, in order "[t]o qualify as 'strong' . . . , an inference of scienter must be more than merely plausible or reasonable – **it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent**."  *Id.* at 309 (emphasis added).  In performing this analysis,

---

[3] A "severely reckless act" is "an act so highly unreasonable and such an extreme departure from the standard of ordinary care . . . that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Ottmann v. Hanger Orthopedic Grp., Inc.*, 353 F.3d 338, 343-44 (4th Cir. 2003) (internal citations omitted).

9

the court "must consider, not only inferences urged by plaintiff . . . , but also competing inferences [favoring Defendants] rationally drawn from the facts alleged." *Id.* at 314. "[O]missions and ambiguities count against inferring scienter." *Id.* at 326.

### 1. *Plaintiffs Fail to Plead Actual Knowledge Or Severe Recklessness.*

There are no allegations in the Complaint that could possibly, much less plausibly, give rise to the required strong inference of actual knowledge or severe recklessness on the part of the Individual Defendants. The bulk of the Complaint is devoted to a recitation of what was said publicly from which Plaintiffs ask the Court to infer fraud by hindsight. No facts are pled as to what the Individual Defendants supposedly knew at the time they made any particular alleged misstatement. This deficiency is critical and ultimately dispositive, not only for those individuals, but for B&W as well. Where, as here, the alleged fraud concerns public statements, courts "look to the state of mind of the individual corporate official or officials who make or issue the statement[.]" *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1254 (11th Cir. 2008). Accordingly, corporate liability depends on at least one of the company's agents making a false or misleading statement with scienter. *Yates*, 744 F.3d at 885. There can be no liability in this case for any Defendant because Plaintiffs have not pled the requisite mental state for the Individual Defendants or for anyone else whose knowledge could be imputed to the Company. *See, e.g.*, *Bondali v. Yum! Brands, Inc.*, 620 F. App'x 483, 493 (6th Cir. 2015) (dismissing claims against corporation where complaint did not plead individual defendants acted with scienter and did not attempt to "establish scienter on the part of another agent").

Without any facts to establish actual knowledge, Plaintiffs argue that the Court should bridge this critical gap through the following syllogism: (1) the Individual Defendants are knowledgeable senior executives (Compl. ¶¶ 253, 263-71); (2) knowledge of operations implies

10

the ability to predict with certainty the outcome of all business projects; therefore, (3) the Individual Defendants knew or should have known that the Company would not perform according to expectations. But hyperbole and rhetoric cannot obscure the glaring flaw within this logic – present knowledge does not equate to clairvoyance. Even if one were to assume that the Individual Defendants knew every intimate detail about the Company, the Court cannot infer that the Individual Defendants could predict the future. "It is not sufficient to allege [as Plaintiffs do here] that corporate management was generally aware of the day-to-day operations without adding some additional allegation of specific information conveyed to management and related to the fraud." *Pipefitters Local No. 636 Defined Ben. Plan v. Tekelec*, No. 5:11-cv-4-D, 2013 WL 1192004, at *18 (E.D.N.C. Mar. 22, 2013); *see also Ind. Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 535 (5th Cir. 2008) ("[Defendant's [hands-on] management style, coupled with his alleged boast that 'there is nothing in this company that I don't know,' are insufficient to support a strong inference of scienter.") (citations omitted).

Without supporting detail, Plaintiffs ask the Court to fill in more gaps in their pleading, *i.e.,* the Individual Defendants must have known adverse facts because the Renewable segment was "critical to the Company's success after the spin-off." (Compl. ¶¶ 257; *see also id.* 258-62.) Once again, the flaw in this reasoning is obvious – there is no "critical to success" inference recognized by any court. It is well settled law that one cannot plead scienter merely by alleging that the fraud relates to an important aspect of a company's business. *See, e.g., Tekelec,* 2013 WL 1192004, at *14 (refusing to infer scienter because alleged misstatements related to one of the company's most profitable product lines); *Yates*, 744 F.3d at 890 (rejecting plaintiffs' contention that scienter could be inferred because the accounting issues concerned core operations of the company).

11

Plaintiffs are, thus, left to rely on insufficient allegations regarding what unnamed members of "B&W management" or "senior management" supposedly knew. (Compl. ¶¶ 18-19, 67, 69, 88-89.) It is simply not possible, however, to "group plead" scienter. *See, e.g.*, *In re Cree, Inc. Sec. Litig.*, 333 F. Supp. 2d 461, 475 (M.D.N.C. 2004). Moreover, Plaintiffs do not even allege that the Individual Defendants were members of this all-knowing "management" group. But even if they had, the knowledge attributed to this group does not support scienter. At most, members of "management" are alleged to have known that, over the course of time, design, engineering, and construction challenges arose with various renewable projects. (Compl. ¶¶ 56-125.) These are, however, the same kind of issues that all construction companies face on large projects, especially when designing and building products as complex as renewable energy plants and the technology that runs such plants. Thus, merely pleading that employees knew of problems prior to their public disclosure (which is all Plaintiffs have done) is not the stuff of securities fraud. There is a big difference between knowing that certain projects have problems that need to be overcome and knowing, for example, that the costs to complete a particular project have risen to the point where a profit is no longer possible. *See Plumbers & Pipefitters Local Union 719 Pension Fund v. Zimmer Holdings, Inc.*, 679 F.3d 952, 955 (7th Cir. 2012) ("Knowing of 'problems,' which are common, differs from knowing that a facility must be closed and some of its products recalled.").

