**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**

| | |
|---|---|
| ERIC OLLILA, Individually and on Behalf of All Others Similarly Situated,<br><br>               Plaintiff,<br><br>   vs.<br><br>BABCOCK & WILCOX ENTERPRISES, INC., E. JAMES FERLAND and JENNY L. APKER,<br><br>               Defendants. | CIVIL ACTION NO. 3:17-CV-109-MOC-DCK<br><br>CLASS ACTION |

**MEMORANDUM OF LAW IN SUPPORT OF LEAD PLAINTIFF'S**
**MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT,**
**PLAN OF ALLOCATION, AND CERTIFICATION OF SETTLEMENT CLASS**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .................................................................................................ii

PRELIMINARY STATEMENT ......................................................................................... 1

PRELIMINARY APPROVAL AND THE NOTICE PROGRAM ............................................. 3

ARGUMENT ..................................................................................................................... 4

    I.    THE PROPOSED SETTLEMENT IS FAIR, REASONABLE, AND
        ADEQUATE UNDER THE APPLICABLE STANDARDS AND SHOULD
        BE APPROVED ................................................................................................ 4

        A.    The Standards for Final Approval of Class Action Settlements ................... 4

        B.    Application of the Fourth Circuit's Factors Supports Final Approval
               of the Settlement ........................................................................................ 7

               1.    An Analysis of the *Jiffy Lube* Fairness Factors Demonstrates
                      that the Settlement Is Fair and Warrants Final Approval ................... 7

               2.    An Analysis of the *Jiffy Lube* Adequacy Factors Demonstrates
                      that the Settlement Is Adequate and Warrants Final Approval ......... 11

        C.    Application of the Factors Identified in the Amendments to Rule 23
               Support Approval of the Settlement as Fair, Reasonable, and
               Adequate ................................................................................................. 16

               1.    Lead Plaintiff and Lead Counsel Have Adequately Represented
                      the Settlement Class ...................................................................... 17

                2.    The Settlement Is the Result of Arm's-Length Negotiations ............. 17

                3.    The Relief Provided to the Settlement Class Is Adequate and
                      the Settlement Treats Class Members Equitably Relative to
                      Each Other ...................................................................................... 17

    II.    THE PROPOSED PLAN OF ALLOCATION SHOULD BE APPROVED .......... 19

    III.    THE COURT SHOULD GRANT FINAL CERTIFICATION OF THE
        SETTLEMENT CLASS ................................................................................. 21

CONCLUSION.................................................................................................................. 21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anselmo v. W. Paces Hotel Grp., LLC,*
    2012 U.S. Dist. LEXIS 164618, (D.S.C. Nov. 19, 2012) ........................................................ 10

*Cooke v. Manufactured Homes, Inc.,*
    998 F.2d 1256 (4th Cir. 1993) ........................................................................................... 11

*DeWitt v. Darlington Cty.,*
    2013 U.S. Dist. LEXIS 172624, (D.S.C. Dec. 6, 2013) ........................................................ 4, 5

*Flinn v. FMC Corp.,*
    528 F.2d 1169 (4th Cir. 1975) ........................................................................................... 15

*Horton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,*
    855 F. Supp. 825 (E.D.N.C. 1994) ..................................................................................... 10

*In re Fed. Nat'l Mortg. Ass'n Sec., Derivative, & "ERISA" Litig.,*
    4 F. Supp. 3d 94 (D.D.C. 2013) ..................................................................................... 13, 14

*In re Genworth Fin. Sec. Litig.,*
    210 F.Supp. 3d 837 (E.D. Va. 2016) ................................................................................... 9, 15

*In re Jiffy Lube Sec. Litig.,*
    927 F.2d 155 (4th Cir. 1991) ..................................................................................... *passim*

*In re MicroStrategy Inc. Sec. Litig.,*
    148 F.Supp. 2d 654 (E.D. Va. 2001) ............................................................................. *passim*

*In re Mills Corp. Sec. Litig.,*
    265 F.R.D. 246 (E.D. Va. 2009) ..................................................................................... *passim*

*In re Neustar, Inc. Sec. Litig.,*
    2015 WL 5674798, (E.D. Va. Sept. 23, 2015) ..................................................................... 7, 9

*In re Omnivision Tech. Inc.,*
    559 F. Supp. 2d 1036 (N.D. Cal. 2008) ............................................................................... 13

*In re Veeco Instruments Inc. Sec. Litig.,*
    2007 WL 4115809 (S.D.N.Y. Nov. 7, 2007) ........................................................................ 16

*In re Wachovia Corp. ERISA Litig.,*
    2011 U.S. Dist. LEXIS 155045, (W.D.N.C. Oct. 24, 2011) ................................................... 19

Case 3:17-cv-00109-MOC-DCK   Document 84   Filed 11/12/19   Page 3 of 28

*Int'l Bhd. of Elec. Workers Local 697 Pension Fund v. Int'l Game Tech., Inc.*,
2012 WL 5199742 (D. Nev. Oct. 19, 2012) ............................................................. 13

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
135 S. Ct. 1318 (2015) ................................................................................................ 11

*Phillips v. Triad Guaranty Inc.*,
2016 WL 1175152, (M.D.N.C. Mar. 23, 2016) ........................................... 6, 7, 12, 14

*Robinson v. Carolina First Bank NA*,
2019 WL 2591153, (D.S.C. June 21, 2019) .................................................................. 8

*Rowles v. Chase Home Fin., LLC*,
2012 U.S. Dist. LEXIS 3264, (D.S.C. Jan. 10, 2012) ................................................. 12

*S.C. Nat'l Bank v. Stone*,
139 F.R.D. 335 (D.S.C. 1991) .................................................................................. 8, 10

*S.C. Nat'l Bank v. Stone*,
749 F. Supp. 1419 (D.S.C. 1990) ............................................................................. 4, 14

