# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA

ERIC OLLILA, Individually and on Behalf of All
Others Similarly Situated,

                Plaintiff,

     vs.

BABCOCK & WILCOX ENTERPRISES, INC.,
E. JAMES FERLAND and JENNY L. APKER,

                Defendants

CIVIL ACTION NO.: 3:17-CV-00109

## MEMORANDUM OF LAW IN SUPPORT OF LEAD COUNSEL'S MOTION FOR AN AWARD OF ATTORNEYS' FEES AND <u>REIMBURSEMENT OF LITIGATION EXPENSES</u>

# TABLE OF CONTENTS

I.      PRELIMINARY STATEMENT ........................................................................1

II.     THE STANDARDS GOVERNING THE AWARD OF ATTORNEYS' FEES IN
        COMMON FUND CASES..............................................................................5

        A.      Lead Counsel Is Entitled to a Reasonable Fee from the Common Fund
                Created by the Settlement ..................................................................5

        B.      The Court Should Award Attorneys' Fees Using the Percentage of the
                Recovery Method.................................................................................6

        C.      The Requested Fee Has Been Approved By Lead Plaintiff and Is
                Presumptively Reasonable ...................................................................7

III.    ANALYSIS OF THE RELEVANT FOURTH CIRCUIT FACTORS SUPPORTS
        THE FEE REQUEST......................................................................................8

        A.      The Results Obtained for the Settlement Class....................................9

        B.      The Absence of Objections by Settlement Class Members to Date ...................10

        C.      The Quality, Skill, and Efficiency of the Attorneys Involved ..............................11

        D.      The Complexity and Duration of the Litigation ..................................12

        E.      The Risk of Nonpayment ...................................................................15

        F.      Public Policy Considerations .............................................................17

        G.      Awards in Similar Cases....................................................................18

        H.      A Lodestar Cross-Check Also Supports the Fee Request.....................19

IV.     LEAD COUNSEL'S REQUEST FOR LITIGATION EXPENSES IS
        REASONABLE .............................................................................................22

V.      LEAD PLAINTIFF'S REQUEST FOR REIMBURSEMENT IS APPROPRIATE
        UNDER THE PSLRA....................................................................................24

VI.     CONCLUSION..............................................................................................25

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Backman v. Polaroid Corp.*,
    910 F.2d 10 (1st Cir. 1990) ............................................................................... 15

*Barber v. Kimbrell's Inc.*,
    577 F.2d 216 (4th Cir. 1978) ...................................................................... passim

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988) ......................................................................................... 17

*Bateman Eichler, Hill Richards, Inc. v. Berner*,
    472 U.S. 299 (1985) ......................................................................................... 17

*Bentley v. Legent Corp.*,
    849 F. Supp. 429 (E.D. Va. 1994) ................................................................... 15

*Blum v. Stenson*,
    465 U.S. 886 (1984) ........................................................................................... 7

*Boeing Co. v. Van Gemert*,
    444 U.S. 472 (1980) ........................................................................................... 5

*City of Providence v. Aeropostale, Inc.*,
    2014 WL 1883494 (S.D.N.Y. May 9, 2014) ............................................... 5, 14

*Decohen v. Abbasi*, LLC,
    299 F.R.D. 469 (D. Md. 2014) .................................................................... 9, 23

*Dura Pharm., Inc. v. Broudo*,
    544 U.S. 336 (2005) ......................................................................................... 14

*Epstein v. World Acceptance Corp.*,
    No. 6:14-cv-01606-MGL, slip op. (D.S.C. Dec. 18, 2017) .............................. 19

*EVCI Career Colls. Holding Corp. Sec. Litig.*,
    2007 WL 2230177 (S.D.N.Y. July 27, 2007) ................................................... 8

*In re Force Protection, Inc. Sec. Litig.*,
    No. 08-cv-845-CWH, slip op. (D.S.C. Mar. 9, 2011) ...................................... 19

*Hensley v. Eckerhart*,
    461 U.S. 424 (1983) ........................................................................................... 9

*HHH Choices Health Plan, LLC*,
   Case Nos. 15-11158 (MEW), 15-13264, & 16-10028
   (Bankr. S.D.N.Y. Oct. 6, 2017) .................................................................................. 21

*Hicks v. Morgan Stanley*,
   2005 WL 2757792 (S.D.N.Y. Oct. 24, 2005) ............................................................. 6

*Horton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
   855 F. Supp. 825 (E.D.N.C. 1994) ..................................................................... 10, 11

*Hubbard v. BankAtlantic Bancorp, Inc.*,
   688 F.3d 713 (11th Cir. 2012) ................................................................................. 14

*In re Amgen Inc. Sec. Litig.*,
   2016 WL 10571773 (C.D. Cal. Oct. 25, 2016) ......................................................... 15

*In re Bear Stearns Cos. Sec., Derivative, & ERISA Litig.*,
   909 F. Supp. 2d 259 (S.D.N.Y. 2012) ...................................................................... 22

*In re Comput. Scis. Corp. Sec. Litig.*,
   (E.D. Va. Sept. 20, 2013) ......................................................................................... 25

*In re ECI Telecom Ltd. Sec. Litig.*,
   No. 01-913-A, (E.D. Va. Nov. 18, 2002) .................................................................. 19

*In re Genworth Fin. Sec. Litig.*,
   210 F. Supp. 3d 837 (E.D. Va. 2016) ................................................................ passim

*In re Initial Pub. Offering Sec. Litig.*,
   671 F. Supp. 2d 467 (S.D.N.Y. 2009) ...................................................................... 22

*In re JDS Uniphase Corp. Sec. Litig.*,
   (N.D. Cal. Nov. 27, 2007) ........................................................................................ 15

*In re Marsh & McLennan, Inc. Sec. Litig.*,
   2009 WL 5178546 (S.D.N.Y. Dec. 23, 2009) .......................................................... 22

*In re Marsh ERISA Litig.*,
   265 F.R.D. 128 (S.D.N.Y. 2010) ............................................................................. 12

*In re Microstrategy, Inc. Sec. Litig.*,
   172 F. Supp. 2d 778 (E.D. Va. 2001) .......................................................... 6, 18, 23

*In re Neustar, Inc. Sec. Litig.*,
   2015 WL 8484438 (E.D. Va. Dec. 8, 2015) ........................................................ passim

*In re Par Pharm. Sec. Litig.*,
   2013 WL 3930091 (D.N.J. July 29, 2013) ................................................................ 13

*In re PSINet Inc. Sec. Litig.*,
  No. 00-, (E.D. Va. July 2, 2003) ........................................................... 19

*In re Red Hat Inc. Sec. Litig.*,
  No. 5:04-CV-473-BR(3), slip op. (E.D.N.C. Dec. 10, 2010) ................................. 19

*In re Royal Ahold, N.V. Sec. & ERISA Litig.*,
  461 F. Supp. 2d 383 (D. Md. 2006) ..................................................... 9, 21

*In re The Mills Corp. Sec. Litig.*,
  265 F.R.D. 246 (E.D. Va. 2009) .................................................... *passim*

*In re Wachovia Corp. ERISA Litig.*,
  2011 WL 7787962 (W.D.N.C. Oct. 24, 2011) .............................................. 9

*Int'l Bhd. of Elec. Workers Local 697 Pension Fund v. Int'l Game Tech., Inc.*,
  2012 WL 5199742 (D. Nev. Oct. 19, 2012) ............................................. 10

*Jones v. Dominion Res. Servs., Inc.*,
  601 F. Supp. 2d 756 (S.D. W. Va. 2009) .............................................. 18

*Klugmann v. Am. Capital Ltd.*,
  No. 09-CV-00005-PJM, slip op. (D. Md. June 12, 2012) ................................. 19

*Kruger v. Novant Health, Inc.*,
  2016 WL 6769066 (M.D.N.C. Sept. 29, 2016) ......................................... 4, 5