### 2. *The Allegations From Confidential Informants Do Not Support Scienter*.

Plaintiffs' scienter allegations are dependent on information supposedly gleaned from so-called "Confidential Witnesses" ("CWs"). (Compl. ¶¶ 263-71.) Even under the best of circumstances, such allegations "must be 'discounted' [and] . . . usually that discount will be steep." *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 757 (7th Cir. 2007). Here, such allegations should carry no weight at all because none of the CWs are alleged to have had any

connection to or contact with the Individual Defendants.[4]  Accordingly, although the Complaint devotes a lot of space to outlining operational issues and construction challenges purportedly observed by CWs (*see, e.g.,* Compl. ¶¶ 80, 83, 93, 96-101, 107, 109-10, 114-15, 119, 122), there are no allegations that these individuals personally interacted with the Individual Defendants on these topics and, thus, would have had any basis to know what they supposedly knew (and when) about these issues.

The burden is also on Plaintiffs to show that their sources possess personal knowledge of the matters that they purport to know.  *Ash v. PowerSecure Int'l, Inc.*, No. 4:14-cv-92-JCD, 2015 WL 544741, at *13 (E.D.N.C. Sept. 15, 2015).  Accordingly, "[w]hen the complaint chooses to rely on facts provided by confidential sources, it must describe the sources 'with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged . . . ."  *Teachers' Ret. Sys. of La. v. Hunter*, 477 F.3d 162, 174 (4th Cir. 2007).  The Complaint, however, makes clear that the allegations from Plaintiffs' CWs are not grounded in their personal knowledge.  (*See, e.g.*, Compl. ¶¶ 68, 70, 77, 80 & n.13, 88, 90, 93 & n.15, 95, 108, 116, 123.)  Such allegations "based on generalized office scuttlebutt rather than personal knowledge . . . carry little weight."  *Tekelec*, 2013 WL 1192004, at *12, n.5; *see also In re Diebold Sec. Litig.*, No. 5:05-cv-2873-PCE, 2008 WL 3927467, at *7 (N.D. Ohio Aug. 22, 2008) (rejecting confidential witnesses who "merely regurgitate[ed] gossip and innuendo").

---

[4] *See, e.g., In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 360 (S.D.N.Y. 2011) (no scienter inference where plaintiffs "fail[ed] to identify any meetings, documents or reports that connect[ed] the confidential sources with the Individual Defendants"); *In re EveryWare Global, Inc. Secs. Litig.*, 175 F. Supp. 3d 837, 853 (S.D. Ohio 2016) (confidential witness insufficient to show defendants' actual knowledge of false statements because plaintiff failed to plead witness talked directly to defendants); *City of Pontiac Gen. Emps.' Ret. Sys. v. Stryker Corp.*, 865 F. Supp. 2d 811, 819, 834 n.9 (W.D. Mich. 2012) (confidential witness statements did not establish scienter because "none of the CWs had contact with Defendants" and thus they "cannot testify as to what Defendants knew").

13

The speculative nature of the information derived from CW 3 and CW 4 illustrates this problem. CW 3, who had a marketing job, claims that "there was a declining corporate culture prior to his departure in June 2016 in which Ferland ignored several red flags highlighting a declining demand" and the "inability to deliver on Renewable projects." (Compl. ¶ 60.) As an initial matter, this allegation is fatally vague. The Complaint does not explain what is meant by "a declining corporate culture" or "declining demand" and those issues are never linked to anything relevant to the case. CW 3 also does not identify what the specific "red flags" were that Ferland supposedly ignored or how CW3 knows they were ignored by him and when this supposedly occurred. The reason for the lack of detail is simple. It is obvious that CW 3 lacks personal knowledge of the matters of which he speaks and has passed on rank speculation. CW 3, who worked in the Company's Barberton, Ohio office, does not claim to know Defendant Ferland, who works out of the Company's Charlotte office, or to have ever had any meetings with him. He does not profess to have ever spoken to Ferland or to know anyone else who has. He cannot even claim to have ever been in the same room with Ferland. Under these circumstances, nothing CW 3 offers can be of any assistance to Plaintiffs in attempting to plead scienter as to Ferland or anyone else. *See, e.g.*, *Ash*, 2015 WL 5444741, at *13 (declining to credit allegation from confidential witness where he/she had no communications or meetings with defendants); *Tekelec*, 2013 WL 1192004, at *12 (no inference of scienter where confidential informant alleges no direct interaction with the defendant or awareness of defendant's knowledge).

Similar problems arise with CW 4. CW 4 maintains that "B&W was expressly warned that focus on Copenhill would cause losses on other projects." (Compl. ¶ 88.) CW 4 claims that "Volund CEO Olesen discussed the issue with B&W management and expressed concern that B&W had 'put all their eggs in one basket' with their decision to focus on Copenhill." (*Id.*) CW

14

4, however, does not claim to have been present for that discussion or to have directly participated in it and, thus, it is never explained how he purports to know the substance of that discussion. CW 4 also cannot name a specific person at "B&W" who was supposedly the recipient of Olesen's warnings nor can he say when these warnings were supposedly issued.[5] The fact that CW 4 is unable to say who participated in these discussions or when they occurred proves that he lacks sufficient personal knowledge to be heard on these issues. *See, e.g.*, *Constr. Laborers Pension Tr. of Greater St. Louis v. Neuocrine Biosciences, Inc.*, No. 3:07-cv-1111-IEG-RBB, 2008 WL 4370010, at *4 (S.D. Cal. Sept. 23, 2008) (discounting confidential witness-based "allegations regarding a warning made to executive team" where complaint failed to explain "who received [the warning or] when it was made."). It is clear that he and the other similarly situated CWs are repeating unsubstantiated gossip, which cannot count towards scienter. *Tekelec*, 2013 WL 1192004, at *12, n.5 ("Hearsay allegations and bald assertions . . . by confidential witnesses will not defeat a Rule 12(b)(6) motion.").[6]

The CWs provide no help to Plaintiffs for the additional reason that the information they supply, even if accepted as true, is not supportive of fraud. For example, the CWs claim that

_____

[5] CW 4 also apparently cannot speak to the issue of what anyone at B&W supposedly said or did in response to these alleged comments from Olesen. The Complaint admits that B&W had mitigation plans in place to try to avoid negative repercussions to the other projects. (Compl. ¶ 264.) Thus, this is not situation where Plaintiffs can contend that any warnings from Olesen were ignored.