*Temp. Servs., Inc. v. Am. Int'l Grp., Inc.*,
2012 U.S. Dist. LEXIS 86474, (D.S.C. June 22, 2012) ............................................... 5

## **Rules**

Fed. R. Civ. P. 23 ..................................................................................................... 5, 16

Fed. R. Civ. P. 23(a) ..................................................................................................... 20

Fed. R. Civ. P. 23(b)(3) ................................................................................................ 20

Fed. R. Civ. P. 23(e) ...................................................................................................... 1, 4

Fed. R. Civ. P. 23(e)(2) ..................................................................................... 4, 5, 6, 16

Fed. R. Civ. P. 23(e)(2)(C)(i) ....................................................................................... 17

Fed. R. Civ. P. 23(e)(2)(C)(ii) ...................................................................................... 17

Fed. R. Civ. P. 23(e)(2)(C)(iii) ..................................................................................... 18

Fed. R. Civ. P. 23(e)(2)(C)(iv) ..................................................................................... 19

Fed. R. Civ. P. 23(e)(2)(D) ........................................................................................... 19

Fed. R. Civ. P. 23(e)(3) .............................................................................................. 6, 19

**Other Authorities**

Private Securities Litigation Reform Act of 1995 ........................................................ 9, 11, 13 16

Lead Plaintiff Arkansas Teacher Retirement System ("ATRS" or "Lead Plaintiff") respectfully submits this memorandum of law in support of its motion, pursuant to Federal Rule of Civil Procedure 23(e), requesting (i) final approval of the proposed settlement of the above-captioned class action (the "Settlement"); (ii) approval of the proposed Plan of Allocation for the distribution of the proceeds of the Settlement to eligible claimants; and (iii) final certification of the Settlement Class.[1]

## PRELIMINARY STATEMENT

As detailed in the Stipulation, the Parties have agreed to settle the Action, and related claims, for a payment of $19,500,000 in cash. The terms of the Settlement are set forth in the Stipulation. This recovery is a very favorable result for the Settlement Class and avoids the substantial risks and expenses of continued litigation, including the risk of recovering less than the Settlement Amount, or nothing at all.

The Settlement was reached only after Lead Plaintiff and Lead Counsel had a well-developed understanding of the strengths and weaknesses of the claims. As more fully described in the Declaration of Frederic S. Fox,[2] the decision to settle was well informed by more than two

---

[1]  All capitalized terms not otherwise defined herein have the same meaning as those set forth in the Stipulation and Agreement of Settlement, dated as of June 21, 2019 (the "Stipulation") (ECF No. 77-1).

[2]  The Declaration of Frederic S. Fox in Support of (1) Lead Plaintiff's Motion for Approval of Settlement, Plan of Allocation, and Certification; (2) Lead Counsel's Motion for Award of Attorneys' Fees and Reimbursement of Expenses; and (3) Lead Plaintiff's Request for Reimbursement of Reasonable Costs and Expenses (the "Fox Declaration" or "Fox Decl."), filed herewith, is an integral part of this submission and, for the sake of brevity in this memorandum, the Court is respectfully referred to it for a detailed description of, *inter alia*: the history of the Action; the nature of the claims asserted; the negotiations leading to the Settlement; and the risks and uncertainties of continued litigation. All exhibits herein are annexed to the Fox Declaration. Citations to "¶ __" herein refer to paragraphs in the Fox Declaration and citations to "Ex. __" herein refer to exhibits to the Fox Declaration. For clarity, citations to exhibits that themselves have attached exhibits will be referenced as "Ex. __ -__." The first numerical reference is to the designation of the entire exhibit attached to the Fox Declaration and the second reference is to the exhibit designation within the exhibit itself.

years of hard-fought litigation involving a thorough and wide-ranging factual investigation, which included a careful review of publicly available information concerning Defendants, interviews with 64 former employees of B&W; successful briefing on Defendants' motion to dismiss the operative Complaint; a review and analysis of more than 280,000 pages of documents obtained from Defendants and subpoenaed records from non-party Deloitte & Touche LLP; and an extensive mediation process overseen by a well-respected mediator, the Honorable Layn R. Phillips (Ret.) ("Judge Phillips"), including preparing detailed mediation briefs and attending two full-day mediation sessions. *See generally* Fox Decl. at § III.

While Lead Plaintiff and Lead Counsel believe that the claims asserted against Defendants have merit, they recognize that continuing to litigate the Action presented a number of substantial risks. Despite Lead Plaintiff's success opposing the motion to dismiss the Complaint and its belief that it could prove all of the requisite elements of the claims asserted under Section 10(b) and 20(a) of the Securities Exchange Act of 1934, Defendants would have continued to vigorously challenge the claims were the Action to continue into summary judgment, trial, and through appeals.

In light of these risks, as discussed below and in the Fox Declaration, Lead Plaintiff respectfully submits that the Settlement is fair, reasonable, and adequate, and warrants final approval by the Court. It also has the full support of Lead Plaintiff. *See* Declaration of Rod Graves in Support of Motion for Final Approval of Class Action Settlement and Motion for an Award of Attorneys' Fees and Expense and Award to Lead Plaintiff, dated November 12, 2019 ("Graves Decl."). *See* Ex. 2 at ¶5. Lead Plaintiff also requests that the Court approve the proposed Plan of Allocation for the distribution of the proceeds of the Settlement, which was set forth in the Notice sent to Settlement Class Members. The Plan of Allocation, which was developed by Lead Counsel in consultation with Lead Plaintiff's consulting damages expert, provides a reasonable and

equitable method for allocating the Net Settlement Fund among Settlement Class Members who submit valid claims.