*Lane v. Page*,
  862 F. Supp. 2d 1182 (D. N.M. 2012) ................................................ 17

*Loudermilk Servs., Inc. v. Marathon Petroleum Co.*,
  623 F. Supp. 2d 713 (S.D. W. Va. 2009) ............................................... 9

*Missouri. v. Jenkins*,
  491 U.S. 274, 284 (1989) ............................................................ 22

*McKnight v. Circuit City Stores, Inc.*,
  14 F. App'x 147 (4th Cir. 2001) ...................................................... 9

*Nallagonda v. Osiris Therapeutics, Inc. et al.*, No. 1:15-cv-03562-PX, slip op. (D. Md. Feb. 4,
  2019)……………………………………………………………………………………………………..18

*Nieman v. Duke Energy Corp.*,
  2015 WL 13609363 (W.D.N.C. Nov. 2, 2015) ......................................... 6, 7

*Phillips v. Triad Guar. Inc.*,
  2016 WL 2636289 (M.D.N.C. May 9, 2016) ........................................ 6, 7, 12

*Shapiro v. JPMorgan Chase & Co.*,
    2014 WL 122466 (S.D.N.Y. Mar. 24, 2014) ................................................ 4

*Singer v. Reali*,
    883 F. 3d 425 (4th Cir. 2018) ..................................................................... 13

*Singleton v. Domino's Pizza, LLC*,
    976 F. Supp. 2d 665 (D. Md. 2013) ...................................................... 12, 23

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ................................................................................ 6, 17

*Willix v. Healthfirst, Inc.*,
    2011 WL 754862 (E.D.N.Y. Feb. 18, 2011) .............................................. 20

**Statutes**

15 U.S.C. §78u-4(a)(4) ....................................................................................... 24

15 U.S.C. § 78u-4(a)(6) ........................................................................................ 7

**Rules**

Fed. R. Civ. P. 23(h) ............................................................................................. 1

**Other Authorities**

1995 U.S.C.C.A.N. 730 ................................................................................... 8, 24

H.R. Rep. No. 104-369 ...................................................................................... 24

H.R. Rep. No. 104-369 ........................................................................................ 8

Pursuant to Federal Rule of Civil Procedure ("Rule") 23(h), Court-appointed Lead Counsel Kaplan Fox & Kilsheimer LLP ("Kaplan Fox" or "Lead Counsel") respectfully submits this memorandum of law in support of its motion for: (i) an award of attorneys' fees in the amount of 25% of the Settlement Fund (i.e., $4,875,000); (ii) reimbursement from the Settlement Fund of $285,805.92 for Litigation Expenses that were reasonably and necessarily incurred by Plaintiff's Counsel[1] and Liaison Counsel in prosecuting and resolving the Action; and (iii) an award of $1,848.96 to Court-appointed Lead Plaintiff, Arkansas Teacher Retirement System ("ATRS" or "Lead Plaintiff"), for its costs and expenses directly related to representing the Settlement Class, as authorized by the Private Securities Litigation Reform Act of 1995 ("PSLRA").[2]

## I.    PRELIMINARY STATEMENT

After more than two years of dedicated litigation efforts, Plaintiff's Counsel have successfully negotiated a settlement of this securities class action with defendants Babcock & Wilcox Enterprises, Inc. ("B&W" or the "Company"), E. James Ferland, and Jenny L. Apker (collectively, "Defendants"). The proposed Settlement, if approved by the Court, will resolve this case in its entirety in exchange for $19.5 million in cash. Based on Plaintiff's Counsel's and Lead Plaintiff's thorough understanding of the risks and uncertainties in this litigation, the assessment of approximate class wide damages, and the ability of Defendants to withstand a greater judgment

---

[1]    The term "Plaintiff's Counsel" refers to: (i) Lead Counsel and (ii) additional counsel Kessler Topaz Meltzer & Check, LLP and Labaton Sucharow LLP.

[2]    All capitalized terms used herein have the meanings ascribed to them either in the Stipulation and Agreement of Settlement dated June 21, 2019 (ECF No. 77-1) ("Stipulation") or in the Declaration of Frederic S. Fox in Support of (1) Lead Plaintiff's Motion for Approval of Settlement and Plan of Allocation; (2) Lead Counsel's Motion for Award of Attorneys' Fees and Reimbursement of Expenses; and (3) Lead Plaintiff's Request for Reimbursement of Reasonable Costs and Expenses ("Fox Declaration" or "Fox Decl."), filed herewith. Citations to "¶ __" herein refer to paragraphs in the Fox Declaration and citations to "Ex. __" herein refer to exhibits to the Fox Declaration. Unless otherwise noted, all internal citations and quotations have been omitted and emphasis has been added.

at some point in the future, this recovery is an outstanding result for the Settlement Class. Indeed, the Settlement is greater than the "near-record" median securities class-action settlement amount for 2018 (i.e., $13 million)[3] and represents a material portion of the Settlement Class's *maximum* damages as estimated by Lead Plaintiff's damages consultant—i.e., approximately 4.8% of maximum damages ($404 million), approximately 6.9% of maximum disaggregated damages ($284 million), and an even larger percentage of potential damages when taking into consideration certain hurdles to establishing damages and loss causation at summary judgement and/or trial.[4]

The benefits of the Settlement are clear when weighed against the risk that the Settlement Class might recover less than the Settlement Amount (or nothing) if the Action were litigated through further discovery, class certification, summary judgment, trial, and post-trial appeals. In addition, given the significant doubt concerning B&W's ability to continue as a going concern in mid- to late-2018—following multiple quarters of losses in excess of $100 million, a stock price well under $1.00 over an extended period of time, and the de-listing of its stock by the New York Stock Exchange ("NYSE")—Plaintiff's Counsel were concerned about B&W's ability to fund a settlement or future judgment in an amount greater than the Settlement Amount. The Settlement eliminates this risk as well as the additional litigation risks Lead Plaintiff would face in proving the Settlement Class's claims if the Action continued.

As fully set forth in the Fox Declaration, the litigation risks in this complex case were substantial, both from a liability and damages perspective. Plaintiff's Counsel assumed all of those

---

[3]   *See* Stefan Boettrich & Svetlana Starykh, *Recent Trends in Securities Class Action Litigation: 2018 Full-Year Review*, NERA Economic Consulting (Jan. 29, 2019), https://www.nera.com/content/dam/nera/publications/2019/PUB_Year_End_Trends_012819_Fin al.pdf ("NERA"), Ex. 4 at 30.

[4]   *See* NERA, Ex. 4 at 35 (finding median settlement between 1996 and 2018 in securities cases with investor losses between $200 million and $399 million recovered 2.6% of investor losses and between $400 million and $599 million recovered 1.8% of investor losses).

risks in litigating the Action by taking this case on a fully contingent basis and devoted substantial resources to prosecuting the Action against highly-skilled opposing counsel in order to achieve the Settlement. Among other work detailed in the Fox Declaration, Plaintiff's Counsel: (i) conducted an extensive investigation into the Settlement Class's claims, including reviewing the voluminous public record and interviewing approximately 64 former B&W employees with personal knowledge of the matters alleged (from a pool of more than 200 potential witnesses identified by Plaintiff's Counsel); (ii) drafted two detailed complaints; (iii) successfully opposed Defendants' motion to dismiss; (iv) engaged in extensive discovery, which included negotiations with Defendants regarding the scope of discovery, the review and analysis of over 280,000 pages of documents produced by Defendants and B&W's auditor during the Class Period, the review and production of discovery on behalf of Lead Plaintiff, and preparations for depositions; and (v) consulted with experts in the areas of loss causation and damages as well as engineering and power plant project management.[5]

Lead Counsel also engaged in protracted and hard-fought settlement negotiations with Defendants and their insurance carriers, including two formal mediation sessions overseen by an experienced and highly respected mediator, retired United States District Judge Layn R. Phillips ("Judge Phillips"). ¶¶55-59. The Parties' settlement negotiations proceeded over a period of seven months in parallel with the Parties' extensive discovery efforts. The Parties reached an agreement in principle to resolve the Action at the second mediation in April 2019.