[6] CW 1 and CW 6 are similarly situated. Because CW 1's employment ended before the alleged class period began (Compl. ¶ 56), his allegations regarding what happened at Volund after he left are inherently unreliable. *In re Trex Co., Inc. Secs. Litig.*, 454 F. Supp. 2d 560, 573 (W.D. Va. 2006). CW 6 began working for B&W Volund in mid-January 2017 and left in mid-May 2017. (Compl. ¶ 70.) He nevertheless purports to speak to issues that arose *before* he arrived at the Company. (*Id.* ¶¶ 70, 103.) As a result, CW 6's allegations regarding how "problems originated" and what practices were "in place prior to when he joined B&W Volund[]" are equally unreliable. (*Id.*)

15

internal reports were distributed within the Company (Compl. ¶¶ 18, 56, 64-65, 67, 69-70, 81, 266-68, 270-71), which, if accepted as true, does nothing to plead scienter. Bare allegations of internal reports, which is all Plaintiffs offer, are insufficient. *See, e.g.*, *Abrams v. Baker Hughes, Inc.*, 292 F.3d 424, 432 (5th Cir. 2004) ("An unsupported general claim about the existence of confidential corporate reports that [supposedly] reveal [contrary] information . . . is insufficient to survive a motion to dismiss."). Every company has some type of reporting process in place and Plaintiffs have failed to plead sufficient detail about these reports – let alone the "right" kind of detail necessary to make these allegations relevant to pleading scienter.[7]

The second flaw in this regard is that Plaintiffs have not alleged the substance of any particular report they claim is relevant and, thus, they have failed to show how any report purportedly contained information at odds with the Company's public statements. *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1036 (9th Cir. 2002) ("[N]egative characterizations of reports [supposedly] relied on by insiders, without specific reference to the contents of those reports, are insufficient [under the Reform Act].").[8] Moreover, there are no allegations in the Complaint that

---

[7] *In re Trex Co., Inc. Sec. Litig.*, 212 F. Supp. 2d 596, 610 (W.D. Va. 2002) (scienter not pled in the absence of "facts concerning the people who made or received the reports, the content of the reports, the dates of transmissions, the manner in which they were transmitted or the bases for plaintiff's knowledge" regarding the reports at issue). Moreover, the fact that the CWs purport to know the names of certain reports is insufficient where no detail is offered as to what any particular report said. *See, e.g., In re Metawave Commc'ns. Corp. Sec. Litig.,* 298 F. Supp. 2d 1058, 1075 (W.D. Wash. 2003) (rejecting for lack of detail allegations from CWs on "weekly GSM operating reports" and "weekly lab and field-trial reports").

[8] Plaintiffs claim that reports would have provided "an update on each project," "included descriptions of the project's initial budget [and] costs to date," informed "senior management" of "problems, delays and cost-overruns", and "indicated when the Company began to experience delays on projects." (Compl. ¶¶ 18, 64, 67, 69, 271.) But that description provides only an overview of general topic areas typically covered. Plaintiffs do not point to a specific report on any project issued at a particular time and explain what "problems" "delays" or "cost overruns" were allegedly described in that report. The Complaint simply lacks the type of particularized detail from which one could infer that any specific reports existed at the time the alleged

16

any report containing supposedly conflicting information, the substance of which is alleged with particularity, was ever shown to the Individual Defendants or when this supposedly occurred.[9]

### 3. More Compelling Inferences Of Non-Fraudulent Intent Exist.

The more compelling inference available from the facts alleged is that Defendants had a reasonable basis to believe that the Renewable segment's outlook was bright throughout 2015 and into early 2016 when the vast majority of the alleged misstatements were made. The Complaint concedes that the segment's results at that time were positive and in line with management's expectations. (Compl. ¶¶ 136, 153, 160-61, 175, 184.) The decision to bid on new renewable contracts prior to and at the start of the alleged class period has to be considered against the backdrop of what the Complaint acknowledges was Volund's track record of past project successes and the successful completion of a renewable project in the U.K. at end of 2015. (*Id.* ¶¶ 54-55, 128, 148, 168, 186, 189, 257.) The most plausible inference available from these facts is that Defendants' "statements of optimism [about the renewable business] were genuine and neither intentionally false nor reckless." *In re Swisher Hygine, Inc.*, 2015 WL 4132157, at *12 (W.D.N.C. July 8, 2015).

Defendants did not blatantly ignore problems, as Plaintiffs concede. Even after the design problems at Copenhill were discovered in the second quarter of 2016, it is illogical to suggest as Plaintiffs do that the Company had reason to believe the problems at Copenhill were insurmountable or that these problems would negatively impact other sites. This is so because the

---

misstatements were made that actually contained the litany of supposed "true facts" Plaintiffs contend were known, but not disclosed.

[9] Allegations that U.S. employees would sometimes visit Volund or the European construction sites (*see, e.g.,* Compl. ¶¶ 68, 102) also do give rise to any inference of scienter. *See Rahman* v. *Kid Brands, Inc.,* 736 F.3d 237, 245 (3d Cir. 2013) (noting that it is expected employees "would visit [the] company's subsidiaries in the course of conducting legitimate business" and that such visits "will not establish that [management] had knowledge of illegal activities at the subsidiary.").