## PRELIMINARY APPROVAL AND THE NOTICE PROGRAM

On August 12, 2019, the Court entered an order preliminarily approving the Settlement and approving the proposed forms and methods of providing notice to the Settlement Class (the "Preliminary Approval Order," as amended on August 30, 2019, ECF No. 79). Pursuant to and in compliance with the Preliminary Approval Order, through records maintained by the Company's transfer agent and information provided by brokerage firms and other nominees, beginning on September 3, 2019, the Court-appointed Claims Administrator JND Legal Administration LLC ("JND"), caused the Notice and Claim Form (together, the "Notice Packet") to be mailed by first-class mail to potential Settlement Class Members. *See* Declaration of Luiggy Segura Regarding (A) Mailing of the Notice and Claim Form; (B) Publication of Summary Notice; and (C) Report on Requests for Exclusion and Objections Received to Date ("Segura Decl."), dated November 8, 2019 (the "Mailing Declaration"), Ex. 3 at ¶¶5-6. To date, 38,300 Notice Packets have been mailed. *Id*. at ¶11. On September 9, 2019, the Summary Notice was published in *Investor's Business Daily* and transmitted over the *PR Newswire. Id*. at ¶12 and Exhibit B attached thereto. The Notice and Claim Form were also posted, for review and easy downloading, on the website established for purposes of this Settlement. *Id*. at ¶15.

The Notice described, *inter alia*, the claims asserted in the Action, the contentions of the Parties, the course of the litigation, the terms of the Settlement, the maximum amounts that would be sought in attorneys' fees and expenses, the Plan of Allocation, the right to object, and the right to seek to be excluded from the Settlement Class. *See generally* Ex. 3-A. The Notice also gave the deadlines for objecting, seeking exclusion, submitting claims, and advised potential Settlement Class Members of the scheduled Settlement Fairness Hearing before this Court. *Id*. To date, the

Settlement Class's reaction to the proposed Settlement has been positive. While the deadline (November 25, 2019) for requesting exclusion or objecting to the Settlement has not yet passed, to date there have been only two requests for exclusion, no objections to the proposed Settlement, and no objections to the Plan of Allocation.[3]

For all the following reasons, Lead Plaintiff respectfully requests that the Court approve the proposed Settlement and Plan of Allocation, and finally certify the Settlement Class.

## ARGUMENT

**I. THE PROPOSED SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE UNDER THE APPLICABLE STANDARDS AND SHOULD BE APPROVED**

### A. The Standards for Final Approval of Class Action Settlements

Rule 23(e) of the Federal Rules of Civil Procedure requires judicial approval of the compromise of claims brought on a class basis. The standard for determining whether to grant final approval to a class action settlement is whether the proposed settlement is "fundamentally fair, adequate, and reasonable." Fed. R. Civ. P. 23(e)(2). As a matter of public policy, courts favor the settlement of disputed claims, particularly in complex class actions. *See DeWitt v. Darlington Cty.*, No. 4:11-cv-00740-RBH, 2013 U.S. Dist. LEXIS 172624, at *11 (D.S.C. Dec. 6, 2013) ("Courts greatly favor the settlements of cases and allowing litigants to achieve their own resolution of disputes."); *S.C. Nat'l Bank v. Stone*, 749 F. Supp. 1419, 1423 (D.S.C. 1990) ("settlement of the complex disputes often involved in class actions minimizes the litigation expenses of both parties and also reduces the strains such litigation imposes upon already scarce judicial resources").

---

[3] Should any objections or additional requests for exclusion be received, Lead Plaintiff will address them in its reply papers, which are due to be filed with the Court on December 9, 2019.

Thus, "[a]lthough the district court has broad discretion in approving a settlement of a class action case, there is a strong presumption in favor of finding a settlement fair." *DeWitt*, 2013 U.S. Dist. LEXIS 172624, at *11. Moreover, in determining whether a proposed settlement is "fair, reasonable, and adequate" under Rule 23(e)(2), a court should recognize that "[s]ettlements, by definition, are compromises which need not satisfy every single concern of the plaintiff class, but may fall anywhere within a broad range of upper and lower limits." *Temp. Servs., Inc. v. Am. Int'l Grp., Inc.*, No. 3:08-cv-00271-JFA, 2012 U.S. Dist. LEXIS 86474, at *30-31 (D.S.C. June 22, 2012). In other words, a "settlement fairness hearing is not a trial, and the court should defer to the evaluation and judgment of experienced trial counsel in weighing the relative strengths and weaknesses of the parties' respective positions and their underlying interests in reaching a compromise." *DeWitt*, 2013 U.S. Dist. LEXIS 172624, at *11; *In re Mills Corp. Sec. Litig.*, 265 F.R.D. 246, 255 (E.D. Va. 2009) ("Counsel are highly experienced in the field of securities class action litigation . . . . [Their] decision to settle the case is the product of thorough exploration and deliberation and as such, their representations to the court that the settlement provides class relief which is fair, reasonable and adequate should be given significant weight.").

The Fourth Circuit determines whether a proposed settlement meets the requirements of Rule 23 by considering two elements: "fairness," which focuses on whether the proposed settlement was negotiated at arm's-length (procedural fairness); and "adequacy," which focuses on whether the consideration provided to class members is sufficient (substantive fairness). *In re Jiffy Lube Sec. Litig.*, 927 F.2d 155, 158-59 (4th Cir. 1991); *see also In re MicroStrategy Inc. Sec. Litig.*, 148 F.Supp. 2d 654, 663 (E.D. Va. 2001) (noting Fourth Circuit in *Jiffy Lube* "adopted a bifurcated analysis, separating the inquiry into a settlement's 'fairness' from the inquiry into a settlement's 'adequacy'").

In determining the fairness of a proposed settlement, district courts within the Fourth Circuit consider four factors: "(1) the posture of the case at the time settlement was proposed, (2) the extent of discovery that had been conducted, (3) the circumstances surrounding the negotiations, and (4) the experience of counsel in the area of securities class action litigation." *Jiffy Lube*, 927 F.2d at 158-59; *see also Phillips v. Triad Guaranty Inc.*, No. 1:09CV71, 2016 WL 1175152, at *2 (M.D.N.C. Mar. 23, 2016); *MicroStrategy*, 148 F.Supp. 2d at 664.