---

[5]     The Fox Declaration is an integral part of this submission and, for the sake of brevity in this memorandum of law, the Court is respectfully referred to it for a detailed description of, among other things: the nature of the claims asserted (¶¶14-17); the procedural history of the Action and the work performed by Plaintiff's Counsel (¶¶18-28, 30, 34-53); the Settlement negotiations (¶¶55-59); and the risks of continued litigation (¶¶54, 74-84, 113-116).

Through October 31, 2019, Plaintiff's Counsel and Liaison Counsel have devoted approximately 11,390 hours collectively, with a resulting lodestar of $6,080,858.60, to the investigation, prosecution, and resolution of the Action. ¶102. Here, unlike in most cases where counsel seek a fee which exceeds their lodestar,[6] Lead Counsel's fee request is *less than* the total lodestar value of the time that Plaintiff's Counsel and Liaison Counsel dedicated to the Action.[7] It is against this backdrop that Lead Counsel respectfully submits its request for a fee award of 25% of the Settlement Fund. Lead Plaintiff ATRS—a sophisticated institutional investor that actively supervised the Action—has endorsed this fee request.[8]

Pursuant to the Court's Preliminary Approval Order, more than 38,300 Notices have been disseminated to potential Settlement Class Members and nominees, and the Summary Notice was published in the national edition of *Investor's Business Daily* and transmitted over *PR Newswire*.[9] The Notice advises recipients that Lead Counsel would be applying to the Court for an award of attorneys' fees in an amount not to exceed 25% of the Settlement Fund, and would seek reimbursement of Litigation Expenses paid or incurred by Plaintiff's Counsel and Liaison Counsel in an amount not to exceed $400,000. Ex. 3-A at ¶5. The fees and expenses that Lead Counsel now requests do not exceed these amounts. The Notice further informs Settlement Class Members that

---

[6]    *See, e.g., In re Genworth Fin. Sec. Litig.*, 210 F. Supp. 3d 837, 845 (E.D. Va. 2016) ("[A] positive multiplier is typically applied to the lodestar in recognition of the risk of litigation, the complexity of the issues, the contingent nature of the engagements, the skill of the attorneys, and other factors." (quoting *Shapiro v. JPMorgan Chase & Co.*, 2014 WL 122466, at *24 (S.D.N.Y. Mar. 24, 2014) (alteration in original)).

[7]    *See also Kruger v. Novant Health, Inc.*, 2016 WL 6769066, at *6 (M.D.N.C. Sept. 29, 2016) ("[c]ourts have generally held that lodestar multipliers falling between 2 and 4.5 demonstrate a reasonable attorney's fee") (alteration in original).

[8]    *See* Declaration of Rod Graves in Support of Motion for Final Approval of Class Action Settlement and Motion for an Award of Attorneys' Fees and Expenses and Award to Lead Plaintiff ("Graves Declaration"), Exhibit 2 ¶6; *see also infra* Section V.

[9]    *See* Declaration of Luiggy Segura on behalf of the Court-appointed Claims Administrator JND Legal Administration ("JND"), Exhibit 3 ¶¶11-12.

4

they can object to the requests for attorneys' fees and expenses until November 25, 2019.  *Id.* While the deadline to object has not yet passed, to date, no objections to the amount of attorneys' fees and expenses set forth in the Notice have been received. ¶121.[10]

For the reasons discussed herein, Lead Counsel respectfully submits that the requested fee is fair and reasonable under the applicable legal standards. In addition, Lead Counsel also respectfully submits that the Litigation Expenses for which it seeks reimbursement were reasonable and necessary for the successful prosecution of the Action, and that the request for reimbursement to Lead Plaintiff pursuant to the PSLRA for the time it dedicated to the Action on behalf of the Settlement Class is likewise reasonable and appropriate. Accordingly, Lead Counsel respectfully submits that its motion for attorneys' fees and expenses should be granted in full.

## II.    THE STANDARDS GOVERNING THE AWARD OF ATTORNEYS' FEES IN COMMON FUND CASES

### A.    Lead Counsel Is Entitled to a Reasonable Fee from the Common Fund Created by the Settlement

The propriety of awarding attorneys' fees from a common fund is well established. *See Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980) ("a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole").  Further, courts recognize that awards of fair attorneys' fees from a common fund "serve to encourage skilled counsel to represent those who seek redress for damages inflicted on entire classes of persons," and therefore "to discourage future misconduct of a similar nature." *City of Providence v. Aeropostale, Inc.*, 2014 WL 1883494, at *11 (S.D.N.Y. May 9, 2014), *aff'd sub nom.*, *Arbuthnot v. Pierson*, 607 F. App'x 73 (2d Cir. 2015). As the Supreme Court has emphasized, private securities actions are "an essential supplement to criminal

---

[10]    If any objections are received following this submission, Lead Counsel will address them in its reply brief to be filed with the Court on December 9, 2019.

prosecutions and civil enforcement actions" by the DOJ and SEC. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007). Given the importance of such suits—particularly where, like here, the private securities class action is the sole proceeding seeking redress for the alleged fraud, "the process of setting a proper fee in a PSLRA case must include an incentive component to ensure that competent, experienced counsel will be encouraged to undertake the often risky and arduous task of representing a class in a securities fraud case." *In re Microstrategy, Inc. Sec. Litig.*, 172 F. Supp. 2d 778, 788 (E.D. Va. 2001); *see also Hicks v. Morgan Stanley*, 2005 WL 2757792, at *9 (S.D.N.Y. Oct. 24, 2005) ("[s]uch actions could not be sustained if plaintiffs' counsel were not to receive remuneration from the settlement fund for their efforts on behalf of the class").

### B. The Court Should Award Attorneys' Fees Using the Percentage of the Recovery Method

An award of attorneys' fees and the method used to determine that award are "within the Court's discretion." *Genworth*, 210 F. Supp. 3d at 843; *see also In re Neustar, Inc. Sec. Litig.*, 2015 WL 8484438, at *6 (E.D. Va. Dec. 8, 2015) ("Courts evaluating PSLRA fees typically employ the percentage-of-recovery method or the lodestar method of calculation."). While the Fourth Circuit has not mandated one particular method for courts to evaluate requests for attorneys' fees in common fund cases, the percentage of the recovery method is the preferred approach in calculating an award of attorneys' fees in this Circuit. *See, e.g.*, *Phillips v. Triad Guar. Inc.*, 2016 WL 2636289, at *2 (M.D.N.C. May 9, 2016) (noting that courts "overwhelmingly" prefer percentage method to calculate attorneys' fees); *Nieman v. Duke Energy Corp.*, 2015 WL 13609363, at *1 (W.D.N.C. Nov. 2, 2015) (Cogburn, J.) (applying "percentage-of-recovery" in awarding counsel attorneys' fees); *In re The Mills Corp. Sec. Litig.*, 265 F.R.D. 246, 260-61, 266 (E.D. Va. 2009) (granting fee application on a percentage basis).

6

The use of the percentage of recovery method also comports with the language of the PSLRA, which states that "[t]otal attorneys' fees and expenses awarded by the court to counsel for the plaintiff shall not exceed a ***reasonable percentage*** of the amount of any damages and prejudgment interest actually paid to the class. . . ." 15 U.S.C. § 78u-4(a)(6). Furthermore, the Supreme Court has consistently held that the percentage-of-recovery approach is an appropriate methodology for awarding plaintiffs' counsel's fees in a common fund case. *See, e.g., Blum v. Stenson*, 465 U.S. 886, 900 n.16 (1984).