17

Complaint concedes Volund had successfully completed projects in the past, the Company found that none of its other plants had the same piping design problems as Copenhill, and "mitigation plans" had been put in place to avoid negative consequences to the other plants. (Compl. ¶ 220.) The facts alleged only support the inference that management gradually became aware of the piping design issue at Copenhill and its ripple effect on the other projects. Even the Complaint states that the piping design issue at Copenhill was "discovered . . . in pieces and it took [the Company] some time to step back and realize that the engineering design just needed to be redone." (*Id.* ¶ 188.) Where, as here, the facts alleged support the non-culpable inference that the severity of the issues was not immediately apparent to management, scienter has not been pled adequately. *Yates*, 744 F.3d at 894. The Fourth Circuit has stressed that "when the facts as a whole more plausibly suggest that the defendant acted innocently – or even negligently – rather than with intent or severe recklessness, the action must be dismissed." *Cozzarelli*, 549 F.3d at 624.[10]

Yet, Plaintiffs ask the Court to believe that Defendants engaged in a scheme whereby they knowingly pursued more contracts than their resources would allow and received absolutely nothing to show for it. This makes no sense. The unanswered question is why would Defendants set themselves up for failure? Plaintiffs do not allege that the Individual Defendants or B&W were

---

[10] Plaintiffs also point to the fact that "the additional charges taken for the . . . Renewable projects" in the second quarter of 2017 "required additional financing" in form of a new loan agreement. (Compl. ¶ 26.) Plaintiffs criticize the loan's terms and argue that, if this was "the best [option] by far," then "B&W was aware of the full severity of the problems it disclosed on August 9, 2017 well before that disclosure." (*Id.* ¶ 27.) This logic is nonsensical and, thus, no inference of scienter is possible from these facts. Of course, B&W was aware of its results before they were disclosed publicly on August 9, 2017. Moreover, the Complaint concedes that the Company looked at its financing options in the "few weeks" prior to the August 9 announcement (*id.*), which means that the determination to enter into this loan was made *during* the second quarter of 2017. There is, thus, nothing about the timing or the terms of the new loan that can give rise to an inference that the Company knew the dollar amount or severity of the problems announced on August 9 any earlier than the second quarter of 2017.

18

motivated to or did in fact profit by failing to disclose problems earlier than they did. There are, for example, no allegations that the Individual Defendants profited through the sale of B&W stock or received compensation that would have otherwise been unavailable to them if disclosures happened earlier. Allegations, like those present here, that are premised on the notion that parties would act in an illogical manner and against their own self-interest cannot plead a strong inference of fraud.[11] The more plausible and compelling interpretation of events is that the Company did not discover that its resources were "overstretched" (*id.* ¶¶ 24, 217, 220) until sometime *after* it had been forced to redeploy resources to correct design problems at Copenhill. *See Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc.*, 576 F.3d 172, 188-90 (4th Cir. 2009) (holding that the amount of time and number of resources devoted to discovering problems suggested that defendants had been previously unaware of problems); *Yates*, 744 F.3d at 894 (allegations supported non-culpable inference that management only gradually became aware of "true facts").

Moreover, the Complaint acknowledges that the Company took steps to ensure that the issues at Copenhill were isolated and would not impact the other projects, all of which it disclosed to investors. (Compl. ¶¶ 188-89, 200, 264.) The Company's mitigation efforts ultimately proved to be unsuccessful, but "[t]hese rehabilitative actions [nevertheless] suggest openness and negate any inference that Defendants knowingly or recklessly misrepresented [B&W's] ability to grow rapidly." *Swisher*, 2015 WL 4132157, at *11. "The fact that the Complaint shows efforts by [the Company] to remedy the various problems that it was encountering is also inconsistent with a strong inference of scienter on the part of [D]efendants." *In re Crocs, Inc. Sec. Litig.*, 774 F. Supp.

---

[11] *See, e.g., Hampshire Equity Partners II, L.P. v. Teradyne, Inc.*, No. 1:04-cv-03318-LAP, 2005 WL 736217, at *3 (S.D.N.Y. Mar. 30, 2005), *aff'd*, 159 F. App'x 317 (2d Cir. 2005) (holding that "allegations of irrational motive cannot support a fraud claim"); *DiLeo v. Ernst & Young*, 901 F.2d 624, 629 (7th Cir. 1990) ("Indulging ready inferences of irrationality would too easily allow the inference that ordinary business reverses are fraud.").

19

2d 1122, 1147 (D. Colo. 2011), *aff'd sub nom. Sanchez v. Crocs, Inc.*, 667 F. App'x 710 (10th Cir. 2016).

## B. The Complaint Fails To Plead An Actionable Misstatement Or Omission.

To state a claim under Section 10(b), a plaintiff must allege an actionable misrepresentation or omission of material fact. *Yates*, 744 F.3d at 884. The Reform Act requires that the complaint "specify each statement alleged to have been misleading" and the "reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1). Where, as is the case here, allegations of misstatements are made "on information and belief," as opposed to personal knowledge, "the complaint shall [also] state with particularity all facts on which that belief is formed." *Id.* This Complaint squarely runs afoul of these fundamental pleading requirements.