In determining adequacy, courts within the Fourth Circuit consider the following factors: "(1) the relative strength of the plaintiffs' case on the merits, (2) the existence of any difficulties of proof or strong defenses the plaintiffs are likely to encounter if the case goes to trial, (3) the anticipated duration and expense of additional litigation, (4) the solvency of the defendants and the likelihood of recovery on a litigated judgment, and (5) the degree of opposition to the settlement." *Jiffy Lube*, 927 F.2d at 159.

Additionally, pursuant to the recent amendments to Rule 23(e)(2), a court may approve a settlement as "fair, reasonable, and adequate" after considering the following four factors, most of which overlap with the factors considered by the Fourth Circuit:

> (A)  whether the class representatives and class counsel have adequately represented the class;
>
> (B)  whether the proposal was negotiated at arm's length;
>
> (C)  whether the relief provided for the class is adequate, taking into account:
>
>> i.    the costs, risks, and delay of trial and appeal;
>>
>> ii.   the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;
>>
>> iii.  the terms of any proposed award of attorneys' fees, including timing of payment; and

        iv.        any agreement required to be identified under Rule 23(e)(3); and

    (D)        whether the proposal treats class members equitably relative to each other.

For the reasons discussed herein, the proposed Settlement meets the criteria set forth by the Fourth Circuit and the federal rules.

### B. Application of the Fourth Circuit's Factors Supports Final Approval of the Settlement

#### 1. An Analysis of the *Jiffy Lube* Fairness Factors Demonstrates that the Settlement Is Fair and Warrants Final Approval

##### (a) The Posture of the Case and Extent of Discovery Conducted

"Looking to the first factor, the Court considers whether the case has progressed far enough to dispel any wariness of 'possible collusion among the settling parties.'" *In re Neustar, Inc. Sec. Litig.*, No. 1:14CV995, 2015 WL 5674798, at *10 (E.D. Va. Sept. 23, 2015) (quoting *Mills*, 265 F.R.D. at 254). "Like the first factor, the second factor—evaluating the extent of discovery that has been conducted—enables the Court to ensure that the case is well-enough developed for Class Counsel and Lead Plaintiffs alike to appreciate the full landscape of their case when agreeing to enter into this Settlement." *Mills*, 265 F.R.D. at 254. No minimum or definitive amount of discovery must be undertaken, however. *See Jiffy Lube*, 927 F.2d at 159.

There is no question that Lead Plaintiff and Counsel had a thorough understanding of the strengths and weaknesses of the claims and defenses asserted and could make intelligent, informed appraisals of their chances of success had the Action continued to be litigated. As noted in the Fox Declaration, Lead Plaintiff (i) conducted an extensive investigation into the Settlement Class's claims prior to filing the operative Complaint, including the review of voluminous publicly available information regarding B&W and interviews with 64 former B&W employees; (ii) prepared two detailed amended complaints; (iii) defeated Defendants' motion to dismiss the

Complaint; (iv) engaged in a thorough discovery process that included the review and analysis of approximately 280,000 pages of documents from Defendants and B&W's auditor; (v) consulted with experts on loss causation and damages as well as an industry expert; and (vi) thoroughly vetted both sides' damages assumptions, methodologies, and calculations through two mediations. *See* ¶¶22-32, 34-53, 55-59; *Phillips*, 2016 WL 1175152, at *2 (posture of the case support a finding of fairness where the parties briefed motion to dismiss but before formal discovery); *MicroStrategy*, 148 F. Supp. 2d at 664-65 ("plaintiffs have conducted sufficient informal discovery and investigation to. . . evaluate [fairly] the merits of Defendants' positions during settlement negotiations"); *Mills*, 256 F.R.D. at 254 (posture of the case supports fairness where lead plaintiffs "filed three complaints, overc[ame] motions to dismiss and pursu[ed] the action through to class certification").

Thus, Lead Plaintiff was fully informed regarding Defendants' factual and legal theories, arguments, and defenses and was able to thoroughly evaluate the Parties' respective positions. This record is more than sufficient to support approval of the Settlement.

### (b)     Circumstances Surrounding the Negotiations

The third *Jiffy Lube* fairness factor asks the Court to evaluate the conditions and circumstances surrounding the settlement negotiations between counsel. *See Mills*, 265 F.R.D. at 255. "The objective of this factor is to ensure that counsel entered into settlement negotiations on behalf of their clients after becoming fully informed of all pertinent factual and legal issues in the case." *Id.* (internal quotation omitted). "Moreover, supervision by a mediator lends an air of fairness to agreements that are ultimately reached." *Robinson v. Carolina First Bank NA*, No. 7:18-CV-02927-JDA, 2019 WL 2591153, at *9 (D.S.C. June 21, 2019); *S.C. Nat'l Bank v. Stone*, 139 F.R.D. 335, 345–46 (D.S.C. 1991) ("Although a magistrate judge's supervision is not mandatory in order to determine a settlement is fair, such participation can insure that the parties

8

will negotiate in good faith without collusion.").