An alternative method for judicial review of a fee request in a common fund case is the lodestar-multiplier method, which reviews the value of time spent by counsel, multiplied by a risk multiplier. While some courts use the lodestar as the primary method for determining an award of fees, courts more often use the lodestar as a "cross-check" for the reasonableness of a fee awarded pursuant to the percentage of the recovery method. *Neustar*, 2015 WL 8484438, *7 (characterizing the use of the lodestar as a cross-check for the percentage method as "the common practice within this Circuit"); *Phillips*, 2016 WL 2636289, at *2 (finding "the percentage of the fund method, supplemented with the lodestar cross-check, [to be] the appropriate means by which to determine an award of attorneys' fees"); *Duke Energy*, 2015 WL 13609363, at *1 (noting lodestar multiplier as "merely a crosscheck"). While Lead Counsel here seeks an award on a percentage of the recovery basis, the 25% fee request is reasonable under any method of review available to the Court. *See infra* Section II(H) for application of lodestar cross-check.

### C. The Requested Fee Has Been Approved By Lead Plaintiff and Is Presumptively Reasonable

The 25% fee requested here has been approved by the Court-appointed Lead Plaintiff. Ex. 2 ¶6. Lead Plaintiff—a sophisticated institutional investor—is the type of fiduciary that Congress

envisioned when it enacted the PSLRA.[11] Courts in the Fourth Circuit and elsewhere have held that in "a PSLRA case in which a fee request has been approved and endorsed by properly-appointed lead plaintiffs," the request "enjoys a presumption of reasonableness." *Mills*, 265 F.R.D. at 261; *see also EVCI Career Colls. Holding Corp. Sec. Litig.*, 2007 WL 2230177, at *16 (S.D.N.Y. July 27, 2007) (noting that "public policy considerations supported the [fee] award" in a case in which a large public pension fund, serving as lead plaintiff, "conscientiously supervised the work of lead counsel, and had given its endorsement to the fee request").

Here, Lead Plaintiff ATRS is an institutional investor that manages billions of dollars in assets for the benefit of thousands of current and former employees of the Arkansas education community. Ex. 2 ¶1. As detailed below and in the Graves Declaration (Ex. 2), ATRS actively supervised the prosecution of the Action from its commencement through settlement, including traveling to and attending the formal mediations in December 2018 and April 2019. Ex. 2 ¶¶3-4. Based on its involvement in the Action as well as its prior experience serving as court-appointed lead plaintiff in other securities class actions, ATRS has evaluated Lead Counsel's present fee request and believes that it is fair and reasonable and warrants approval by the Court. Ex. 2 ¶6.

## III. ANALYSIS OF THE RELEVANT FOURTH CIRCUIT FACTORS SUPPORTS THE FEE REQUEST

In determining the proper percentage of recovery to award as attorneys' fees, many district courts in the Fourth Circuit consider seven primary factors: "(1) the results obtained for the Class; (2) objections by members of the Class to the settlement terms and/or fees requested by counsel;

---

[11] Congress enacted the PSLRA in large part to encourage investors with a significant financial stake in the outcome of a securities class action to assume control of the litigation and "increase the likelihood that parties with significant holdings in issuers, whose interests are more strongly aligned with the class of shareholders, will participate in the litigation and exercise control over the selection and actions of plaintiff's counsel." *See* H.R. Rep. No. 104-369, at 32 (1995), *as reprinted in* 1995 U.S.C.C.A.N. 730, 731.

(3) the quality, skill, and efficiency of the attorneys involved; (4) the complexity and duration of the litigation; (5) the risk of nonpayment; (6) public policy; and (7) awards in similar cases." *Mills*, 265 F.R.D. at 261; *see also Neustar*, 2015 WL 8484438, at *7 (same); *Decohen v. Abbasi,* LLC, 299 F.R.D. 469, 481 (D. Md. 2014) (same); *In re Wachovia Corp. ERISA Litig.*, 2011 WL 7787962, at *3 (W.D.N.C. Oct. 24, 2011) (same).[12] Each of the foregoing factors is discussed below.

### A. The Results Obtained for the Settlement Class

The result achieved is recognized as the most important factor in considering an attorneys' fee request. *Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983) ("the most critical factor is the degree of success obtained"); *McKnight v. Circuit City Stores, Inc.*, 14 F. App'x 147, 149 (4th Cir. 2001) (same); *Loudermilk Servs., Inc. v. Marathon Petroleum Co.*, 623 F. Supp. 2d 713, 718 (S.D. W. Va. 2009) ("The result achieved should . . . be the most prominent factor considered in the analysis."); *Barber*, 577 F.2d at 226 n.28 (eighth *Barber* factor). Here, the $19.5 million Settlement is an excellent result for investors, providing a guaranteed all-cash recovery while avoiding the

---

[12]     These seven factors overlap substantially with those used by some courts within the Fourth Circuit when applying the lodestar method and analyzing the reasonableness of a multiplier. *See Genworth*, 210 F. Supp. 3d at 843. These lodestar factors (often referred to as the *Barber* factors) include: "(1) time and labor expended; (2) novelty and difficulty of the questions raised; (3) skill required to properly perform the legal services; (4) attorney's opportunity costs in pressing the litigation; (5) customary fee for like work; (6) attorney's expectations at the outset of litigation; (7) time limitations imposed by the client or circumstances; (8) amount in controversy and results obtained; (9) experience, reputation, and ability of the attorney; (10) undesirability of the case within the legal community in which the suit arose; (11) nature and length of the professional relationship between the attorney and client; and (12) fee awards in similar cases." *See Mills*, 265 F.R.D. at 261 n.6 (citing *Barber v. Kimbrell's Inc.*, 577 F.2d 216, 226 (4th Cir. 1978)). Other courts rely on the twelve *Barber* factors in determining a reasonable fee under either method. *See In re Royal Ahold, N.V. Sec. & ERISA Litig*. 461 F. Supp. 2d 383, 385 (D. Md. 2006) (noting that "under both methods there are numerous factors that may be considered in determining a reasonable fee" and listing the twelve *Barber* factors).

significant risk that further litigation would result in a smaller recovery for the Settlement Class, or no recovery at all.

Notably, this recovery is almost double the 2018 median securities class-action settlement of $11.3 million, and is larger than more than 47% of securities class-action settlements reached in 2018.[13] In addition, the Settlement represents a material portion of the Settlement Class's maximum damages as estimated by Lead Plaintiff's damages consultant—i.e., approximately 4.8% of maximum damages ($404 million) and 6.9% of maximum disaggregated damages ($284 million). ¶72.[14] Moreover, these damages estimates assume that Lead Plaintiff would be able to prove damages based on *all* alleged corrective disclosures and do not consider the real possibility that Defendants could succeed in having one or more of the alleged corrective disclosures dismissed at summary judgment or trial. It is also important to note that this favorable result was achieved despite B&W's deteriorating financial condition during the Action. ¶54; *see infra* II(E). Accordingly, the result obtained strongly supports approval of the fee request here.

### B. The Absence of Objections by Settlement Class Members to Date

Pursuant to the Court's Preliminary Approval Order, more than 38,300 copies of the Notice have been mailed to potential Settlement Class Members and nominees, and the Summary Notice

---

[13] *See* Laarni T. Bulan, Ellen M. Ryan & Laura E. Simmons, *Securities Class Action Settlements: 2018 Review and Analysis*, Cornerstone Research (2019) ("Cornerstone Research"), Ex. 1 at 3-4.