Plaintiffs rely primarily on statements that are non-actionable as a matter of law. In addition, Plaintiffs have also failed to explain how many statements in the Complaint could possibly be false or misleading because they are nothing more than accurate statements of historical fact or positive commentary on the Company's past financial results, which Plaintiffs do not challenge. Plaintiffs, for example, have not and cannot explain how statements describing renewable contracts awarded to the Company (Compl. ¶¶ 12, 128, 130, 146, 148, 153, 155, 157, 168-69) were false and misleading simply because those contracts proved to be less profitable than the Company had hoped.[12] Similarly, Plaintiffs cite to B&W's reported revenues and gross profit

---

[12] *See, e.g., In re Target Corp. Sec. Litig.*, No. 16-cv-1315-JNE-BRT, 2017 WL 3267708, at *4 (D. Minn. July 31, 2017) (dismissing as fraud by hindsight allegation that later disclosure of "systemic problems" rendered earlier statements on expanding operations misleading); *City of Taylor Gen. Emps. Ret. Sys. v. Magna Int'l Inc.*, 967 F. Supp. 2d 771, 793-97 (S.D.N.Y. 2013) (dismissing as fraud by hindsight allegation that earlier statements "downplay[ed]" operational inefficiencies where company announced losses at European facilities and later announced that losses were greater than originally thought).

20

for the Global Power and Renewable segments (*id.* ¶¶ 136, 153, 160-61, 174-75, 180-81, 184, 205, 208), but do not contend that those figures are inaccurate in any respect. Courts routinely refuse to "read" into statements of past or current financial results any guarantees as to what the future might hold.[13] Simply because "[a]t one time the [company] bathes itself in a favorable light" and later must "disclose[] that things are less rosy" it does not follow "that the difference must be attributable to fraud." *DiLeo*, 901 F.2d at 627. "[O]nly a fraction of financial deteriorations reflects fraud" and "plaintiffs may not offer the different financial statements and rest." *Id.* That is, however, all Plaintiffs have attempted here. They have failed "to point to [any] facts suggesting that the difference [between B&W's past and present circumstances] is attributable to fraud." *Id.*

Another example of Plaintiffs' legally impermissible use of "fraud by hindsight" pleading relates to their allegations regarding internal controls. Plaintiffs contend that the statement in the Company's Form 10-K for 2016 that "management has concluded that B&W's internal control over financial reporting was effective . . . as of December 31, 2016," was false and misleading because the Company later disclosed on August 9, 2017 it had a material weakness in its internal control over financing reporting at Volund. (Compl. ¶ 218; *see also id.* ¶¶ 227, 245.) Plaintiffs make similar arguments regarding a statement on the effectiveness of internal controls found in the Company's 10-Q for the first quarter of 2017. (*Id.* ¶¶ 233, 237.)

However, later disclosed internal control weaknesses do not render prior statements false or misleading as a matter of law. More so here where, as a factual matter, the impact on the first

---

[13] *See, e.g., In re CompUSA Inc. Sec. Litig.*, No. 3:94-cv-01151-H, 1995 WL 811960, at *8 (N.D. Tex. Oct. 30, 1995) ("[S]tatements regarding historical performance of a company 'contain no implicit prediction that those events or conditions will continue in the future'") (internal citation omitted); *In re Duane Reade, Inc. Sec. Litig.*, 1:02-cv-06478-NRB, 2003 WL 22801416, at *6 (S.D.N.Y. Nov. 25, 2003 ) ("'[D]isclosure of accurate historical data does not become misleading even if less favorable results might be predictable by the company in the future.") (internal citations omitted), *aff'd sub nom., Nadoff v. Duane Reade Inc.*, 107 Fed. Appx. 250 (2d Cir. 2004).

quarter was immaterial (*id.* ¶ 245) and the disclosed material weakness "d[id] not change [the Company's] previous conclusion that [its] internal control over financial reporting was effective at December 31, 2016." (Walker Decl. Ex. D at 44.) Similar contentions were rejected by the court in *Southeastern Pa. Transp. Authority v. Orrstown Fin. Servs., Inc.*, No. 1:12–cv–00993-YK, 2015 WL 3833849 (M.D. Pa. June 22, 2015), where the plaintiff alleged that defendants' disclosure of internal control weaknesses rendered prior statements on controls misleading. *Id.* at *46. Like here, the plaintiff in that case failed to demonstrate that the defendants knew "the internal controls were ineffective [at the time earlier statements were made], and thus [could not claim] that defendants knowingly issued misleading statements[.]" *Id.* Absent such particularized facts, which are also lacking here, the "allegations are improperly based on hindsight, and therefore are inactionable." *Id.*

### 1.    *The Safe Harbor For Forward-Looking Statements Bars Plaintiffs' Claims.*

The vast majority of the statements challenged by Plaintiffs are forward-looking and, thus, are not actionable as a matter of law under the Reform Act's "safe harbor" provision. Under that provision, a defendant shall not be liable for an oral or written forward-looking statement if the statement is (1) identified as forward-looking and (2) accompanied by "meaningful cautionary statements identifying important factors that could cause actual results to differ materially." 15 U.S.C. § 78u-5(c)(1)(A)(i). Where, as is the case here, such cautionary language exists, the claims regarding the forward-looking statements must be dismissed. *Plymouth Cnty. Ret. Ass'n v. Primo Water Corp.*, 966 F. Supp. 2d 525, 550 (M.D.N.C. 2013). Only if the cautionary language is found to be insufficient does the statute direct courts to assess the alleged mental state of the speaker. *Id.* at 552 n.18. Moreover, even a forward-looking statement without sufficient cautionary language is immune from liability unless the plaintiff can satisfy the heavy burden of pleading that the

speaker made the statement with ***actual knowledge*** that it was false or misleading.  15 U.S.C. § 78u-5(c)(B)(i).