Here, the Settlement is the product of informed arm's-length negotiations. The Parties participated in a mediation session on December 14, 2018, before Judge Phillips. Prior to the mediation, the Parties exchanged comprehensive mediation statements and replies. *See* ¶¶55-56. During the mediation, the Parties engaged in detailed discussions focused on their positions regarding liability and damages. However, the mediation session did not result in a settlement. A second mediation session was held on April 16, 2019, also before Judge Phillips, and preceded by a supplemental mediation memorandum by Lead Plaintiff on April 2, 2019. Following extensive negotiations, the Parties reached a settlement in principle that day and executed a Term Sheet. ¶¶58-59. Given the arm's-length nature of the negotiations and the active involvement of an experienced mediator, there can be no question that the Settlement was fairly and honestly negotiated. *See In re Genworth Fin. Sec. Litig.*, 210 F.Supp. 3d 837, 840–41 (E.D. Va. 2016) ("continuing efforts before an experienced mediator left the parties and their counsel 'fully informed of all pertinent factual and legal issues' and demonstrate that the Settlement is fair and reasonable"); *NeuStar,* 2015 WL 5674798, at *11 (finding factor satisfied where parties "reached [their settlement] after one day of mediation before a Judicial Arbitration and Mediation Services neutral" and "exchanged comprehensive mediation statements and supporting evidence, including information and analyses from experts" and noting that these features "indicate an arm's length negotiation").

### (c)     Experience of Counsel in this Field of Law

"The final *Jiffy Lube* 'fairness' factor looks to the experience of Class Counsel in this particular field of law." *Mills*, 265 F.R.D. at 255. It is respectfully submitted that Kaplan Fox & Kilsheimer LLP is among the nation's preeminent law firms in this area of practice and has served as lead or co-lead counsel on behalf of institutional investors in numerous class actions since the

enactment of the PSLRA. *See* Ex. 5-A. The additional Plaintiff's Counsel and Liaison Counsel who did non-duplicative work in this Action for the benefit of the Settlement Class also have long and successful track records in the cases they have litigated and are highly regarded and experienced litigators. *See* Exs. 6-8. In this Action, the tenacity of Lead Counsel, in the face of difficult legal and factual circumstances, clearly led to a better result for the Settlement Class. *See Anselmo v. W. Paces Hotel Grp., LLC*, No. 9:09-cv-02466-DCN, 2012 U.S. Dist. LEXIS 164618, at *8 (D.S.C. Nov. 19, 2012) ("The court gives substantial weight to [Class Counsel's] suggestion" "that settlement is the preferable alternative.").

The quality of the work performed by Lead Counsel in attaining the Settlement should also be evaluated in light of the quality of opposing counsel. *See MicroStrategy*, 148 F. Supp. 2d at 665 (noting that "counsel for *both* sides are nationally recognized members of the securities litigation bar" when considering the fairness of the settlement). Defendants in this case were represented by the preeminent defense firm Alston & Bird LLP which spared no effort or expense in the defense of its clients. In the face of this knowledgeable and formidable defense, Lead Counsel was nonetheless able to develop a case that was sufficiently strong to persuade Defendants to settle the Action for $19.5 million on terms that are favorable to the Settlement Class. Thus, this factor supports the fairness of the Settlement and weighs in favor of its approval.

Accordingly, Lead Counsel submits that its view that the Settlement is fair and an excellent result for the Settlement Class is entitled to due consideration by the Court. *See Horton v. Merrill Lynch, Pierce, Fenner & Smith, Inc*., 855 F. Supp. 825, 831 (E.D.N.C. 1994) (giving weight to views of experienced class counsel); *Mills*, 265 F.R.D. at 255 (same).

10

## 2. An Analysis of the *Jiffy Lube* Adequacy Factors Demonstrates that the Settlement Is Adequate and Warrants Final Approval

### (a) Strength of Lead Plaintiff's Case on the Merits and the Risks Inherent in Continued Litigation

The "first and second *Jiffy Lube* factors . . . compel the Court to examine how much the class sacrifices in settling a potentially strong case in light of how much the class gains in avoiding the uncertainty of a potentially difficult case." *Mills*, 265 F.R.D. at 256. "Securities cases are 'notably difficult and notoriously uncertain.'" *Stone*, 139 F.R.D. at 340. While Lead Plaintiff was confident of the merits of its claims, it would still have had to overcome numerous defenses asserted by Defendants in order to survive dispositive summary judgment motions or to ultimately recover at trial.

To establish a claim under the Exchange Act, a plaintiff must prove: (i) the defendant made a material misrepresentation or omission; (ii) with scienter; (iii) in connection with the purchase or sale of a security; (iv) that the plaintiff relied on the material misstatement; (v) economic loss; and (vi) loss causation. *Cooke v. Manufactured Homes, Inc.*, 998 F.2d 1256, 1260-61 (4th Cir. 1993). Here, Defendants would have vigorously challenged Lead Plaintiff's ability to establish the falsity and materiality of the alleged misleading statements, scienter, as well as loss causation, among other challenges. *See* ¶¶74-81.

Regarding falsity, Defendants would have vigorously maintained that: (i) the majority of statements Lead Plaintiff challenged are forward-looking and protected by the PSLRA's safe-harbor provision because they were accompanied by cautionary language disclosing risks regarding B&W's Renewable segment—such as the risks regarding potential delays and project scope changes; (ii) the evidence will show that Defendants' disclosures were consistent with what the Individual Defendants knew at the time they were made; and (iii) certain challenged statements constituted either puffery or inactionable statements of opinion under the Supreme Court's

decision in *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318 (2015). ¶78.

Regarding proving scienter, Defendants would argue, among other things, that: (i) the Individual Defendants were unaware of the alleged problems with B&W's Renewable projects when they made positive statements about the business; (ii) Lead Plaintiff cannot point to a specific motive to defraud because there are no allegations in the Complaint that the Individual Defendants profited from stock sales, or received compensation that would not have been available absent the alleged fraud; and (iii) Defendants had a reasonable basis to believe that the Renewable segment's outlook was bright throughout 2015 and into 2016, when the majority of the alleged misstatements were made. ¶79.