[14] *See supra* n.4; *see also* Cornerstone Research, at 6 (finding median securities class action settlement amount to be 4.2% of estimated damages for cases with estimated damages between $250 million and $499 million); *Int'l Bhd. of Elec. Workers Local 697 Pension Fund v. Int'l Game Tech., Inc.*, 2012 WL 5199742, at *3-4 (D. Nev. Oct. 19, 2012) (approving settlement recovering about 3.5% of the maximum damages that plaintiffs believed could be recovered at trial and noting that the amount was "within the median recovery in securities class actions settled in the last few years"); *Horton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 855 F. Supp. 825, 833 (E.D.N.C. 1994) (approving settlement representing approximately 5% of plaintiffs' maximum losses and noting "mere fact that the proposed settlement may amount to only a fraction of plaintiffs' loss, even if damages allowed recovery of such a loss, is not reason to deny approval").

was published in *Investor's Business Daily* and transmitted over *PR Newswire*. Ex. 3, ¶¶ 5-12. The Notice advises recipients that Lead Counsel would be seeking an award of attorneys' fees in an amount not to exceed 25% of the Settlement Fund, and reimbursement of Litigation Expenses in an amount not to exceed $400,000. Ex. 3-A at ¶5. The Notice further informs potential Settlement Class Members that they can object to the requests for attorneys' fees and expenses until November 25, 2019. *Id*. To date, there have been no objections to the requests for attorneys' fees and expenses, or to the Settlement itself, which further supports approval of the fee and expense request. Should any objections be received after the date of this submission, Lead Counsel will address them in its reply papers to be filed with the Court no later than December 9, 2019.

### C.    The Quality, Skill, and Efficiency of the Attorneys Involved

The quality of the representation of plaintiffs' counsel is an important factor that also supports the reasonableness of a fee request. *See Mills*, 265 F.R.D. at 261 (third factor); *Barber*, 577 F.2d at 226 n.28 (third and ninth factors).

Here, the Settlement—which will provide a substantial benefit to the Settlement Class—required significant skill to obtain and demonstrates the ability of Plaintiff's Counsel. The effort and skill of Plaintiff's Counsel in closely familiarizing themselves with, among other things, the intricacies of B&W's business (which entailed significant investigation and consultation with industry experts), surviving Defendants' motion to dismiss in its entirety, navigating through highly-contested discovery, and presenting a strong case during the Parties' settlement negotiations was essential to achieving a meaningful resolution to the Action. In addition, Plaintiff's Counsel's substantial experience in complex federal civil litigation, particularly the litigation of securities class actions (*see* Ex. 5-A; Ex. 6-A; Ex. 7-A) clearly benefitted the Settlement Class in this Action and aided in the efficient prosecution of the Action. *See Genworth*,

210 F. Supp. 3d at 844 (finding "[t]he skill required in complex [securities class action] cases such as this involving massive discovery efforts and complicated issues of fact and law" favored fee request); *Singleton v. Domino's Pizza, LLC*, 976 F. Supp. 2d 665, 684 (D. Md. 2013) (finding fee request supported by counsel's experience, engagement in discovery, mediation efforts, motion-to-dismiss briefing, and efficiency in reaching a settlement approximately two years after action's commencement).

The quality of opposing counsel is also relevant here. *See Phillips*, 2016 WL 2636289, at *5 (considering lead counsel's skill and sophistication in light of the fact that defendants were represented by "sophisticated" defense attorneys); *Mills*, 265 F.R.D. at 262. Plaintiff's Counsel faced talented adversaries in this Action. *In re Marsh ERISA Litig.*, 265 F.R.D. 128, 148 (S.D.N.Y. 2010) ("The high quality of defense counsel opposing Plaintiffs' efforts further proves the caliber of representation that was necessary to achieve the Settlement."). Throughout the Action, Defendants were zealously represented by the prominent defense firm Alston & Bird LLP. In the face of this skilled opposition, Plaintiff's Counsel were able to develop a case that was sufficiently strong to survive a motion to dismiss and settle on terms favorable to the Settlement Class. Plaintiff's Counsel's hard work strongly supports the requested fee award.

### D. The Complexity and Duration of the Litigation

As this Court is aware, this Action was litigated for more than two years and, given its complexity and challenges, further litigation would have continued to be difficult and, if taken to trial, would have likely spanned additional years. *See Mills*, 265 F.R.D. at 263 (fourth factor); *Barber*, 577 F.2d at 226 n.28 (second and tenth factors). Courts have long recognized that securities class actions are among the most difficult type of litigation. *See Neustar*, 2015 WL 8484438 ("Securities fraud class actions are complex and difficult to prosecute as elements such

as scienter, reliance, and materiality of representation are notoriously difficult to establish.") (alterations omitted); *In re Par Pharm. Sec. Litig.*, 2013 WL 3930091, at \*10 (D.N.J. July 29, 2013) ("Securities fraud class actions are notably complex, lengthy, and expensive cases to litigate."); *Mills*, 265 F.R.D. at 263.

Had the Action not settled, the Parties would have proceeded with discovery, including depositions (some of which were actively being scheduled at the time of settlement), moved for certification of the class, and then proceeded to summary judgment. To survive summary judgment, Lead Plaintiff would need to marshal sufficient evidence to establish the elements of its claims, including, for example, scienter (that Defendants acted intentionally or recklessly misled B&W investors) and loss causation (that false or misleading statements by Defendants caused Lead Plaintiff's alleged loss). *See generally Singer v. Reali*, 883 F. 3d 425, 438 (4th Cir. 2018).

As detailed in the Fox Declaration, Defendants advanced considerable challenges to Lead Plaintiff's claims. With respect to the alleged material misstatements and omissions, Defendants would argue, as they did in their motion to dismiss the Complaint, that: (i) the majority of the statements at issue are forward-looking and protected by the PSLRA's safe-harbor provision as they were accompanied by cautionary language disclosing the risks of B&W's Renewable segment; (ii) Defendants' statements were consistent with what the individual Defendants knew at the time the statements were made; and (iii) certain of the statements at issue constitute either puffery or inactionable statements of opinion. ¶78. Further, with respect to scienter, Defendants vigorously argued that Lead Plaintiff would be unable to establish that any of the alleged misstatements was made with the requisite fraudulent intent. ¶79.

Lead Plaintiff also would have confronted risks to establishing loss causation and damages. On these issues, Lead Plaintiff would have to prove (through expert testimony) that the revelation

of the alleged fraud through the alleged corrective disclosures proximately caused the declines in the price of B&W common stock on each of those days, and that any other information released and absorbed by the market on those days played little or no role in the price declines. ¶80; *see Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 345-46 (2005) (plaintiffs bear the burden of proving "that the defendant's misrepresentations 'caused the loss for which the plaintiff seeks to recover'"). Defendants would contend, with the help of their experts, that the price declines on each of the alleged corrective disclosure dates were caused, in whole or in substantial part, by factors unrelated to the alleged fraud and that Lead Plaintiff would be unable to establish loss causation through stock price increases following any of the alleged misrepresentations. ¶80. Due to the complexities of establishing loss causation and damages, both sides would be required to rely on expert testimony at trial, and this element of Lead Plaintiff's claims would be reduced to "a battle of experts at trial, with no guarantee of the outcome in the eyes of the jury." *Mills*, 265 F.R.D. at 256; *see also Aeropostale*, 2014 WL 1883494, at *9 ("Undoubtedly, the Parties' competing expert testimony on damages would inevitably reduce the trial of these issues to a risky battle of the experts and the jury's verdict with respect to damages would depend on its reaction to the complex testimony of experts, a reaction that is inherently uncertain and unpredictable.").

Even if Lead Plaintiff defeated Defendants' summary judgment motions and was successful against Defendants at trial, Lead Plaintiff's efforts in establishing its claims in all likelihood would not end with a judgment at trial, but would continue through one or more levels of appellate review. *Mills*, 265 F.R.D. at 257 ("even if successful at trial, plaintiffs still face the uncertainty on appeal"). Moreover, in complex litigation such as this, even a victory at the trial stage does not guarantee ultimate success. *See Hubbard v. BankAtlantic Bancorp, Inc.*, 688 F.3d 713 (11th Cir. 2012) (following plaintiff verdict after four-week trial, court granted defendants'

post-trial motion for judgment as a matter of law on loss causation grounds, which judgment was affirmed on appeal).[15] "A trial of a complex, fact-intensive case like this could have taken weeks, and the likely appeals of rulings on summary judgment and at trial could have added years to the litigation." *In re Amgen Inc. Sec. Litig.*, 2016 WL 10571773, at *3 (C.D. Cal. Oct. 25, 2016).