Plaintiffs improperly seek to impose liability for a wide variety of forward-looking statements regarding, for example, (1) the Company's growth strategy and belief that it would be able to deliver positive financial performance for the Global Power and Renewable segments (Compl. ¶¶ 8, 11, 127, 129, 137, 145-46, 155, 157, 162, 169-70, 175, 180, 182, 186, 188, 197, 204, 211, 224, 235-36), (2) the benefits the Company expected to achieve through cost-savings and margin improvement initiatives (*id.* ¶¶ 14-15, 140, 180), (3) the revenues the Company expected to recognize in its backlog for renewable contracts (*id.* at 17 n.6; *see also id.* ¶¶130, 134, 137-38, 145, 151, 153-54, 162, 164, 167, 171, 178, 199, 207, 211, 219, 224, 232), and (4) the Company's belief that it would be able to complete its renewable projects within revised budgets and schedules (*id.* ¶¶ 188, 190, 198, 200, 205-06, 208-09, 217, 225, 231, 235).  Plaintiffs pursue these claims despite the fact that, throughout the alleged class period, Defendants specifically identified their forward-looking statements for investors and expressly invoked the protections of the safe harbor. [14]

---

[14] *See, e.g.,* Walker Decl. Ex. B Ex. 99.1 at 5; B&W Form 8-K filed August 4, 2015, Ex. 99.1 at 6 (Walker Decl. Ex. E); B&W Form 8-K filed February 25, 2016, Ex. 99.1 at 7 (Walker Decl. Ex. F); B&W Form 8-K filed May 10, 2016, Ex. 99.1 at 7 (Walker Decl. Ex. G); B&W Q2 2015 Earnings Call Transcript at 1 (Walker Decl. Ex. H); B&W Q3 2015 Earnings Call Transcript at 1 (Walker Decl. Ex. I); B&W Q4 2015 Earnings Call Transcript at 1-2 (Walker Decl. Ex. J); B&W Q1 2016 Earnings Call Transcript at 1 (Walker Decl. Ex. K); B&W Q2 2016 Earnings Call Transcript at 2 (Walker Decl. Ex. L); B&W Business Update Call Transcript dated June 28, 2016, at 1 (Walker Decl. Ex. M); B&W Q3 2016 Earnings Call Transcript at 2 (Walker Decl. Ex. N); B&W Q4 2016 Earnings Call Transcript at 2 (Walker Decl. Ex. O); B&W Q1 2017 Earnings Call Transcript at 2 (Walker Decl. Ex. P).  The Court will note that the Company's forward-looking statements could be identified "by words such as 'anticipate,' 'believe,' 'estimate,' 'expect,' 'forecast,' 'goal,' 'intend,' 'plan,' 'predict,' 'project,' 'seek,' 'target,' 'could,' 'may,' 'should' or 'would' or other similar expressions that convey the uncertainty of future events or outcomes." (Walker Decl. Ex. A at 8; Ex. C at 6-7; Ex. D at 29); B&W Prospectus dated June 30, 2015, at 27 (Walker Decl. Ex. Q); B&W Form 10-Q for the Quarter Ending June 30, 2015, at 28 (Walker Decl.

Pertinent here, all of the forward-looking statements cited by Plaintiffs were accompanied by disclosure of the various risks facing the Company. The Company specifically warned, for example, that its backlog was "subject to unexpected adjustments . . . and may not be a reliable indicator of future revenues or earnings." (Walker Decl. Ex. C at 9.) The Company made clear that "[t]here can be no assurance that the revenues projected in [its] backlog will be realized or, if realized, will result in profits." (*Id.*) In addition, "[b]ecause of . . . changes in project scope and schedule," the Company stated that it could not "predict with certainty when or if backlog will be performed[,]" and "[d]elays, . . . scope changes and poor project execution could materially reduce or eliminate the revenues and profits that [it] actually realize[s] from projects in backlog." (*Id.*)

The Company also disclosed that it was "subject to risks associated with contractual pricing in [its] industry, including the risk that if our actual costs exceed the costs we estimate on our fixed-price contracts, our profitability will decline, and we may suffer losses." (*Id.*) The risks also included the "requirement[] to pay liquidated damages upon [the] failure to meet schedule or performance requirements" and other "difficulties encountered on [the Company's] large-scale projects . . . [caused by] schedule disruptions, equipment performance failures, unforeseen site conditions, . . . or other factors that may result in additional costs to [the Company], reductions in revenue, claims, or disputes." (*Id.*) But the Company did not stop there with its in-depth risk factor analysis. It also explained that it recognizes revenues on its fixed-price contracts on a POC accounting basis. (*Id.*) The Company specifically disclosed that its "use of [POC] accounting could result in volatility in [its] results of operations." (*Id.*) This was so because the Company's

---

Ex. R); B&W Form 10-Q for the Quarter Ending September 30, 2015, at 28 (Walker Decl. Ex. S); B&W Form 10-Q for the Quarter Ending March 31, 2016, at 16 (Walker Decl. Ex. T); B&W Form 10-Q for the Quarter Ending June 30, 2016, at 19 (Walker Decl. Ex. U); B&W Form 10-Q for the Quarter Ending September 30, 2016, at 24 (Walker Decl. Ex. V); B&W Form 10-Q for the Quarter Ending March 31, 2017, at 24 (Walker Decl. Ex. W).)

"estimates of . . . contract costs and profitability of [its] long-term contracts . . . could change as a result of uncertainties associated with these types of contracts, and if adjustments to overall contract costs are significant, the reductions or reversals of previously recorded revenue and profits could be material . . . ." (*Id.*)

In sum, throughout the proposed class period, the Company specifically disclosed to investors the actual risks that materialized and ultimately contributed to the losses the Company reported. Thus, investors could not have been misled in this regard and the first prong of the safe harbor disposes of Plaintiffs' claims.