Even if Lead Plaintiff was successful in proving liability, Lead Plaintiff's ability to establish loss causation and damages also presented a significant risk to recovery in the Action. Defendants would argue that the price declines on each of the alleged corrective disclosure dates were caused, in whole or in substantial part, by factors unrelated to the alleged fraud. Defendants would have further argued that Lead Plaintiff would be unable to establish loss causation through stock price increases following any of the alleged misrepresentations. If these arguments prevailed at class certification, summary judgment, or trial, the Settlement Class could have recovered significantly less or, indeed, nothing. ¶80. Moreover, Lead Plaintiff's proposed damages calculation would have come under sustained attack by Defendants, and the correct measure of damages would likely have come down to an inherently unpredictable and hotly disputed "battle of the experts" where it would be impossible to predict with any certainty which arguments would find favor with a jury. *See Phillips*, 2016 WL 1175152, at *3 (finding this factor supported approval of the settlement where "lead plaintiff expressed concern that loss causation and damage

assessments of Lead Plaintiff's and Defendants' experts were sure to vary substantially" and would be reduced to a "battle of the experts"); *see also Rowles v. Chase Home Fin., LLC*, No. 9:10-cv-01756-MBS, 2012 U.S. Dist. LEXIS 3264, at *7 (D.S.C. Jan. 10, 2012) (holding that the parties' "dispute [over damages] underscores not only the uncertainty of the outcome but also why the Court finds the [settlement] to be fair, reasonable, adequate, and in the best interests of the Class Members.").

In contrast, the proposed Settlement provides a substantial and certain recovery of $19.5 million for the benefit of the Settlement Class, without the risk, delay, and expense of continued litigation. As explained in the Fox Declaration, Lead Plaintiff's consulting damages expert estimated aggregate damages of approximately $404 million, assuming that liability and loss causation for each of the corrective disclosures was proven. This maximum estimate further assumes that Lead Plaintiff would not need to disaggregate, or parse out, confounding non-fraud related information on those dates. ¶72.

In anticipation of Defendants' likely argument that the price declines resulted from forces unrelated to the alleged fraud, Lead Plaintiff's consulting damages expert performed a disaggregation analysis to remove the effects of potentially confounding information, which reduced damages to approximately $284 million. The Settlement therefore recovers approximately 4.8% of maximum estimated damages and 6.9% of maximum disaggregated damages—a very favorable recovery in light of the risks of continued litigation. *Id.* Since the passage of the Private Securities Litigation Reform Act of 1995, courts have readily approved settlements that recovered comparable or smaller percentages of maximum damages. *See, e.g., In re Fed. Nat'l Mortg. Ass'n Sec., Derivative, & "ERISA" Litig.*, 4 F. Supp. 3d 94, 103 (D.D.C. 2013) (settlement value approximating "4–8% of the 'best case scenario' potential recovery"

deemed reasonable); *Int'l Bhd. of Elec. Workers Local 697 Pension Fund v. Int'l Game Tech., Inc.*, 2012 WL 5199742, at \*2-3 (D. Nev. Oct. 19, 2012) (approving \$12.5 million settlement recovering "about 3.5% of the maximum damages that plaintiffs believe could be recovered at trial," noting that the amount is "within the median recovery in securities class actions settled in the last few years"); *In re Omnivision Tech. Inc.*, 559 F. Supp. 2d 1036, 1042 (N.D. Cal. 2008) (\$13.75 million settlement yielding 6% of potential damages after deducting fees and costs was "higher than the median percentage of investor losses recovered in recent shareholder class action settlements").

To put the recovery further into perspective, the \$19.5 million settlement is greater than the "near-record" median settlement amount in securities class action settlements in 2018—reported by NERA Economic Consulting to be \$13 million, and which ranged from \$6 million to \$13 million since 2009. *See* S. Boettrich & S. Starykh, *Recent Trends in Securities Class Action Litigation: 2018 Full-Year Review* (NERA, Jan. 29, 2019), Ex. 4 at 30.

#### (b)     Anticipated Duration and Expense of Further Litigation

The third *Jiffy Lube* adequacy factor is the additional time and expense that would be necessary if the litigation proceeded to trial. *See Stone*, 749 F. Supp. at 1426 ("The likely duration and associated expenses of continued litigation likewise favor approval of the settlement."). "[S]ubstantial resources would be expended to proceed through discovery, summary judgment, trial and the post-trial appellate process if Lead Plaintiff was successful on appeal, without any guarantee of a better resolution for the Class." *Phillips*, 2016 WL 1175152, at \*4.

In the absence of a settlement now, the Parties would have continued through the completion of extensive fact discovery, expert discovery on complicated issues pertaining to loss causation and damages, briefing on summary judgment, class certification briefing, pre-trial evidentiary motions, a trial, and appeals. Even if Lead Plaintiff could recover a judgment greater than the Settlement Amount at trial, the additional delay of post-trial motions and the appellate

process could last for years. Therefore, anticipated duration and expense of further litigation support approval of the Settlement.

### (c) The Solvency of Defendants and Likelihood of Recovery of a Litigated Judgment

During the prosecution of this case, it also became clear that B&W was (and still is) in significant financial distress—a further contingency threatening a recovery for the Settlement Class. In addition to the massive losses B&W disclosed toward the end of the Class Period, including a $144.6 million loss in the final alleged disclosure on August 9, 2017, B&W continued to post deep losses thereafter. On November 27, 2018, the Company received a notice from the New York Stock Exchange, Inc. ("NYSE") that it was not in compliance with the NYSE's continued listing standards based on the average closing price of the Company's common stock being less than $1.00 per share over a period of 30 consecutive trading days. And, for almost six months afterward, B&W's stock has traded under $1.00 per share. On April 2, 2018, the Company announced that it was at risk of defaulting on the terms of its credit agreements, but on April 5, 2019, B&W announced it had received an infusion of cash from a new lender. *See* ¶54. The Settlement, therefore, avoids the significant risk surround B&W's financial condition while achieving a favorable guaranteed recovery for the Settlement Class. *See In re Genworth Fin. Sec. Litig.*, 210 F.Supp. 3d at 842 (finding the solvency of the defendants and likelihood of recovery on a litigated judgement supported adequacy where the company's stock had fallen precipitously prior the settlement, despite it rising since the date of settlement, and where the company had undergone downgrades in credit rating).