Despite the difficulty of the issues raised and the risks faced (including the risk of nonpayment discussed below), Plaintiff's Counsel have secured an excellent result for the Settlement Class while avoiding the delays of continued litigation. As a result, this factor strongly supports the requested fee award.

### E. The Risk of Nonpayment

Plaintiff's Counsel undertook this Action on a contingent-fee basis and prosecuted the claims with no guarantee of compensation or recovery of any litigation expenses. Courts within the Fourth Circuit have consistently recognized that the risk of receiving little or no recovery is a major factor in considering an award of attorneys' fees. *See, e.g., Mills*, 265 F.R.D. at 263 ("counsel bore a substantial risk of nonpayment . . . [t]he outcome of the case was hardly a foregone conclusion, but nonetheless counsel accepted representation of the plaintiff and the class on a contingent fee basis, fronting the costs of litigation") (alterations in original); *see also Barber*, 577 F.2d at 226 n.28 (fourth and sixth factors).

Unlike defense counsel, who are typically paid substantial hourly rates and reimbursed for their expenses on a regular basis, Plaintiff's Counsel have not been compensated for their time or

---

[15]     *See also e.g.*, *In re JDS Uniphase Corp. Sec. Litig.*, No. 4:02-cv-01486-CW (N.D. Cal. Nov. 27, 2007), ECF No. 1883 (verdict for defendants); *Bentley v. Legent Corp.*, 849 F. Supp. 429 (E.D. Va. 1994), *aff'd sub nom.*, *Herman v. Legent Co.*, 50 F.3d 6 (4th Cir. 1995) (directed verdict after plaintiffs' presentation of its case to the jury); *Backman v. Polaroid Corp.*, 910 F.2d 10 (1st Cir. 1990) (after eleven years of litigation, and following a jury verdict for plaintiffs and an affirmance by a First Circuit panel, plaintiffs' claims were dismissed by an *en banc* decision and plaintiff received nothing).

expenses since this case began in 2017. From the outset, Plaintiff's Counsel understood that they were embarking on a complex, expensive, and lengthy endeavor with no guarantee of ever being compensated for the investment of time and money the case would require. In undertaking that responsibility, Plaintiff's Counsel were obligated to ensure that sufficient attorney and other professional resources were dedicated to the prosecution of the Action and that funds were available to compensate staff and to pay for the costs entailed. Indeed, there have been many class actions in which plaintiffs' counsel took on the risk of pursuing claims on a contingent basis, expended thousands of hours and hundreds of thousands of dollars in expenses, and received nothing for their efforts. *See supra* n.16. Thus, any fee award has always been at risk, and completely contingent on the result achieved and on this Court's discretion in awarding fees.

Here, the risk of nonpayment was heightened due to the uncertainty surrounding B&W's financial condition. ¶54. During the Action, it became clear that B&W was in significant financial distress. In addition to the massive losses B&W disclosed toward the end of the Class Period, including a $144.6 million loss in the final alleged disclosure on August 9, 2017 (B&W's second quarter 2017 financial release), B&W continued to post deep losses thereafter.[16] Further, on November 27, 2018, NYSE notified B&W that it was not in compliance with the NYSE's continued listing standards based on the average closing price of B&W's common stock being less than $1.00 per share over a period of 30 consecutive trading days. Following the NYSE's notification, B&W's common stock continued to trade under $1.00 per share for approximately

---

[16] For instance, in three of the five quarters that followed, B&W lost more than $100 million per quarter, and it posted losses in the tens of millions of dollars for the other two quarters. Specifically, B&W's post-Class Period losses through November 2018 are as follows: (i) $104.7 million loss in the third quarter 2017; (ii) $23.4 million loss in the fourth quarter 2017; (iii) $102.7 million loss in the first quarter 2018; (iv) $137.4 million loss in the second quarter 2018; and (v) $45.1 million loss in the third quarter 2018. ¶54 n.6.

six months. On April 2, 2019, B&W announced that it was at risk of defaulting on the terms of its credit agreements, but on April 5, 2019, B&W announced it had received an infusion of cash from a new lender. In light of these financial red flags, Plaintiff's Counsel carefully considered the uncertainty surrounding B&W's financial condition and its ability to fund a future judgment in an amount greater than the Settlement Amount (or any judgment) when agreeing to resolve the Action. *See generally Genworth*, 210 F. Supp. 3d at 842 ("a large jury verdict could easily render Genworth insolvent and decrease plaintiffs' likelihood of recovery through bankruptcy proceedings"); *Lane v. Page*, 862 F. Supp. 2d 1182, 1249 (D. N.M. 2012) ("[W]ithout the Settlement, there is no guarantee that there will be funds available to satisfy any jury verdict that might be returned in the class' favor."). Accordingly, the risk of nonpayment in this case also supports the requested fee.

## F. Public Policy Considerations

The federal securities laws are remedial in nature and, to effectuate their purpose of protecting investors, courts should encourage private lawsuits such as this one. *See Basic Inc. v. Levinson*, 485 U.S. 224, 230-31 (1988). The Supreme Court has emphasized that private securities actions provide "a most effective weapon in the enforcement of the securities laws and are a necessary supplement to [SEC] action." *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 310 (1985); *see also Tellabs*, 551 U.S. at 318-19 (noting that the Supreme Court has long recognized that meritorious private actions to enforce federal antifraud securities laws are an essential supplement to criminal prosecutions and civil enforcement actions).

Courts in the Fourth Circuit have held that "[t]he public benefits when capable and seasoned counsel undertake private action to enforce the securities laws." *Mills*, 265 F.R.D. at 263

17

(citing *In re MicroStrategy, Inc. Sec. Litig.*, 172 F. Supp. 2d 778, 787-88 (E.D. Va. 2001)). As set forth by the court in *MicroStrategy*:

> [T]he process of setting a proper fee in a PSLRA case must include an incentive component to ensure that competent, experienced counsel will be encouraged to undertake the often risky and arduous task of representing a class in a securities fraud case. The percentage method aids in meeting this objective as it is based on the contingent fee concept and PSLRA cases are essentially contingent fee cases; there is no fee unless there is a recovery and the fee awarded must bear a reasonable relation to the size of the recovery.

172 F. Supp. 2d at 788. If plaintiffs in class actions are to be zealously and effectively represented, courts should award fees that adequately compensate plaintiffs' counsel. *See, e.g., Jones v. Dominion Res. Servs., Inc.*, 601 F. Supp. 2d 756, 765 (S.D. W. Va. 2009) ("public policy generally favors attorneys' fees that will induce attorneys to act and protect individuals who may not be able to act for themselves but also will not create an incentive to bring unmeritorious actions."). Public policy therefore favors the fee requested here.

### G.    Awards in Similar Cases

District courts within the Fourth Circuit have stated that while there is no fee benchmark, "it is worth noting as a starting point that percentage awards are often between 25% and 30% of the fund." *Mills*, 265 F.R.D. at 264. Moreover, "[c]ourt[s] look[] to fee awards in analogous cases to determine the reasonableness of the percentage requested." *Id.* at 263; *see also Barber*, 577 F.2d at 226 n.28 (fifth and twelfth factors).