### 2. *Defendants' Statements Of Optimism and Opinion are Inactionable.*

Many of the statements for which Plaintiffs seek to recovery are also either vague and indefinite statements of corporate optimism or statements of personal opinion, both of which are inactionable. The Fourth Circuit has long held that loose optimistic statements, sometimes known as "puffery," cannot form the basis of a securities claim. *Raab v. Gen. Physics Corp.*, 4 F.3d 286, 289 (4th Cir. 1993). "A statement is considered 'puffery,' and, therefore immaterial, if it is 'a certain kind of rosy affirmative commonly heard from corporate managers and familiar to the marketplace[.]'" *Phillips v. Triad Guar., Inc.*, No. 1:09-cv-71-NCT, 2015 WL 1457980, at *8 (M.D.N.C. Mar. 30, 2015) (citations omitted). Courts refuse to impose liability on such "loosely optimistic statements [because they] are so vague, so lacking specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important to the total mix of information available." *Id.* The following represent just a few examples of non-actionable puffery cited in the Complaint:

- "[W]e do engineering and design, *we're really good* at both of those. . . . *We're really good* at complex project management." (Compl. ¶ 44 (emphasis added).)

25

- "*We are a proven leader and brand* in the design, engineering, manufacture, supply, construction and maintenance of steam generating and environmental control systems . . . ." (*Id.* ¶ 133 (emphasis added).)

- "[O]ur backlog *remains strong*" and "[w]e *were pleased* to see our bid pipeline grow[.]" (*Id.* ¶ 167 (emphasis added).)[15]

- "With more than 500 biomass and waste-to-energy units installed worldwide . . . , *we bring unmatched capabilities* to this important project." (*Id.* ¶ 148 (emphasis added).)

- "Global Power . . . *remains a strength* for us. *We . . . continue to perform well on the[se] projects* . . . ." (*Id.* ¶ 183 (emphasis added).)

These statements and others found in the Complaint,[16] are classic examples of non-actionable puffery, which cannot form the basis of a claim. *See, e.g.*, *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 537 (3d Cir. 1999) (statements touting company's "technological expertise" and its status as "one of the most efficient producers in the industry" were non-actionable puffing); *Swisher*, 2015 WL 4132157, at *7, *14 (statements regarding company's growth strategies were non-actionable puffery); *Phillips*, 2015 WL 1457980, at *13 (statements regarding strength of company's fundamentals and prospective opportunities were non-actionable puffery); *Tekelec*, 2013 WL 1192004, at *16 (no liability can exist for statement that a particular market was seen "as a growth driver for our business going forward"); *Ash*, 2015 WL 5444741, at *10 (no claim possible as to statement: "With our expanding . . . relationships, strong backlog, and the high quality of our sales pipeline, we have visibility into what we believe will be another very good

---

[15] Plaintiffs confuse the backlog with the bid pipeline. (Compl. ¶¶ 146, 155, 157, 162, 167, 182, 224.) The bid pipeline reflects revenues that the Company might be able to achieve if awarded the contract at issue. If something is in the pipeline, it will not be in the backlog because the backlog reflects contracts awarded and in progress. (*Id.* at 17 n.6, ¶ 157.) There is, therefore, no connection between the Company's performance on a particular awarded project and the pipeline, which reflects work the Company does not yet have.

[16] *See, e.g.*, Compl. ¶¶ 10-12, 15, 45, 127-28, 136, 146, 153-54, 156-57, 162, 168-70, 175, 180, 182, 184, 224.

26

year in 2014"); *Hillson Partners Ltd. P'ship v. Adage, Inc.*, 42 F.3d 204, 210 (4th Cir. 1994)
(optimistic income projections qualified by the word "good" were inactionable puffery).

With respect to statements of opinion, they can be actionable only if Defendants "did not
believe what they said they believed[.]" *Longman v. Food Lion, Inc.*, 197 F.3d 675, 683 (4th Cir.
1999) (citing *Va. Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1091—96 (1991); *see also
Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 135 S. Ct. 1318, 1327
(2015).[17] Plaintiffs do not and cannot allege this. No claim is possible simply because the opinions
failed to come to fruition or because the Company knew, but failed to disclose, some facts that cut
the other way. *Omnicare,* 135 S. Ct. at 1327-28. Statements, like those quoted below, that are
prefaced by the words "we believe" or "we think" (*see id.* at 1326), are classic non-actionable
statements of opinion:

- "We *believe* [Copenhill] is an isolated issue and have performed reviews to ensure this piping design issue is not present in the other projects." (Compl. ¶ 186 (emphasis added).) [18]

- "I have spent significant time over there with the [t]eam and in the plant and *believe* we can complete [the Copenhill] project within the current budget and schedule." (*Id.* ¶ 188 (emphasis added).)

- "We've also . . . made some changes in the management [t]eam and [at] Volund . . . that we *think* will enhance our project management execution." (*Id.* ¶ 189 (emphasis added).)

- "[W]e've obviously gone in and put together a highly scrutinized new schedule and cost estimate [for Copenhill], which we *believe* is achievable." (*Id.* ¶ 190 (emphasis added).)[19]

---

[17] *Omnicare* dealt with claims brought under Section 11 of the Securities Act of 1933, but the logic of *Omnicare* has been applied to Section 10(b) claims based on opinion statements. *See, e.g., In re Velti PLC Sec. Litig.*, No. 13-cv-03889-WHO, 2015 WL 5736589, at *33 (N.D. Cal. Oct. 1, 2015).

[18] Plaintiffs misconstrue the commentary that Copenhill presented an "isolated issue." The Company said that, based on its investigation, none of the other plants had the same type of piping design defect as Copenhill. Contrary to Plaintiffs' insinuation, the Company never suggested that its other projects were free of issues or would never develop any problems.

[19] *See also* Compl. ¶¶ 15, 180 (examples of other opinion statements cited in Complaint).