### (d) The Degree of Opposition to the Settlement

The reaction of the Settlement Class to the proposed Settlement, to date, also supports final approval. The reaction of class members to a proposed settlement "as expressed directly or by

failure to object" is also "a proper consideration for the trial court."  *Flinn v. FMC Corp.*, 528 F.2d 1169, 1173 (4th Cir. 1975).  A low number of objections or opt-outs in comparison to the size of the settlement class evidences the fairness of the proposed settlement.  *See Mills*, 265 F.R.D. at 257-58 (noting that the lack of any objections to the settlement and the small number of opt-outs strongly compels a finding of adequacy).

The Notice, mailed to approximately 38,300 potential members of the Settlement Class and their nominees, set forth the terms of the Settlement in detail.  Ex. 3-A.  The Notice also informed Settlement Class Members of their right to object to the Settlement and Plan of Allocation, their right to seek exclusion from the Settlement Class, and the procedures for doing so.  *Id*.  The deadline for filing objections or seeking exclusion is November 25, 2019.  No objections and only two requests for exclusion have been received to date.[4]

Moreover, Lead Plaintiff—a sophisticated institutional investor—actively participated in both the prosecution of the Action and the settlement negotiations.  Lead Plaintiff's direct participation and approval of the Settlement is further evidence that the Settlement is fair, reasonable and adequate.  *See In re Veeco Instruments Inc. Sec. Litig*., No. 05 MDL 01695 (CM), 2007 WL 4115809, at *5 (S.D.N.Y. Nov. 7, 2007) ("[U]nder the PSLRA, a settlement reached . . . under the supervision and with the endorsement of a sophisticated institutional investor . . . is 'entitled to an even greater presumption of reasonableness . . . .'").

### C.    Application of the Factors Identified in the Amendments to Rule 23 Support Approval of the Settlement as Fair, Reasonable, and Adequate

The proposed Settlement also meets the criteria set forth in the amendments to Rule 23(e)(2), many of which are covered by the traditional Fourth Circuit factors discussed above.

---

[4]   If any objections or additional requests for exclusion are received, Lead Plaintiff will address them in its reply submission to be filed with the Court on December 9, 2019.

### 1. Lead Plaintiff and Lead Counsel Have Adequately Represented the Settlement Class

Lead Plaintiff and Lead Counsel have adequately represented the Settlement Class. As set forth in the previously filed motion for preliminary approval, Lead Plaintiff, like all other members of the Settlement Class, purchased B&W common stock during the Class Period and claims to have suffered damages. *See* ECF No. 79. Thus, the claims of Lead Plaintiff and the Settlement Class would prevail or fail in unison. Moreover, the common objective of maximizing recovery from Defendants aligns the interests of Lead Plaintiff and all other members of the Settlement Class. Lead Plaintiff participated in the litigation, conferred with counsel, attended both mediations, and agreed to settle the case with an informed understanding of the strengths and weaknesses of the claims. *See* Ex. 2 at ¶¶4, 8.

Additionally, throughout the Action, Lead Plaintiff had the benefit of the advice of knowledgeable counsel well-versed in shareholder class action litigation and securities fraud cases. *See supra* at §I.B.1(c).

### 2. The Settlement Is the Result of Arm's-Length Negotiations

As set forth above in § I.B.1(b), the Settlement here was achieved thorough arm's-length negotiations between well-informed and experienced counsel, under the supervision of an experienced mediator, and rigorous investigation into the claims.

### 3. The Relief Provided to the Settlement Class Is Adequate and the Settlement Treats Class Members Equitably Relative to Each Other

Rule 23(e)(2)(C)(i), which requires that "the relief provided for the class is adequate, taking into account the costs, risks, and delay of trial and appeal," has been discussed above in §I.B.2.

Rule 23(e)(2)(C)(ii) considers whether the relief is adequate, taking into account the "effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims." As set forth below in Section II, discussing the proposed Plan

17

of Allocation, the proceeds of the Settlement will be distributed to Settlement Class Members who submit valid and timely claims. Using the formulas of the Plan of Allocation, the Claims Administrator will calculate claimants' "Recognized Claims" using the transactional information provided by claimants in their Claim Forms, which can be mailed to the Claims Administrator, submitted online using the settlement website, or, for large investors with hundreds of transactions, submitted via e-mail to the Claims Administrator's electronic filing team. Lead Plaintiff's claim will be calculated the same way. Because most securities are held in "street name" by the brokers that buy them on behalf of clients, the Claims Administrator, Lead Counsel, and Defendants do not have Settlement Class Members' transactional data and a claims process is required. The Claims Administrator will determine each eligible claimant's *pro rata* share of the Net Settlement Fund based upon each claimant's total "Recognized Claim" compared to the aggregate Recognized Claims of all eligible claimants.

Once the Claims Administrator has processed all submitted claims, notified claimants of deficiencies or ineligibility, processed responses, and made claim determinations, distributions will be made to eligible claimants. Any disputes about claim determinations that cannot be resolved will be presented to the Court. After an initial distribution of the Net Settlement Fund, if there is any balance remaining in the Net Settlement Fund (whether by reason of tax refunds, uncashed checks or otherwise), after at least nine (9) months from the date of initial distribution, the Claims Administrator will, if feasible and economical after payment of Notice and Administration Expenses, Taxes, and attorneys' fees and expenses, if any, re-distribute the balance among eligible claimants who have cashed their checks. These re-distributions will be repeated until the balance in the Net Settlement Fund is no longer feasible to distribute. Any balance that still remains in the Net Settlement Fund after re-distribution(s), which is not feasible or economical

to reallocate, after payment of any outstanding Notice and Administration Expenses or Taxes, if any, shall be contributed to non-sectarian, not-for-profit organization(s), to be recommended by Plaintiff's Counsel and approved by the Court. *See* Ex. 3-A at ¶56.