In looking at such cases, ample precedent exists in this Circuit for granting fees in securities class actions and other similar litigation that are equal to, or greater than, the percentage fee requested here.[17] *See, e.g., Nallagonda v. Osiris Therapeutics, Inc. et al.*, No. 1:15-cv-03562-PX,

---

[17]    All slip opinions are being provided to the Court as part of a compendium of unreported cases. *See* Ex. 9.

slip op. (D. Md. Feb. 4, 2019), ECF No. 110 (awarding 25% of $18.5 million fund); *Epstein v. World Acceptance Corp.*, No. 6:14-cv-01606-MGL, slip op. (D.S.C. Dec. 18, 2017), ECF No. 212 (awarding 30% of $16 million fund); *Klugmann v. Am. Capital Ltd.*, No. 09-CV-00005-PJM, slip op. (D. Md. June 12, 2012), ECF No. 87 (awarding 33 1/3% of $18 million fund); *In re Force Protection, Inc. Sec. Litig.*, No. 08-cv-845-CWH, slip op. (D.S.C. Mar. 9, 2011), ECF No. 218 (awarding fees of 25% from $24 million fund); *In re Red Hat Inc. Sec. Litig.*, No. 5:04-CV-473-BR(3), slip op. (E.D.N.C. Dec. 10, 2010), ECF No. 231 (awarding 30% of $20 million fund); *In re PSINet Inc. Sec. Litig.*, No. 00-1850, (E.D. Va. July 2, 2003) (ECF No. 259) (awarding 30% of $17.833 million fund); *In re ECI Telecom Ltd. Sec. Litig.*, No. 01-913-A, (E.D. Va. Nov. 18, 2002) (ECF No. 115) (awarding 28.5% of $21.75 million fund). Accordingly, Lead Counsel respectfully submits that the attorneys' fee request of 25% of the Settlement Fund is consistent with fee awards granted in similar actions.

### H.    A Lodestar Cross-Check Also Supports the Fee Request

As mentioned above, Plaintiff's Counsel have expended substantial time and effort pursuing the claims on behalf of the Settlement Class. *See generally* Fox Decl. § III. The Settlement follows more than two years of hard-fought litigation that included, *inter alia*:

- conducting a significant legal and factual investigation into the Settlement Class's claims, which included: (i) review and analysis of B&W's public filings with the SEC; research reports by securities and financial analysts; transcripts of investor conference calls; publicly available presentations by B&W; press releases and media reports; and economic analyses of B&W's stock price movements and pricing dates; (ii) interviews of approximately 64 former employees of B&W (out of a list of more than 200 potential witnesses compiled by Plaintiff's Counsel); and (iii) consultation with experts in the areas of engineering and project management, and market efficiency and damages (¶¶22-24);

- drafting the detailed 88-page Consolidated Amended Complaint for Violations of Federal Securities Laws and then, after further information related to Lead Plaintiff's claims was revealed, seeking to amend the prior complaint and drafting

the operative Second Amended Consolidated Complaint for Violations of Federal Securities Laws (¶¶25-28);

- successfully opposing Defendants' motion to dismiss (¶¶29-32);

- conducting significant discovery, including propounding a set of document requests (consisting of 65 separate and comprehensive requests) and a set of interrogatories on Defendants, engaging in meet and confer negotiations regarding the scope of discovery; receiving and analyzing over 280,000 pages of documents produced by Defendants; and subpoenaing B&W's auditor during the Class Period, Deloitte & Touche LLP and reviewing a 145-page index of its work papers related to B&W audits (¶¶34-45);

- responding to Defendants' discovery of Lead Plaintiff, including reviewing potentially responsive documents and producing approximately 570 pages of documents to Defendants (¶¶46-47);

- preparing to take: (i) corporate depositions pursuant to Rule 30(b)(6); and (ii) up to twenty fact depositions, including depositions of the Individual Defendants and numerous other current and former B&W executives and non-parties (¶¶51-53); and

- engaging in protracted settlement negotiations over the course of seven months, including two formal mediations and preparation of detailed mediation memoranda (¶¶55-59).

Further, should the Court approve the Settlement, Plaintiff's Counsel will continue to perform legal work on behalf of the Settlement Class. Plaintiff's Counsel will expend additional resources assisting Settlement Class Members with their Claim Forms and related inquiries and working with the Claims Administrator, JND, to ensure the smooth progression of claims processing and distribution of the Net Settlement Fund. No additional legal fees will be sought for this work. *See Willix v. Healthfirst, Inc.*, 2011 WL 754862, at *7 (E.D.N.Y. Feb. 18, 2011) ("The fact that Class Counsel's fee award will not only compensate them for time and effort already expended, but for time that they will be required to spend administering the settlement going forward also supports their fee request.").

As noted above, district courts within the Fourth Circuit consider the amount of time and labor expended by counsel, *Barber*, 577 F.2d at 226 n.28 (first factor), and apply a lodestar cross-check to a percentage fee request. *See, e.g., Mills*, 265 F.R.D. at 261; *Royal Ahold*, 461 F. Supp. 2d at 385. The lodestar is calculated by "multiplying the number of hours reasonably worked by reasonable hourly rates for such services given the geographical area, the nature of the services provided, and the experience of the lawyer." *Mills*, 265 F.R.D. at 264. The hourly rates for Plaintiff's Counsel and Liaison Counsel range from $500 to $975 for partners, $350 to $750 for associates and counsel, and $100 to $340 for paralegals. *See* Exs. 5-B, 6-B, 7-B, and 8. Lead Counsel respectfully suggests that these hourly rates are reasonable. *See Neustar*, 2015 WL 8484438, at *10 (approving rates for securities litigators in a §10(b) case of $420-700 for associates and $800-975 for partners).[18]

The time devoted to this Action by Plaintiff's Counsel and Liaison Counsel is set forth in the individual firm declarations submitted herewith, and the schedules annexed thereto. *See* Exs. 5-B, 6-B, 7-B, and 8. In total, from the inception of this Action through October 31, 2019, Plaintiff's Counsel and Liaison Counsel have expended approximately 11,390 hours on the investigation, prosecution and resolution of the claims against Defendants for an aggregate lodestar of $6,080,858.60.[19] Accordingly, the 25% fee request represents a negative "multiplier" of

---

[18]    Plaintiff's Counsel's hourly rates are also reasonable when compared to rates of defense firms specializing in complex litigation. Indeed, in a 2017 bankruptcy filing, Defendants' Counsel in this Action, Alston & Bird LLP, reported hourly rates ranging from $305 to $355 per hour for paraprofessionals, $515 to $720 per hour for associates, and $652.50 to $805.50 per hour for partners (reflecting "a 10% discount on the current hourly rates charged by A&B partners working on this matter"). *See In re: HHH Choices Health Plan, LLC*, Case Nos. 15-11158 (MEW), 15-13264, & 16-10028 (Bankr. S.D.N.Y. Oct. 6, 2017), ECF No. 664.

[19]    The Supreme Court and courts in this Circuit have approved the use of current hourly rates to calculate the lodestar figure as a means of compensating for the delay in receiving payment, inflation, and the loss of interest. *See Missouri. v. Jenkins*, 491 U.S. 274, 284 (1989).

approximately 0.80 on the lodestar value of counsels' time. ¶102.

Pursuant to the lodestar method, after an analysis of counsel's lodestar, a positive multiplier may be awarded to account for the contingency-fee risk incurred by counsel and other relevant factors. *See Genworth*, 210 F. Supp. 3d at 845 (finding 1.97 multiplier "eminently reasonable"). District Courts in the Fourth Circuit Court routinely approve fee awards with 2-3 times lodestar multipliers. *Id*. Here, the resulting *negative* multiplier is below the parameters approved throughout district courts in this Circuit and is additional evidence that the requested fee is reasonable. *See, e.g., In re Bear Stearns Cos. Sec., Derivative, & ERISA Litig.*, 909 F. Supp. 2d 259, 271 (S.D.N.Y. 2012) (approving fee with negative multiplier and noting that the negative multiplier was a "strong indication of the reasonableness of the [requested] fee"); *In re Marsh & McLennan, Inc. Sec. Litig.*, 2009 WL 5178546, at *20 (S.D.N.Y. Dec. 23, 2009) (reasoning that where the multiplier is negative, the lodestar cross-check "unquestionably supports the requested percentage fee award"); *In re Initial Pub. Offering Sec. Litig.*, 671 F. Supp. 2d 467, 515 (S.D.N.Y. 2009) (finding "no real danger of overcompensation" given that requested fee represented discount to counsel's lodestar).