As discussed previously, there are no well-pled facts in the Complaint directed at what Mr. Ferland, who made all of the above statements, supposedly knew at any particular point in time. Plaintiffs, thus, have not and cannot allege any facts to show that the beliefs he offered were not sincerely held. Nor have Plaintiffs pled the type of facts capable of stating an omissions-based claim for opinion statements, which "is no small task for an investor." *Omnicare,* 135 S. Ct. at 1332. To plead on that basis, "[an] investor must identify particular (and material) facts going to the basis for the [defendant]'s opinion – facts about the inquiry the [defendant] did or did not conduct or the knowledge it did or did not have – whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *Id.* Plaintiffs instead offer only conclusory assertions that Ferland must have known something in conflict with the Company's public statements (which Plaintiffs decline to specify), but that is insufficient to call into question the basis of the opinions he offered. *See City of Westland Police and Fire Ret. Sys. v. MetLife, Inc.*, 129 F. Supp. 3d 48, 69 (S.D.N.Y. 2015) ("[A] plaintiff must plead facts that, if true, would be sufficient to show that the speaker did not 'actually hold[] the stated belief.'").

### C. Corporate Mismanagement Is Not Actionable Under The Securities Laws.

At bottom, Plaintiffs are attempting to state a claim for mismanagement, which is simply not actionable under the federal securities laws. The Supreme Court soundly rejected such claims 40 years ago in *Santa Fe Indus. Inc. v. Green*, 430 U.S. 462 (1977). The Court there held that "claims that 'constitute no more than internal corporate mismanagement' are not actionable under the securities laws." *Id.* at 479.

Everyone, management included, would have wanted the Company to perform better. But business downturns or even losing money does not imply fraud. For that reason, Plaintiffs' disappointment with the Company's business decisions cannot give rise to a claim. "Congress did not intend for the securities laws to be used by investors to play 'Monday morning quarterback'

28

on the legitimate business decisions, however bad, of company officers and executives." *In re Cable Wireless, PLC,* 321 F. Supp. 2d 749, 770 (E.D. Va. 2004). Plaintiffs are expressly "prohibited from 'bootstrapping' a mismanagement claim into a securities fraud claim." *In re USF&G Corp. Sec. Litig.*, No. B902928, 1993 WL 740188, *5 (D. Md. Feb. 11, 1993) (rejecting attempt to "circumvent . . . *Santa Fe* . . . simply by alleging that the defendants 'failed to disclose' mismanagement or a breach of fiduciary duty.") Yet that is exactly what they attempt to do here. Plaintiffs' allegations regarding construction problems, cost-saving initiatives that supposedly backfired, and the Company's inability to marshal sufficient resources for the renewable business are all, at heart, claims of corporate misstatement for which no claim is possible under the federal securities laws.[20]

### D. The Complaint Does Not State A "Controlling Persons" Claim.

"Plaintiffs must state a primary claim for securities fraud under Section 10(b)" in order for control person liability to attach. *In re Inspire Pharms., Inc. Secs. Litig.*, 515 F. Supp. 2d 631, 641 (M.D.N.C. 2007). As shown above, Plaintiffs have not plead a primary claim and, thus, no control person liability exists as a matter of law. *Id.*

## IV. CONCLUSION

For the foregoing reasons, Defendants respectfully request that their Motion to Dismiss be granted and that Plaintiffs' Complaint be dismissed with prejudice.

---

[20] *See, e.g., In re United Telecomms. Inc. Sec. Litig.,* 781 F. Supp. 696, 698-700 (D. Kansas 1991) (*Santa Fe* barred claim based on allegations that company failed to disclose it lacked resources to maintain market share and growth rate); *Crocs,* 774 F. Supp. 2d at 1147 (allegations related to inadequate management systems during period of rapid growth "revealed mismanagement by Crocs, not fraud'); *In re Donna Karan Int'l Sec. Litig.,* No. 97-cv-2011-CBA, 1998 WL 637547, at *9-*10 (E.D.N.Y. Aug. 14, 1998) (dismissing allegations that assailed the conduct, judgement and abilities of management as "constituting nothing more than assertions of general mismanagement, or nondisclosures of mismanagement, [which] cannot support claims under § 10(b)").

DATED: November 13, 2017

ALSTON & BIRD LLP

*/s/ Thomas G. Walker*
THOMAS G. WALKER
(N.C. State Bar No. 17635)
4721 Emperor Boulevard
Suite 400
Durham, North Carolina, 27703-8580
Tel: 919-862-2200
Fax: 919-862-2260
thomas.walker@alston.com

JOHN L. LATHAM
SUSAN E. HURD
JASON R. OUTLAW
ALSTON & BIRD LLP
1201 West Peachtree Street
Atlanta, Georgia 30309-3424
Tel: 404-881-7000
Fax: 404-881-7777
john.latham@alston.com
susan.hurd@alston.com
jason.outlaw@alston.com

*Counsel for Defendants*

30

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS was filed on November 13, 2017 with the Court and served electronically through the CM/ECF system to the following counsel of record registered to receive a Notice of Electronic Filing for this case:

DHAMIAN A. BLUE
205 Fayetteville St.
Suite 300
Raleigh, NC 27602
Tel: 919-833-1931
Fax: 919-833-8009
dab@bluellp.com

KAPLAN, KILSHEIMER & FOX LLP
FREDERIC S. FOX
MELINDA D. CAMPBELL
DONALD R. HALL
850 Third Ave.
New York, NY 10022
Tel: 212-687-1980
Fax: 212-687-7714
ffox@kaplanfox.com
mcampbell@kaplanfox.com
dhall@kaplanfox.com


By:     */s/ Thomas G. Walker*
        THOMAS G. WALKER
        (N.C. State Bar No. 17635)
        ALSTON & BIRD LLP
        4721 Emperor Boulevard, Suite 400
        Durham, North Carolina, 27703-8580
        Tel: 919-862-2200
        Fax: 919-862-2260
        thomas.walker@alston.com