The terms of the proposed award of attorneys' fees (Rule 23(e)(2)(C)(iii)), are discussed in Lead Counsel's accompanying Fee and Expense Application. Lead Counsel seeks an award of attorneys' fees and expenses pursuant to the common fund doctrine and the request is fully within the discretion of the Court, was not negotiated with Defendants, and is separate from the Settlement. Any fees and expenses that are awarded by the Court are payable upon award.

Finally, Rule 23(e)(2)(C)(iv) asks the Court to consider the fairness of the proposed Settlement in light of any agreement required to be identified under Rule 23(e)(3). Here, the only agreements made by the Parties in connection with the Settlement are the April 16, 2019 term sheet, the Stipulation, and the Supplemental Agreement dated June 21, 2019 (concerning the circumstances under which Defendants may terminate the Settlement based upon the number of exclusion requests). *See* Stipulation at ¶38. It is standard to keep such a supplemental agreement confidential so that a large investor, or a group of investors, cannot intentionally try to leverage a better recovery for themselves by threatening to opt out, at the expense of the class.[5] The Supplemental Agreement may be submitted to the Court *in camera*, if requested.

In sum, each of the relevant factors for considering approval of a class action settlement fully supports a finding that the Settlement here is fair, reasonable, and adequate.

## II. THE PROPOSED PLAN OF ALLOCATION SHOULD BE APPROVED

Following approval of the Settlement and upon the Effective Date, the Net Settlement Fund will be distributed to Authorized Claimants. The proposed Plan of Allocation contained in the

---

[5] Rule 23(e)(2)(D), whether the proposal treats class members equitably with respect to each other, has been discussed and is addressed in Section II below.

Notice (the "Plan") details the manner in which the Net Settlement Fund will be allocated.  *See* Ex. 3-A at 10-14.

Approval of a plan of allocation is governed by the same standards by which a class action settlement is scrutinized–namely, it must be fair, reasonable, and adequate.  *See In re Wachovia Corp. ERISA Litig.*, No. 3:09cv262, 2011 U.S. Dist. LEXIS 155045, at *30-31 (W.D.N.C. Oct. 24, 2011); *MicroStrategy*, 148 F.Supp. 2d at 668.  In evaluating a proposed allocation plan, courts give considerable weight to the opinion of experienced class counsel.  *See Mills*, 265 F.R.D. at 258 ("given that qualified counsel endorses the proposed allocation, the allocation need only have a reasonable and rational basis").

Here, the Plan of Allocation, which was developed in consultation with Lead Plaintiff's damages expert and is consistent with Lead Plaintiff's allegations, provides for distribution of the Net Settlement Fund among Authorized Claimants on a *pro rata* basis based on a formula tied to liability and damages.  In developing the Plan, Lead Plaintiff's expert considered the amount of artificial inflation present in B&W's common stock throughout the Class Period that was purportedly caused by the alleged fraud.  An inflation table was created and is included in the Notice as part of the Plan and will be utilized by the Claims Administrator in calculating Recognized Loss amounts for claimants.  The Claims Administrator will calculate claimants' Recognized Losses using the transactional information provided by claimants in their Claim Forms.  Because the Settlement does not recover 100% of the alleged damages, the Claims Administrator will determine each eligible claimant's pro rata share of the Net Settlement Fund based upon each claimant's total "Recognized Claim" compared to the aggregate Recognized Claims of all eligible claimants.  ¶88.

Calculation of the recovery for each Recognized Claim will depend upon several factors,

including the timing of the Authorized Claimant's purchases of B&W stock during the Class Period and sales during the Class Period, if any.  ¶87.

Accordingly, the proposed Plan of Allocation fairly and rationally allocates the Net Settlement Fund among Authorized Claimants, and should be approved.

## III.    THE COURT SHOULD GRANT FINAL CERTIFICATION OF THE SETTLEMENT CLASS

The Court previously granted preliminary certification to the Settlement Class under Rules 23(a) and (b)(3).  *See* ECF No. 79.  Because nothing has occurred since then to cast doubt on the propriety of class certification for settlement purposes, and no objections have been received to date, the Court should grant final class certification.

## CONCLUSION

For all the foregoing reasons, Lead Plaintiff respectfully requests that the Court:  (i) grant final approval of the Settlement; (ii) approve the Plan of Allocation as fair, reasonable, and adequate; and (iii) finally certify the Settlement Class, for settlement purposes only.


Dated: November 12, 2019                    By: */s/ Frederic S. Fox_____*

Frederic S. Fox (*pro hac vice*)
Donald R. Hall (*pro hac vice*)
Melinda Campbell (*pro hac vice*)
**KAPLAN FOX & KILSHEIMER LLP**
850 Third Avenue, 14th Floor
New York, NY  10022
Telephone:  (212) 687-1980
Facsimile:  (212) 687-7714

*Lead Counsel for Lead Plaintiff and the Settlement Class*

**BLUE LLP**
Dhamian Blue
205 Fayetteville Street
Raleigh, NC  27601

21

Telephone: (919) 822-1931
Facsimile: (919) 822-8009
N.C. Bar No. 31405

*Liaison Counsel*

**KESSLER TOPAZ MELTZER**
**& CHECK, LLP**
Andrew L. Zivitz
Geoffrey C. Jarvis
Matthew L. Mustokoff
Margaret E. Mazzeo
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

**LABATON SUCHAROW LLP**
Jonathan Gardner
Christine M. Fox
Marisa N. DeMato
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477

*Additional Counsel for Lead Plaintiff*