In sum, it is respectfully submitted that the time and effort devoted to this case by Plaintiff's Counsel and Liaison Counsel to obtain the $19.5 million Settlement confirm that the 25% fee request is reasonable.

## IV. LEAD COUNSEL'S REQUEST FOR LITIGATION EXPENSES IS REASONABLE

In addition to a reasonable attorneys' fee, Lead Counsel respectfully seeks reimbursement in the amount of $285,805.92 for litigation expenses reasonably incurred by Plaintiff's Counsel and Liaison Counsel in connection with prosecuting the claims against Defendants. ¶¶122-132. This amount is less than the maximum amount or $400,000 reported in the Notice. Ex. 3-A at ¶5. These expenses are set forth in the individual firm declarations submitted herewith and are of the type generally approved by courts. *See* Exs. 5-8.

"There is no doubt that costs, if reasonable in nature and amount, may appropriately be reimbursed from the common fund." *MicroStrategy*, 172 F. Supp. 2d at 791; *see also Singleton*, 976 F. Supp. 2d at 689 ("It is well-established that plaintiffs who are entitled to recover attorneys' fees are also entitled to recover reasonable litigation-related expenses as part of their overall award."). "Such costs include reasonable out-of-pocket expenses that are normally charged by an attorney to a fee-paying client for the provision of legal services." *Decohen*, 299 F.R.D. at 469, 483; *see also Singleton*, 976 F. Supp. 2d at 689 (approving payment of travel costs, deposition and transcript costs, computer research, postage, court costs, and photocopying). The declarations submitted by Plaintiff's Counsel and Liaison Counsel itemize the various categories of expenses incurred by each firm (*see* Exs. 5-C, 6-C, 7-C & 8 at ¶6) and confirm that these expenses were reasonable and necessary to prosecute the claims and achieve the Settlement. Expenses totaling $112,500.00 were paid by the Litigation Fund maintained by Kaplan Fox and created to fund the primary litigation expenditures in this case. *See* Ex. 5-D.

The largest component of counsels' expenses was the cost of Lead Plaintiff's experts and consultants in the amount of $99,784.19, or approximately 35% of total expenses. ¶124. As detailed in the Fox Declaration, Plaintiff's Counsel utilized experts/consultants at each stage of the Action—e.g., to assist in: (i) drafting the allegations against Defendants; (ii) evaluating documents and evidence in support of the claims; (iii) preparing discovery requests; (iv) preparing for settlement negotiations and assisting with mediation; and (v) developing the Plan of Allocation— and these experts/consultants were absolutely critical to the prosecution and resolution of the Action. ¶126. Document production and data hosting was also one of the largest expenses (i.e., $57,752.59, or approximately 20% of total expenses). ¶124. This amount includes charges for an outside vendor to host the document database utilized to review and analyze the documents

produced in this Action, as well as a vendor used in connection with Lead Plaintiff's document collection and production. ¶127. Counsel also incurred costs for the formal mediation with Judge Phillips ($54,822.50, *see* ¶¶124, 128) and the cost of online research required to prosecute this Action ($51,558.66, *see* ¶¶124, 129). The other expenses for which Lead Counsel seeks payment include, among others, travel and work-related meals, printing and photocopying, filing and process service fees, long-distance telephone and facsimile expenses, and postage. ¶124. All of the foregoing costs and expenses were necessarily incurred for the effective prosecution of the matter and thus, reimbursement of these expenses is reasonable and appropriate. To date, there have been no objections to the request for expenses. ¶132.

## V.  LEAD PLAINTIFF'S REQUEST FOR REIMBURSEMENT IS APPROPRIATE UNDER THE PSLRA

The PSLRA limits a class representative's recovery to an amount "equal, on a per share basis, to the portion of the final judgment or settlement awarded to all other members of the class," but also provides that "[n]othing in this paragraph shall be construed to limit the award of reasonable costs and expenses (including lost wages) directly relating to the representation of the class to any representative party serving on behalf of a class." 15 U.S.C. §78u-4(a)(4). Congress specifically acknowledged the importance of awarding appropriate reimbursement to class representatives. *See* H.R. Rep. No. 104-369, at 36 *as reprinted in* 1995 U.S.C.C.A.N. 730, 734 ("The Conference Committee recognizes that lead plaintiffs should be reimbursed for reasonable costs and expenses associated with service as lead plaintiff, including lost wages, and grants the court discretion to award fees."). As detailed in the Graves Declaration, Lead Plaintiff is seeking $1,848.96 in reimbursement for costs and expenses directly related to its representation of the Settlement Class in the Action. Ex. 2, ¶¶7-10.

Numerous cases have approved reasonable payments to compensate class representatives for the time and effort devoted by them. *See, e.g., Mills*, 265 F.R.D. at 265 (awarding lead plaintiffs $42,419.50); *In re Comput. Scis. Corp. Sec. Litig.*, 11-cv-0610-TSE-IDD, slip op. at 2 (E.D. Va. Sept. 20, 2013) (awarding $60,905 to institutional plaintiff); *In re Am. Int'l Grp., Inc.*, 2010 U.S. WL 5060697, at *3 (S.D.N.Y. Dec. 2, 2010) (granting PSLRA award of $30,000 to institutional lead plaintiffs "to compensate them for the time and effort they devoted on behalf of [the] class"). Here, Lead Plaintiff ATRS, through its employees, has devoted at least 23 hours to the Action, which included time spent, *inter alia*: (i) conferring with Lead Counsel on a regular basis regarding counsel's strategy for the prosecution and eventual settlement of the case, among other subjects; (ii) reviewing pleadings, motions, and other material documents filed throughout the case; (iii) reviewing Defendants' requests for production of documents; (iv) verifying interrogatory responses; (v) traveling to and attending the formal mediations with Judge Phillips on December 14, 2018 and April 16, 2019; and (vi) analyzing and approving the proposed Settlement. Ex. 2 ¶¶4, 8-10. This is time that these employees were unable to devote to their regular duties on behalf of ATRS. Lead Counsel therefore respectfully submits that the $1,848.96 sought, based on Lead Plaintiff's active involvement in the Action from inception to settlement, is eminently reasonable and should be granted.

## VI.    CONCLUSION

For the reasons stated herein and in the Fox Declaration, Lead Counsel respectfully requests that the Court award attorneys' fees in the amount of 25% of the Settlement Fund and approve reimbursement of Litigation Expenses in the amount of $285,805.92, as well as the proposed award in the amount of $1,848.96 to Lead Plaintiff.

Dated: November 12, 2019                    By: */s/ Frederic S. Fox*_____

Frederic S. Fox (*pro hac vice*)
Donald R. Hall (*pro hac vice*)
Melinda Campbell (*pro hac vice*)
**KAPLAN FOX & KILSHEIMER LLP**
850 Third Avenue, 14th Floor
New York, NY 10022
Telephone: (212) 687-1980
Facsimile: (212) 687-7714

*Lead Counsel for Lead Plaintiff and the*
*proposed Settlement Class*


**BLUE LLP**
Dhamian Blue
205 Fayetteville Street
Raleigh, NC 27601
Telephone: (919) 833-1931
Facsimile: (919) 833-8009
N.C. Bar No. 31405

*Liaison Counsel*


**KESSLER TOPAZ MELTZER**
**& CHECK, LLP**
Andrew L. Zivitz
Geoffrey C. Jarvis
Matthew L. Mustokoff
Margaret E. Mazzeo
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056


**LABATON SUCHAROW LLP**
Jonathan Gardner
Christine M. Fox
Marisa N. DeMato
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477

*Additional Counsel for Lead Plaintiff*